**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| FORD MOTOR COMPANY, | ) |
| Plaintiff, | ) ) ) ) |
| | ) Civil Action No. 3:12CV839 |
| v. | ) ) JURY TRIAL DEMANDED |
| NATIONAL INDEMNITY COMPANY, | ) ) ) ) |
| Defendant. | ) ) ) |

FILED NOV 15 2012 CLERK, U.S. DISTRICT COURT RICHMOND, VA

# COMPLAINT

Ford Motor Company ("Ford"), by counsel, states as follows for its Complaint against National Indemnity Company ("NICO").

## I. PARTIES

1. Ford is a corporation incorporated under the laws of Delaware with its principal place of business in Dearborn, Michigan.

2. NICO is corporation incorporated under the law of Nebraska with its principal place of business in Omaha, Nebraska. NICO is registered to do business in the Commonwealth of Virginia and has appointed a registered agent in Norfolk, Virginia.

## II. JURISDICTION AND VENUE

3. The Court has jurisdiction pursuant to 28 U.S.C. §1332. The parties are citizens of different states and the amount in controversy exceeds $75,000 without interest and costs.

4. Venue is proper pursuant to 28 U.S.C. §1391(b)(1) and (2).

### III. STATEMENT OF FACTS

5. Beginning in 1995, and continuing through the end of 2003, Ford purchased a series of insurance policies from a group of insurers (the "Aggregate Stop Loss Carriers.") These policies indemnified Ford from losses relating to Ford's product liability lawsuit exposure (the "Aggregate Stop Loss Policies.")

6. The Aggregate Stop Loss Policies indemnified Ford for all product liability verdicts, settlements and related litigation costs incurred on account of losses happening within prescribed policy years. A provision in the policy, Exclusion L, put certain limited losses outside coverage if they were insured by prior policies of insurance purchased by Ford that indemnified Ford for specifically-declared and specially-"batched" claims made to those predecessor Ford insurers (the "Batch Claims.")

7. The Aggregate Stop Loss Carriers each assumed a pro-rata quota share of Ford's Aggregate Stop Loss coverage, in a position excess of self-insured retention amounts defined in Ford's individual policies with each participating Aggregate Stop Loss Carrier. The Aggregate Stop Loss Policies provided Ford substantially comparable coverage terms, from carrier to carrier.

### *The Gerling Policies*

8. One of the Aggregate Stop Loss carriers was Gerling-Konzern Allgemeine Versicherungs-Aktiengesellschaft ("Gerling"). Gerling was a 100-year old German insurance company with a proud heritage of serving companies including automobile manufactures such as BMW, Mercedes, and Volkswagen. Gerling was no stranger to Ford's insurance coverage.

Gerling had provided Ford with longstanding worldwide property loss coverage. Gerling had also underwritten European vehicle liability coverage for Ford, and had been one of Ford's Batch Claims carriers, in certain policy years.

9. In 1995, Gerling made a deliberate attempt to join Ford's North American product liability program, initiating meetings with Ford and accepting significant streams of historic product loss information to enable study and prospective premium calculation.

10. After extensive scrutiny, Gerling issued to Ford and Ford accepted a total of four Aggregate Stop Loss Policies (the "Gerling Policies" or, individually, the "Gerling Policy.") The first, incepting on December 15, 1995, was renewable for two additional years under the same terms. The Gerling Policies were in fact renewed or reissued until coverage lapsed December 15, 2003.

11. Through its Aggregate Stop Loss Policies, Gerling agreed to indemnify Ford for certain risks, including product liability claims up to $75 million for claims made each year. This coverage was excess of Ford's self-insured retention of $2 million per claim and attached only after Ford had satisfied a $50 million aggregate retention. The Gerling Policy also obligated Gerling to pay the portion of any single claim against Ford excess of $25 million.

12. The Gerling Policy is a quota share policy, and Gerling insured $32.5 million of the $75 million in the first layer of the Aggregate Stop Loss insurance program. This means that Gerling was obligated to pay Ford a maximum of $32.5 million for occurrences in each of the three years the policy was in effect. In return, Ford paid Gerling a premium annually of $1,245,833, although this fluctuated over time.

### *Ford's Aggregate Stop Loss Claims*

13. Beginning in 1999, four years into the Gerling Aggregate Stop Loss Policy coverage, Ford started receiving notice that the Firestone tires on certain Ford Explorer and other vehicles were de-laminating at travel speeds, a problem precipitated by the mis-manufacture of tires sold to Ford by Firestone. As a consequence of Firestone's failures, by October 8, 2002, Ford had incurred over $680 million in payments to plaintiffs through settlements, verdicts, and related litigation expenses.

14. Ford experienced a second category of losses during this 1995-2003 Aggregate Stop Loss period, namely those obligations potentially associated with several alleged vehicle defects that had been identified as giving rise to "batches" under Ford's prior insurance. These 1995-2003 product liability claims (the "Batch Claims") would have been insured by the Aggregate Stop Loss carriers automatically in the ordinary course but for Exclusion L, which obligated Ford to first attempt insurance of the Batch Claims under the prior "batch" policies. Only when the Batch Claims failed to be insured by the batch carriers could Ford then gain recovery of the portion of these product liability losses falling within the 1995-2003 Aggregate Stop Loss coverage window.

### *Mitigate's Audit of Ford's Claims*

15. In 1995-2003, Ford also experienced a third category of product liability claims, product liability losses that were not related to Firestone tire failure, and were also in no way affiliated with any declared Batch Claims. All told, Ford has incurred over $117 million in such insured "non-batch" claims (called "non-batch" by the parties to distinguish them from Batch Claims and Firestone single-occurrence product liability claims). Ford routinely submitted these non-batch

indemnity and expense claims to the Aggregate Stop Loss Carriers, including Gerling - adhering to agreed processes and procedures.

16. The Aggregate Stop Loss Carriers, including Gerling, hired a claims auditor in common to receive and to process the Ford Aggregate Stop Loss Claims, a company called Mitigate, Inc, of Mt. Carmel, New York ("Mitigate").

17. Ford submitted to Mitigate, and Mitigate validated for carrier consideration and payment, over $260 million of Ford/Firestone losses, over $113 million of which were recovered by Ford under the Gerling Policies. Gerling paid these claims to Ford with reasonable and customary dispatch and timeliness, following relatively patterned payment procedures.

18. Gerling was slower to consider payment to Ford on those claims declared by Ford as potential Batch Claims from 1990-1995. The Batch Claims, with few exceptions, were not insured in full or in part by the batch carriers for various reasons. These "failed" Batch Claims came to be known as the Passive Belt batch, Active Belt batch, Rear Lap Belt batch (post Model Year 1990), and the Rear Impact Fuel Systems batch. The portions of these declared but-non-insured claims that fell within the 1995 – 2003 Aggregate Stop Loss coverage period amounted to $365 million in claims.

19. Gerling refrained from paying these declared-but-non-insured Batch Claims, the only Ford Aggregate Stop Loss Carrier of any significance to assume this non-coverage position to date.

### *Gerling's Corporate Decline*

20. Paying Ford $113 million in insurance obligations on the Firestone liabilities was an unwelcome and non-expected occurrence for Gerling, and a significant drain to Gerling's business operations. In or about 2000, as a consequence of the Firestone rolling insurance

payouts to Ford, Gerling demoted employees responsible for managing Gerling's North American business. Gerling moved the Ford liability business from Gerling's headquarters in Cologne, Germany to its London office, where North American risks were typically understood and managed by a different Gerling team.

21. In or around 2003, Gerling began experiencing deeper financial problems as the company succumbed to changing global insurance markets, slumping economic conditions, and massive Aggregate Stop Loss coverage obligations to Ford in connection with Firestone. On February 26, 2003, Standard & Poor's downgraded Gerling's credit rating precipitously when a German regulatory agency, the Bundesanstalt fur Finanzdienstleistungsaufsicht, blocked the sale of Gerling's reinsurance unit due to concerns about the low level of capitalization by the acquiring company. On April 30, 2003, the Financial Times reported that Deutsche Bank had written its 34.5% stake in Gerling down to zero.

22. As of May 6, 2003, Gerling began attempting to sell all of its operating companies, and it was in talks with another German carrier, HDI. Those talks broke down. Warren Buffett's Berkshire-Hathaway Inc. was rumored to be a suitor for Gerling, but such a deal was never consummated. Years later, Gerling finally did enter into a merger deal with HDI to form HDI-Gerling Industrie Versicherung AG ("HDI-Gerling"). On information and belief, Gerling was purchased by Talanx in 2006, and then was merged into HDI-Gerling in 2007.

### *HDI-Gerling's Retroactive Reinsurance Contract With NICO*

23. Sometime around the time of the HDI and Gerling merger, HDI-Gerling and/or Gerling, without Ford's knowledge, entered into an agreement with defendant NICO of a special type, an insurance transaction know as retroactive reinsurance ("Retroactive Reinsurance.") Retroactive Reinsurance is the bundling of already-declared insurance claims with a "long-tail" payment

prospect that are ceded to a Retroactive Reinsurer, either for a contingency, or premium, or fee to a Retroactive Reinsurer. The cedant gains the regulatory advantage, balance sheet benefit, or peace of mind of no longer bearing primary obligation on the risk. The Retroactive Reinsurer gains compensation based on the spread between the claim as declared, and that claim as paid – or such other calculation. In a Retroactive Reinsurance variant known as "loss portfolio transfer," the cedant gives up control of claim reserves to the Retroactive Reinsurer, which then invests the "float" up to the point of payout on the long-tail claims, keeping for itself the earnings on the invested reserves.

24. NICO is a subsidiary of Berkshire-Hathaway Reinsurance, itself a subsidiary of a Berkshire-Hathaway Inc. NICO is one of the most prolific providers of Retroactive Reinsurance agreements in the world. In his 2006 annual report to shareholders, Warren Buffett pronounced that: "[Berkhsire-Hathaway] is the reinsurer of choice for these coverages...[n]o other company can offer the certainty that Berkshire can...." Berkshire Hathaway, Inc., 2006 Letter to Shareholders, attached as Exhibit A, at p. 9-10.

25. NICO's Retroactive Insurance objectives were plainly stated by Warren Buffett in that 2006 shareholders letter. The key to huge profits, according to Buffett, was to acquire insurance companies with sizeable reserves. "Simply put" extolled Buffett, "float is money we hold that is not ours but which we get to invest." Buffett warned, however, that "[t]he float from retroactive insurance contracts, of which we have many, automatically drifts down over time. Therefore it will be difficult for us to increase float in the future unless we make new acquisitions...." Exhibit A, at p. 7.

26. Buffett postulated in that 2006 report that the profitability for NICO on one featured Retroactive Reinsurance contract, issued to Equitas, would be determined by how much the

"'known' claims will end up costing us, how many [sic] yet-to-be-presented claims will cost, and how soon claim payments will be made and how much we earn on the cash we receive before it must be paid out. [Management] and I think the odds are in our favor. And should we be wrong, Berkshire can handle it." *Id* at p. 9.

### *NICO's Control of Ford's Claims*

27. By virtue of its Retroactive Reinsurance agreement with NICO, the now-merged HDI-Gerling insurance entity shed all or part of the bottom-line obligations to Ford incurred beginning in 1995, and continuing at the time of the Retroactive Reinsurance agreement. Ford was unaware of this. Under this transaction, HDI-Gerling and/or Gerling paid a premium to NICO, or gave up complete or partial financial control in the Ford policies to NICO in a fashion prescribed by the Retroactive Reinsurance contract. In return, NICO agreed to assume Gerling's obligation to indemnify Ford under the Aggregate Stop Loss Policies, in part or in full.

28. As an additional wrinkle on the NICO/HDI-Gerling Retroactive Reinsurance contract, NICO contracted for or otherwise assumed the right to control HDI-Gerling's *claims* function, so that NICO, through its agents and attorneys, could decide which Gerling claims to pay to Ford, the manner in which they would be paid, the claims process to be utilized, and the decision to contest or pay a Ford claim arising from the Gerling policies.

29. With Gerling completely out of Ford's day-to-day claims processes, and HDI-Gerling disinterested in selling future indemnity insurance to Ford, the party now in control of paying Ford's Aggregate Stop Loss claims – NICO – had no incentive whatsoever to act fairly to Ford, or to conduct Ford's claims-paying process to professional and accepted standards of good faith and fair dealing.

30. In Warren Buffett's 2006 shareholder letter he warned both that Retroactive Reinsurance proceeds would go down as claims were paid out to the insured and that the quicker such claims were paid, the less time the Retroactive Reinsurer had to hold the float, and the less money to be made by Berkshire-Hathaway. Despite these market forces, Buffett professed self-confidence in Berkshire-Hathaway's ability to attract these Retroactive Reinsurance deals because of a distinguishing characteristic: the "certainty that Berkshire can [offer the insured] in terms of guaranteeing the full and fair settlement of these obligations." *Id.* at p. 9-10.

31. Instead of adhering to Buffett's principles, however, NICO sought to enlarge its profits by falling victim to the temptation to stall payment of legitimate Ford Aggregate Stop Loss claims. NICO also suppressed claims review activity that was pushing timely payment obligations to Ford, and used its agents and attorneys to adopt a litigation-driven posture that choked off indemnity payments on all of Ford's Aggregate Stop Loss claims, even the ones for which NICO/HDI-Gerling *had no conceivable defense to coverage*, and expressed none to Ford.

### *NICO's Denial of Ford's Non-Batch Claims*

32. On or about February 12, 2010, Ford, writing through its attorneys in Richmond, Virginia, and tired of waiting for indemnity payments for non-paid insurance obligations from HDI-Gerling, demanded of Gerling and other insurance carriers payment of stalled non-batch and other claims. Attached as Exhibit B.

33. In a May 19, 2010, e-mail to Ford's counsel in Richmond, Virginia, Kent Wilson, a lawyer who claimed to be acting on behalf of numerous of Ford's insurers, including Gerling, provided instructions by which Ford could perfect its claims. Advised Wilson: "In the interim, Scott Friedman [a Mitigate, Inc. employee] is prepared to address *any non-batch reimbursement*

requests/reconciliations that Jennie [Sharp, a Ford employee] is ready to submit for review." [Emphasis added.] Attached as Exhibit C.

34. Ford proceeded to submit to Mr. Friedman, from Virginia and elsewhere, extensive claims information supporting Ford's entitlement to payment of non-batch claims and expenses.

35. On or about May 26, 2010, Ford issued a follow-up demand letter to HDI-Gerling and other carriers, insisting on payment for non-batch claims. Attached as Exhibit D.

36. In a June 25, 2010, letter to Ford's counsel sent to Richmond, Virginia, Kent Wilson wrote: "With respect to *the individual aggregate stop loss claims,* Scott Friedman will continue to work with Ford on behalf of the Insurers in order to audit and evaluate the outstanding reimbursement requests." Below Mr. Wilson's signature on the letter appear the words "Joined By" and the name of a number of Ford's insurers, including "Resolute Management Ltd as claims-handling agent for HDI-Gerling Industrie Versicherung AG." Attached as Exhibit E.

37. By winter 2010, Ford had finished providing all requested claim information to Mitigate at substantial expense to Ford of both time and material. In March 2011, Mitigate issued its audit report to Ford's insurers, including Gerling. Attached as Exhibit F. Mitigate's report validated approximately $360,000,000 worth of non-batch claims submitted by Ford. Notwithstanding the completed Mitigate claim audit, Gerling has not paid its share of Ford's non-batch claims, more than $20 million. NICO was at that time of the Mitigate report and has since been actively, aligning with HDI-Gerling and Resolute to interfere with Ford's contractual property rights.

38. Consistent with its prior pattern of interference, on November 19, 2010, NICO directed the filing in the name of HDI-Gerling of an arbitration against Ford which amounted to a denial of the Ford Batch Claims and non-batch claims. Attached as Exhibit G.

39. NICO initiated arbitration as a means of pressuring or frustrating Ford into accepting less than full value for its legitimate Aggregate Stop Loss claims.

40. NICO directed the denial of Ford's non-batch claims by the initiation of arbitration despite having audit clearance from Mitigate already in the files of HDI-Gerling that cleared payment to Ford on non-batch claims, in the amount of over $20 million.

41. NICO has not directed disclosure to Ford of any provision of the Gerling Policies that would establish for NICO/HDI-Gerling a coverage defense to paying non-batch claims to Ford.

42. NICO has not directed disclosure to Ford of credible basis rooted in Ford's information submission, data provision, or other obligation of Ford's to cooperate with HDI-Gerling or Mitigate that would credibly impact Ford's non-batch claims—claims that are fully audited, cleared and payable to Ford.

### *NICO's Vexatious Conduct Toward Ford*

43. In its March 21, 2011, letter response to Ford's counterclaims to HDI-Gerling's arbitration statement, sent to Ford's counsel in Virginia, NICO/HDI-Gerling counsel indicated Ford, "failed to qualify an amount it was purportedly underpaid by HDI-Gerling." Attached as Exhibit H, at p.3. NICO/HDI-Gerling further intoned that "Gerling has properly paid claims where Ford has provided sufficient documentation to show the amount of loss covered under the policies." *Id.*

44. At the point it made these representations, NICO/HDI-Gerling had in its possession for almost two weeks the March 7, 2011 Mitigate report that revised a Mitigate claims-clearance report first released several months previously. NICO/HDI-Gerling's March 21, 2011 representations were therefore false when made, and issued for the purpose of justifying and extending spurious and baseless coverage litigation that forestalled claims payment to Ford.

45. NICO pursued a sharp and vexatious path of declining to pay Ford's non-batch claims even though every one of Ford's other major Aggregate Stop Loss carriers proceeded to pay Ford for its Aggregate Stop Loss claims, or opened and advanced processes to pay Ford those claims, especially Ford's non-batch claims.

46. To date, NICO, operating through the shell of HDI-Gerling's North American enterprise, stands alone in denying Ford Aggregate Stop Loss claims payment.

47. In filing the arbitration against Ford, NICO utilized its Retroactive Reinsurance arrangement with HDI-Gerling, and the claims process control assumed in that transaction, for the purpose of paying Ford less than full value for Ford's valid insurance claims. Ford was not apprised in advance that the party with substantial or principal responsibility for coverage had transitioned from Gerling to NICO.

48. NICO was fully aware of the Gerling Policies, HDI-Gerling's obligations to fulfill those contracts, and the process by which HDI-Gerling was adjusting and conducting the Ford claims payment operation.

49. NICO has caused Resolute Management and its attorneys and agents to make material false statements to Ford and its agents in order to fraudulently conceal NICO's actions. For instance, Kent Wilson's May 25, 2010 letter falsely represented Resolute as HDI-Gerling's claims agent. Ford first became aware of NICO's actions from statements made by Berkshire-Hathaway's Robert Love on September 21, 2012.

50. NICO and HDI-Gerling concealed from Ford NICO's role in managing the Aggregate Stop Loss claims, and did not disclose to Ford that NICO was denying Ford's non-batch claims for improper and tortious motives, fraught with concern only for its own profit and self-dealing.

## COUNT I—TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

51. Ford incorporates paragraphs 1 through 50 as if full stated herein.

52. Ford entered a series of insurance contracts with Gerling, and HDI-Gerling has assumed Gerling's responsibilities under those contracts. NICO was at all relevant times aware of Ford's contracts with Gerling and Gerling's duty to Ford under those contracts.

53. NICO has in the past and continues at the present time to interfere with Ford's contracts, and has used its power, access, and self-dealing motive to induce HDI-Gerling to breach its contracts with Ford. Ford has been damaged as a result of NICO's action.

54. At a minimum, Ford has incurred substantial attorneys' fees in attempting to recover insurance proceeds from HDI-Gerling and in conducting the arbitration. Ford has also been deprived of interest on the insurance proceeds on the non-batch claims for a number of years.

55. NICO also directed the non-payment of Ford's non-batch claims, assuming through agents and attorneys' the role of primary claim adjuster for Ford on the Gerling Policies. NICO failed to conduct its claim handling in good faith, and has utilized sharp and vexatious actions and methods to interfere with proper claims handling pursued by HDI-Gerling. Ford has been damaged as a result. NICO's conduct warrants imposition of punitive damages.

## COUNT II—VIOLATION OF THE VIRGINIA BUSINESS CONSPIRACY STATUTE §§ 18.2-499, and -500

56. Ford incorporates paragraphs 1 through 55 as if full stated herein.

57. NICO agreed with Gerling and/or HDI-Gerling to harm Ford's business interest in recovering on its insurance contracts.

58. NICO and or HDI-Gerling acted intentionally, purposefully, and without lawful justification.

59. Ford has been harmed in its business as a result of NICO's and HDI-Gerling's and/or Gerling's actions. Specifically, Ford has incurred substantial attorneys' fees and been deprived of interests on the insurance proceeds to which it is entitled.

WHEREFORE, Ford Motor Company respectfully prays the Court award it special damages, punitive damages, treble damages and attorneys' fees pursuant to Code of Virginia §18.2-500, injunctive relief, and such other relief as justice may require. Ford demands trial by jury for all claims so triable.

Dated: November ___, 2012                              Respectfully Submitted,

_[signature]_

Scott C. Oostdyk (VSB#28512)
soostdyk@mcguirewoods.com

J. Tracy Walker (VSB#31355)
twalker@mcguirewoods.com

H. Carter Redd (VSB#34392)
hredd@mcguirewoods.com

Matthew D. Fender (VSB# 76717)
mfender@mcguirewoods.com

McGuireWoods LLP
One James Center
901 E. Cary St.
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061

*Counsel for Ford Motor Company*