1               IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                     RICHMOND DIVISION

4

5    -----------------------------------
                                       :
6    FORD MOTOR COMPANY                :    Civil Action No.
                                       :    3:12CV839
7    vs.                               :
                                       :
8    NATIONAL INDEMNITY COMPANY        :    February 7, 2013
                                       :
9    -----------------------------------

10

11    PARTIAL TRANSCRIPT OF THE INITIAL PRETRIAL CONFERENCE

12            BEFORE THE HONORABLE ROBERT E. PAYNE

13               UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   Scott C. Oostdyk, Esquire
     Matthew D. Fender, Esquire
17   McGuireWoods
     One James Center
18   901 East Cary Street
     Richmond, Virginia  23219
19   Counsel for the plaintiff

20   Michael S. Levine, Esquire
     Hunton & Williams
21   1751 Pinnacle Drive
     Suite 1700
22   McLean, Virginia  22102
     Counsel for the defendant

23

24               Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court

1                    P R O C E E D I N G S

2

3          THE COURT:  All right, now, I want to deal with

4    whatever discovery dispute that you have in the way that

5    we would have dealt with it had you followed the rules

6    which is to pick up the telephone and call.  Now, first

7    thing, let's just get the agenda.  What are we dealing

8    with?

9          MR. LEVINE:  Judge, this is NICO's motion to --

10         THE COURT:  No, not a motion.  We're not dealing

11   with a motion.  We're dealing with the discovery dispute

12   that you all can't sort out.  I'm going to deny this

13   motion to compel discovery responses, docket number 30,

14   because it was filed without first complying with the

15   requirements of the pretrial order.  So that motion is

16   denied.

17         Now, I will use what text, what information I

18   have here to read the discovery responses and help out in

19   doing it, but that's the first thing we're going to do.

20   We're going to do it the way we set out to do it.

21         So, first, what is the issue that we are talking

22   about?  All I want to do is get a simple statement of the

23   issues so I have an agenda.

24         MR. LEVINE:  The first issue, Judge, is a claim

25   by Ford that it need not produce documents that are

1    confidential in other proceedings.

2             THE COURT:  Under other protective orders.

3             MR. LEVINE:  That's correct.

4             THE COURT:  So the issue then is, if a document

5    is covered by a protective order but otherwise is

6    discoverable and we don't have any other objections to it,

7    are they required to produce it.

8             MR. LEVINE:  That's correct.

9             THE COURT:  Well, the answer to that, it would

10   seem to me to be, what's in the protective order.

11            MR. OOSTDYK:  I can get specific on that, because

12   I think you just resolved this issue earlier by their

13   withdrawal of interest in the 7.5 million pages.  There

14   was an underlying proceeding, actually two arbitrations in

15   which Ford was required by the arbitration to keep

16   confidential various pleadings and matters submitted to

17   the panels.

18            Judge, that proceeding has no relevance

19   whatsoever, Mr. Levine just conceded, to this particular

20   relationship issue.  That is regarding something called

21   the batch claims that Ford had, and it was an underlying

22   arbitration about batch claims.

23            Those batch claims are not at issue in this

24   relational dispute.  We don't claim interference with the

25   resolution of those, and as a result of that, all of that

1    material is in the non-relevant category that he just

2    conceded.

3         THE COURT:  So is he correct that there was an

4    arbitration regarding what are called batch claims?  We'll

5    call it the batch claim arbitration; is that right?

6         MR. LEVINE:  Judge --

7         THE COURT:  Was there such a thing?

8         MR. LEVINE:  I don't know.  I don't know, Judge.

9    We're talking about either an arbitration or mediation

10   with Ace, an arbitration or mediation with XL.  I don't

11   know --

12        THE COURT:  Who?

13        MR. OOSTDYK:  All about batch claims.

14        MR. LEVINE:  These are other insurance companies,

15   Ace or XL, and I don't know, Judge, what the context of

16   those proceedings involved, but I do want to say, because

17   Mr. Oostdyk has now said three times that NICO has

18   conceded or admitted that the batch claims are not

19   relevant.  That's not true, and it's not what I said.

20        What I said was, there's a better way to get to

21   that information than producing 7.5 million pages.  I just

22   want to be clear about that since we're now on the record.

23        THE COURT:  I hope you want to be clear all the

24   time, whether we're on the record or not.

25        MR. LEVINE:  That's true, Judge.

1          THE COURT:  So we're talking about documents that

2     were produced during the arbitrations between Ford and

3     Ace; is that right?

4          MR. OOSTDYK:  Ford, for ten years, had an

5     insurance relationship --

6          THE COURT:  Is that right; yes or no?

7          MR. OOSTDYK:  Ace and XL, two different --

8          THE COURT:  Wait a minute.  I'm taking them one

9     at a time.  Ace and Ford had an arbitration, and XL and

10    Ford had an arbitration; right?

11         MR. OOSTDYK:  And then there was one other

12    mediation.

13         THE COURT:  And then there was a mediation.

14    What's the name of the mediation?

15         MR. OOSTDYK:  That mediation was also with XL.

16         THE COURT:  So it's XL mediation, and it's

17    different; is that right?

18         MR. OOSTDYK:  Yes, sir.

19         THE COURT:  And there were documents produced in

20    those -- in the arbitrations, two arbitrations and the

21    mediation.

22         MR. OOSTDYK:  Pursuant to a protective order

23    entered by that panel.

24         THE COURT:  And there's a protective order that's

25    in place as to each one of them.

1        MR. OOSTDYK:  Correct, Judge.

2        THE COURT:  Is it the same protective order in

3   each case, or is it different?

4        MR. OOSTDYK:  Different.

5        THE COURT:  So there are three protective orders.

6        MR. OOSTDYK:  Well, there's two protective orders

7   in the arbitrations, and then there's a mediation

8   agreement where the mediator agrees the whole thing is

9   confidential pursuant to the mediation.  Judge, NICO

10  directed an effort in the arbitration --

11        THE COURT:  Which arbitration?

12        MR. OOSTDYK:  In the arbitration that Ford is

13  having with NICO over other matters --

14        THE COURT:  Let's call that some other name.  You

15  all know this stuff, and short form stuff doesn't help

16  decide issues.  So there's another arbitration, and

17  there's an arbitration pending now between whom?

18        MR. OOSTDYK:  Ford and HDI-Gerling run by NICO.

19        THE COURT:  And we're not talking about documents

20  in that arbitration.

21        MR. OOSTDYK:  No, we're not.

22        THE COURT:  Okay, so --

23        MR. OOSTDYK:  What's going on, though, is that in

24  that proceeding, NICO instigated communications with XL

25  and Ace asking them to release their protected

1    information.  Ford took a passive position on that,

2    because it's not our deal to break.  It belongs to XL and

3    Ace.  They are the ones that initiated those seeking of

4    the protective orders in the first place.

5            THE COURT:  But you are a party to it.

6            MR. OOSTDYK:  We're a party to it, but -- we're a

7    party to it, and we took a passive position in those

8    contexts, but XL and Ace, in each instance, to our

9    knowledge, refused to release, because that communication

10   would have come back through NICO.  We haven't heard that

11   they agreed.

12           So we're not at liberty to produce things that

13   we're not understanding that XL and Ace have released our

14   ability to produce, because we're the ones bound by the

15   protective order.

16           THE COURT:  Let me just get this straight.  If a

17   document is relevant in one case, and it's a contract, and

18   there's communication about the contract, is it your

19   position that if a nonparty to a -- that if there's a

20   protective order in an arbitration involving that contract

21   was entered, and the document was produced in that, that

22   once that's subject to protective order, if there's a

23   subsequent litigation, that the same document, if relevant

24   to the litigation, can't be produced because there's a

25   protective order in the first one?

1          MR. OOSTDYK:  No, that's not our position.  Our

2     position is that --

3          THE COURT:  Because that can't be right.

4          MR. OOSTDYK:  That's right.  Pleadings -- the XL

5     and Ace, because it's London arbitration, take great pains

6     to make sure that their pleadings and procedures are

7     outside the public purview.  They view it as private

8     contract.

9          We were bound into that as an obligation, and so,

10    therefore, we have to keep all the matters submitted into

11    London arbitration confidential.  That's a requirement of

12    the court in a London arbitration.

13         THE COURT:  That's not right.  Let's suppose that

14    in a London arbitration you make an admission that says

15    that NICO doesn't have any responsibility for any of this.

16    Are you saying they can't have access to that because of

17    this agreement in this other court?

18         MR. OOSTDYK:  No, Judge.  The only position that

19    we've taken is that because that's a matter of binding

20    obligation -- imagine if you believe you are in a

21    protected environment, and you believe you submitted

22    things that have gained you protection and that's

23    contractual.  It's like breaking a contract in Ford's

24    view.

25         The contract required this confidentiality.

1    We're not voluntarily at liberty.  That's why we

2    participated in the proceeding that they instigated, to

3    try to get XL and Ace to remove the confidentiality.  We

4    participated in that, and XL and Ace, to my knowledge,

5    said, no, or they would be telling me that --

6              THE COURT:  Is that right?  Did you ask Ace and

7    XL to reduce the documents subject to the protective order

8    in the arbitrations between Ford and Ace and Ford and XL?

9              MR. LEVINE:  Judge, from the documents that Mr.

10   Oostdyk showed me, it appears that that was done.

11             THE COURT:  Wait a minute.  I asked you did you

12   do it.

13             MR. LEVINE:  No, I did not.

14             MR. OOSTDYK:  Kevin Lewis did, Judge, who is

15   running both --

16             THE COURT:  Who is Kevin Lewis?

17             MR. OOSTDYK:  He's the principal who is running

18   what we have alleged to be a sham arbitration against

19   Ford, and he's also running the nonpayment of these

20   particular claims.

21             THE COURT:  Who is he?

22             MR. LEVINE:  Judge, he is assistant general

23   counsel of NICO.

24             THE COURT:  Of NICO.  Is it NICO or NICO?

25             MR. LEVINE:  We can go either way.

1              THE COURT:  Which does the company use?

2              MR. LEVINE:  They use both, Judge.  Let's go with

3     NICO.

4              THE COURT:  You know, you are here demanding

5     these documents, and you haven't found out if your client

6     asked for these arrangements to be made?

7              MR. LEVINE:  Judge, I don't believe that's

8     relevant to this issue.

9              THE COURT:  I do.  If it's covered by another

10    protective order and you initiated a request, and they say

11    you did, to have one of the parties to the protective

12    order waive the requirement for protection, then you have

13    to know the answer to that, and let's suppose that your

14    client initiated that -- I assume they did -- and they

15    were told no, then you come here, and without giving them

16    notice of that, you want me to do something that changes

17    that arrangement.  You can't do that.

18              MR. LEVINE:  Judge, I believe the requests --

19              THE COURT:  You understand that, don't you?

20              MR. LEVINE:  I do understand that, Judge, but I

21    think there's a time issue here.  The requests that Mr.

22    Oostdyk is referring to were not made in any recent events

23    and certainly not in the context of this litigation.  I

24    believe these precede this litigation.

25              THE COURT:  But they were made by your client,

1  according to him.

2          MR. OOSTDYK:  In October, Judge.  A month before

3  this got filed.  I participated in two phone calls to

4  Bermuda arranged by Mr. Lewis --

5          THE COURT:  He is your client?  You go deal with

6  Mr. Lewis.  I'm not dealing with this until you all get

7  that straight.  That's ridiculous.  What you are doing is

8  putting the Court -- where does Mr. Lewis operate; in

9  Bermuda?

10          MR. OOSTDYK:  He's in Connecticut.

11          THE COURT:  Mr. Lewis may end up being down here

12  a lot.  Is he running this case?

13          MR. LEVINE:  He is running this case, Judge.

14          THE COURT:  You tell Mr. Lewis that the way we do

15  things down here is a little different than maybe he's

16  accustomed to, and before he makes any decision that

17  impacts this case, he needs to understand the following

18  things:  One, he isn't running this case, you are, your

19  firm.  You are the ones responsible here, and you tell him

20  what to do.  He doesn't tell you what to do.

21          That's the way it works.  Because you are an

22  officer of the court, you are responsible for what goes on

23  here, and if he wants you to get around some agreement

24  that he tried to get around earlier, he can't use you as a

25  stalking horse to do it and use this litigation as a

1   stalking horse to do it.

2            I don't want to be involved in that, and I'm not

3   going to spend my time on it, and I'm going to spend my

4   time and you all are going to spend your time on things

5   that are important to the disputes that are before this

6   Court.  So that issue is off the table.

7            Now, basically, the mere fact that something, if

8   it's otherwise relevant, is subject to another protective

9   order doesn't foreclose its production here, but it

10  certainly does give -- if the same document is relevant to

11  two protective orders, it gives the participants to the

12  protective order a right to be heard in this Court before

13  the document is produced.  That's just fundamental

14  fairness.

15           And so, you know, they may not even -- and

16  basically my experience has been if you write them and

17  tell them and you've talked to the counsel, and they say,

18  oh, we don't care, and then they waive it and it's done,

19  and I don't ever have to get into it.

20           You've got the cart before the horse here, so

21  that's out.  What is the other topic?  We're not even

22  dealing with these other protective order issues because

23  they are not ripe for resolution.

24           MR. LEVINE:  Sure.

25           THE COURT:  What is the next question that you

1    all...

2           MR. LEVINE:  Judge, the next issue concerns

3    specific responses to interrogatories.

4           THE COURT:  Where are they?

5           MR. LEVINE:  First two are interrogatories six

6    and seven.

7           THE COURT:  Where are they?  That's what I'm

8    looking for.  Which page here?  Okay, here they are on

9    page four of your memo.  Interrogatory six, "Explain in

10   detail what is meant by the statement in the February 12

11   demand letter; is that what you are talking about?

12          MR. LEVINE:  Yes, Judge.

13          THE COURT:  Let me read that.  So you want an

14   answer to that interrogatory.  Did they answer it?  Is the

15   response --

16          MR. LEVINE:  That's the response.

17          MR. OOSTDYK:  Judge --

18          THE COURT:  Let me read the response.

19          MR. OOSTDYK:  Okay.

20          THE COURT:  Is the response the response to

21   interrogatory six or interrogatory seven or both?  I can't

22   tell that.

23          MR. LEVINE:  Judge, the response was -- that's

24   the initial response, and it was to both interrogatories.

25   You will then see below a supplemental response.

1          THE COURT:  Okay.  So Ford supplemented it with

2    the supplemental response, okay.

3          MR. LEVINE:  That's correct, Judge.

4          THE COURT:  What's wrong with the response then?

5          MR. LEVINE:  I don't believe it responds to the

6    question.

7          THE COURT:  Which question?  There are two

8    questions.

9          MR. LEVINE:  We're focusing on the supplemental

10   response to number six.  I believe on the next page is the

11   supplemental response to number seven, Judge, and we've

12   laid out what we believe Ford should be providing with

13   regard to that interrogatory.  It should be itemized on

14   the next page.

15         THE COURT:  All right, what do you say --

16         MR. OOSTDYK:  Two things, Judge.

17         THE COURT:  -- about number six?

18         MR. OOSTDYK:  Number six, they asked us about a

19   letter we wrote them February 12th, 2010, demanding in the

20   same letter payment on the batch claims and the non-batch

21   claims as we've discussed previously.  The batch claims

22   are not at issue in this arbitration.  The batch claims

23   are --

24         THE COURT:  We don't have an arbitration.

25         MR. OOSTDYK:  I'm sorry, litigation.  In this

1    litigation, the batch claims are not at issue.  What they

2    asked us about was the batch claims.  They asked us to

3    define a line in that letter that goes to --

4           THE COURT:  You are saying that if you read the

5    letter in full, the question in interrogatory six relates

6    to the statement that pertains to batch claims only?

7           MR. OOSTDYK:  Exactly.  Only batch claims.

8    There's no other germane information concerning what's at

9    issue in this litigation, so they want us to define, for

10   other purposes probably --

11          THE COURT:  We don't know.

12          MR. OOSTDYK:  -- statements made --

13          THE COURT:  Why -- is that right, Mr. Levine, if

14   you read that letter in whole?  If I pick that letter up

15   right now and read it, will it relate to the batch claims;

16   yes or no?

17          MR. LEVINE:  No.  It relates to all of the

18   claims, batch and non-batch.

19          THE COURT:  Give me the letter.

20          MR. OOSTDYK:  It's Exhibit B to the --

21          THE COURT:  I don't have all that stuff.

22          MR. LEVINE:  Judge, I don't have a copy of that

23   letter.

24          THE COURT:  Do you have a copy of it?

25          MR. OOSTDYK:  I didn't bring it, Judge.

 1             MR. LEVINE:  Actually, Judge, I may have a copy

 2  of it, although it's going to have my markings on it.

 3             THE COURT:  What is the number of this case?

 4             MR. FENDER:  2:12CV839.

 5             MR. LEVINE:  Judge, I have it right here.

 6             THE COURT:  Where is two statement?  Point it out

 7  to me.

 8             MR. LEVINE:  Right here, Judge.  It continues on

 9  to the next page.

10             THE COURT:  Well, it looks to me like that the

11  very sentence from which this quote comes says that it

12  pertains to batch matters because it says, "however, and

13  thus batch coverage did not exist for losses incurred in

14  connection with those later model vehicles."  That's what

15  that sentence says.

16             MR. LEVINE:  Judge, and that would be correct.

17  It is in the section of the letter that pertains to batch

18  claims, but the issue that's raised in that letter

19  pertains to all of their claims.

20             THE COURT:  That isn't the question I asked you.

21  I said, is the statement made in --

22             MR. LEVINE:  Judge, the answer to the question

23  accurately, the statement is made in the context of all of

24  Ford's claims.

25             THE COURT:  That may be the way you read it.

1  That is the not the plain meaning of it.  The objection to

2  number -- the request on number six is that, A,

3  interrogatory six, the answer is that it pertains --

4  statement made pertains to batch claims, and the issue

5  then is, are the batch claims at issue in this litigation,

6  and that's the next issue.

7       MR. LEVINE:  And they are.

8       THE COURT:  And you say they aren't?

9       MR. OOSTDYK:  We say they aren't.

10      THE COURT:  Why do you say they're not?

11      MR. OOSTDYK:  Because we pled a claim that they

12  interfered with our non-batch claims, and we've identified

13  433 claimants where these particular cases pending since

14  2001 were interfered with by NICO, and not one of them is

15  a batch claim, and we've asserted to Mr. Levine in two

16  letters and three phone calls that we're not seeking a

17  nickel relating to interference with batch claims.

18      THE COURT:  Okay.  Now, why do you say, since

19  they've told you the pleadings don't mention these claims

20  and they've told you in writing that those claims aren't

21  at issue, they're not making any claims respecting those

22  things, batch claims, why do you think the batch claims

23  are at issue in the case?

24      MR. LEVINE:  Judge, for one, and this statement

25  hits the nail on the head, at issue is whether Ford's

1    claims are covered and whether it had a right to payment

2    that could have been interfered with.  To determine that,

3    one of the issues, Judge, is whether they had an

4    expectation or an intent to cause the injuries that led to

5    these claims.

6         This statement goes directly to Ford's state of

7    mind, expectation, and intention, and that's exactly what

8    they say --

9         THE COURT:  That's the statement.  I'm not asking

10   about the statement.  I'm asking you why the batch claims

11   are at issue.

12        MR. LEVINE:  Judge, because those batch claims,

13   Ford concedes, it expected and intended.  It's the claims

14   and injuries at issue in those claims that are exactly the

15   same as the injuries that are at issue and give rise to

16   the non-batch claims.

17        If they expected injuries in one category of

18   claim, Judge, there's no reason to believe that they

19   didn't for the other.  The claims are indistinguishable

20   with regard to what caused the claims and what the level

21   of expectation or intent was at Ford.

22        THE COURT:  What is the difference between batch

23   claims and non-batch claims?

24        MR. LEVINE:  It's simply a matter of how they are

25   categorized and presented to the insurance carriers under

1    different policies.

2          THE COURT:  Is non-batch claims shorthand for the

3    claims of Robert Payne and Mr. Levine and Mr. Neal and Ms.

4    Peterson?  Is that a shorthand way of saying that those

5    claims, among others, are included in those, in the claims

6    that are at issue?

7          MR. LEVINE:  I don't believe so, Judge.

8          THE COURT:  What does batch claims mean?

9          MR. LEVINE:  Mr. Oostdyk may be able to explain

10   it better than I, but my understanding, Judge, is that

11   batch claims derives from the policies themselves.  The

12   pre-1995 policies, the batch policies, afforded coverage

13   for a series of similar types of claims that could be

14   aggregated together as a batch, and they had very high

15   threshold retentions that had to be met.

16         So Ford would -- if it had a group of claims that

17   fit the parameters of a batch, they were similar enough,

18   they'd be put together --

19         THE COURT:  Those claims have been made, have

20   they not?

21         MR. LEVINE:  They have been made.

22         THE COURT:  They were made by Ford, and there was

23   a list of names associated with them, wasn't there?  So

24   batch claims is a way, simply, of saying that's these

25   claims that are comprised of all these names, and

1    non-batch claims is a way of saying these claims in this

2    non-batch are comprised of Smiths and Jones and Marys and

3    everybody else's; right?  Yes or no?

4           MR. LEVINE:  No.

5           THE COURT:  You mean to tell me you can't tell

6    what the batch claims are and the non-batch claims are by

7    looking at the names if they've already been submitted?

8           MR. OOSTDYK:  You can, Judge.

9           MR. LEVINE:  Some of the non-batch claims started

10   out as batch claims.  They're now non-batch claims.

11          THE COURT:  You know what?  The way, as I

12   understand the pleadings and the way I understand your

13   communications, batch claims have a meaning contractually

14   because they can be submitted in a batch, and non-batch

15   claims have a meaning contractually because they can't be.

16   They have to be submitted individually.

17          But as insofar as we are concerned today, we know

18   the universe of batch claims, and we know the names of

19   every batch claim in the batch claims; right?

20          MR. OOSTDYK:  Yes.

21          THE COURT:  Yes.  I mean, you do.  You have to

22   admit that.  And as far as today is concerned, i.e., the

23   filing of the case and today, those dates, we know what

24   claims are comprised or constitute the non-batch claims by

25   name, don't we?

1           MR. LEVINE:  We don't know that.

2           THE COURT:  They know.

3           MR. OOSTDYK:  Judge --

4           THE COURT:  And I bet you you do know.

5           MR. OOSTDYK:  I have to interject the facts every

6    now and then because --

7           THE COURT:  Wait a minute.  Is that right or not?

8           MR. OOSTDYK:  What you said is right.  Beyond

9    right, you made an order, Judge, making them produce

10   Mitigate documents if you recall.  Ford submitted from

11   2001 to the present day all the claim information to their

12   vendor Mitigate who sorts all this stuff out, and we

13   attached to the complaint the Mitigate report that

14   validates all this stuff.  Mr. Levine doesn't know this,

15   but his clients know this.  He hasn't --

16          THE COURT:  Mr. Levine doesn't know it?

17          MR. OOSTDYK:  He hasn't learned his case, Judge,

18   and that's why there's factual -- not misrepresentation.

19   I don't want to besmirch my colleague, but there are

20   factual representations --

21          THE COURT:  Misapprehensions.

22          MR. OOSTDYK:  Yeah.  There's factual information

23   born of his non-understanding of how the claim is set up.

24          THE COURT:  All right.  Now, number seven.

25   Anything else on interrogatory six and seven?

1        MR. LEVINE:  With regard to the batch claims

2    being relevant, Judge, yes.

3        THE COURT:  No, regarding anything.  I'm ready to

4    rule on it.  I want to move on.

5        MR. LEVINE:  I want to make sure that the record

6    is clear, Judge, that the batch claims are relevant for

7    several reasons.  I said one, and I articulated that

8    reason, that the level of expectation translates across

9    the spectrum of claims, batch or non-batch.

10        THE COURT:  I don't understand why that would be

11    so.

12        MR. LEVINE:  If they knew a certain defect

13    existed, if they knew that a certain flaw in their vehicle

14    was likely to cause an injury, and it caused an injury

15    that was -- where you had a series of injuries during a

16    certain point in time and they could be aggregated into a

17    batch, but then other injuries that were also similar but

18    for other reasons didn't qualify --

19        THE COURT:  I think I understand that.  What I'm

20    asking you is, why does that have anything to do with this

21    case which does not involve -- it involves your

22    interference with the contractual relationship.

23        MR. LEVINE:  It gets to the right that allegedly

24    is interfered with, Judge.

25        THE COURT:  What?  How?

1        MR. LEVINE:  Because the only way that right

2   exists is if these claims are covered under the policies.

3   That's the only way.

4        THE COURT:  Well, that's a very broad statement

5   that I'm not sure I have a predicate to understand, but it

6   really makes no sense to me right now, and beyond that, in

7   context of this particular interrogatory, this is tied to

8   batch claims.  So is number seven.  Is it tied to batch

9   claims?

10       MR. LEVINE:  It is, Judge.

11       THE COURT:  I mean is it tied in the same

12   structural way as in the sentence that we read from six?

13       MR. LEVINE:  Yes, Judge.

14       THE COURT:  So they relate to batch claims.  The

15   interrogatory has been adequately answered by the

16   supplemental responses.  The things that you've asked for

17   in pages six and seven of docket number 30 are not

18   material, are not proper and necessary to answer the way

19   you posed the question.  So your concern is resolved, and

20   that's the end of that.  They're not going to have to

21   answer any further on six and seven, interrogatory six and

22   seven.  Is there anything else?

23       MR. LEVINE:  Yes.  May I ask you just to clarify

24   that the ruling is with regard to interrogatory six and

25   seven and not to be construed --

1          THE COURT:  All I'm ruling on is six and seven,
2     but I'm going to tell you something.  You have a long way
3     to go before you convince me that the batch claims are
4     relevant.  I don't understand why they are.
5          I don't even -- tell me something.  Do we have
6     any other things that are the subject of your dispute that
7     we're going to try to resolve?
8          MR. LEVINE:  Yes, Judge.
9          THE COURT:  What are they?
10          MR. LEVINE:  Interrogatory number 17.  It should
11     be next in sequence in the brief.
12          THE COURT:  Nope.  Interrogatory 18.
13          MR. LEVINE:  I'm sorry.
14          MR. OOSTDYK:  17 is in there, Judge.  He just
15     didn't break it out in a separate -- he put it in the text
16     of the paragraph on the top of page eight.
17          MR. LEVINE:  I apologize, Judge.  I don't have
18     the motion in front of me.
19          MR. OOSTDYK:  You can use my copy.  This is an
20     easy one, Judge.  He served one request for -- one
21     interrogatory that said if you denied any of my 50
22     admissions, state all facts that support why you denied my
23     50 admissions.
24          And our view was that we cite case law that said
25     that's improper.  You can't ask one interrogatory that

1  says if you denied any of my 50 admissions, state all

2  facts as to why you denied any of my 50 admissions.

3         THE COURT:  What case do you say prohibits that?

4         MR. FENDER:  Your Honor, we had a case -- it was

5  in our letter to Mr. Levine which I think you have.

6         MR. LEVINE:  Judge, I believe we cited it in our

7  brief.

8         MR. FENDER:  It was a California District Court

9  case.  It was a case that provided good analysis and

10 essentially makes the point that that allows you to

11 endlessly multiple your interrogatories by asking a whole

12 bunch of request for admissions and using one

13 interrogatory, and the rules clearly set out a limit of

14 number of interrogatories.  We think it is an improper

15 compound interrogatory that's trying to do an end run

16 around that.

17        THE COURT:  Where is the case cited in your

18 brief, Mr. Levine?

19        MR. LEVINE:  Judge, is it --

20        THE COURT:  Is it?

21        MR. LEVINE:  It starts at the bottom of page 12

22 and carries on to the top of page 13.  It's the *Safeco v.*

23 *Rawstron*.

24        THE COURT:  So this deals with number 17 or 17

25 and 18?

 1          MR. OOSTDYK:  Just 17.  Judge, we gave a letter
 2   that has the quote from the case if that would be of
 3   interest to you.  This is my letter --
 4          THE COURT:  I think I know the case.  I think
 5   I've used it before.  Is this *American Chiropractic* Judge
 6   Wilson's case?
 7          MR. OOSTDYK:  I don't know.
 8          THE COURT:  The Western District of Virginia
 9   case.
10          MR. FENDER:  Your Honor, I don't remember who the
11   judge was.  The case didn't have a good quotable language
12   but essentially reached the same conclusion.
13          THE COURT:  All right.  Anything else?
14          MR. LEVINE:  Judge, yes.  I think the
15   interrogatory is a proper interrogatory.  There is no
16   limit on the number of request for admissions under the
17   federal rules, and to take Ford's position that somehow
18   you can only ask an interrogatory with regard to a limited
19   number of request for admissions counters the purpose of
20   request for admissions.
21          You should be able to explore the reason that you
22   get unqualified -- a qualified admission or denial, and to
23   take Ford's position would mean that we put in their hands
24   the ability to use up all of our interrogatories.  If we
25   ask 50 request for admissions, they can deny or qualify

1   their responses to the first 21 or 30, whatever the limit

2   may be in a particular case, and exhaust a party's

3   interrogatories, and that would be patently unfair.

4           THE COURT:  Anything else?

5           MR. OOSTDYK:  Judge, there are rules about

6   subsections and subparts of interrogatories.  This is a

7   clearly defined admission, and they said, if we asked you

8   50 admissions, we might ask you 50 more, and if you could

9   go in and by one blanket interrogatory address that, you

10  are basically taking a written deposition of the parties,

11  making them establish the entire facts of their case

12  through the rubric of one interrogatory that has 50

13  subparts.

14          THE COURT:  All right.  The decision of *Safeco,*

15  and I feel quite certain I know *American Chiropractic*

16  *Association* from the Western District in 2002, and I think

17  I've ruled the same way, this is improper use of an

18  interrogatory.  It's an improper practice.  It's not

19  allowed.  So you're not going to get anywhere with that

20  interrogatory.

21          Let's look at number 18.  What is your problem

22  with their answer here?

23          MR. LEVINE:  Judge, it's an evasive response.  It

24  doesn't answer the interrogatory in any meaningful way,

25  and the position we received back from Ford is they didn't

1  understand what we meant by coverage.  It's a term, Judge,

2  they use throughout their complaint.

3          THE COURT:  But you say in here that they said

4  they were going to supplement it.

5          MR. LEVINE:  And they did not.  We didn't receive

6  a supplemental response.

7          THE COURT:  You said February 4th.  They said

8  they were going to supplement it, and then you filed this

9  on February 6th.  That's two days later.

10          MR. LEVINE:  No, we received their supplemental

11  responses on February 4th, Judge, and there was no

12  response to 18.

13          MR. OOSTDYK:  Judge, if we --

14          THE COURT:  You say on February 4th, Ford

15  acknowledges response to number 18 was deficient and

16  offered to supplement.  That presupposes that something is

17  coming after they did that.

18          MR. LEVINE:  And, Judge --

19          THE COURT:  That's a wrong statement?

20          MR. LEVINE:  It's unclear, Judge, yes.

21          THE COURT:  It certainly is to me.

22          MR. LEVINE:  We received two things from Ford on

23  February 4, a letter from Mr. Oostdyk where he offered to

24  supplement --

25          THE COURT:  Excuse me.  Was there any supplement

1    at all?

2              MR. LEVINE:  No, Judge.

3              THE COURT:  So this paragraph in the middle of

4    page eight here of your paper is now the extant response;

5    is that right?

6              MR. LEVINE:  That's correct, Judge.

7              THE COURT:  What do you say?

8              MR. OOSTDYK:  Judge, we didn't understand the

9    question, and, therefore, we asked for clarification of

10   the interrogatory, and then we did offer to supplement

11   once we understood what they were asking.

12             We just didn't understand it.  We didn't know

13   what "all issues of coverage" meant, and so we just asked

14   for clarification of that.  We got no clarification.

15   We'll happily answer what we know.  We've answered

16   everything they've asked for.  We've provided 125,000

17   documents.  We've done everything they've asked.

18             THE COURT:  I understand.  That doesn't have

19   anything to do with answering an interrogatory.  I think

20   that you know what coverage means, and you can answer the

21   first part of it.

22             The second part of it is burdensome and really an

23   abuse of the use of the process, so I'm not going to

24   require anybody to answer the second part of it.  If you

25   think their coverage -- you know what the coverage issues

1    are in the arbitration.  You know what things aren't going

2    to be resolved.  Say those things.

3                MR. OOSTDYK:  Okay, Judge.  We'll do it.

4                THE COURT:  How long will it take you to file it;

5    ten days?

6                MR. OOSTDYK:  We'll take three, Judge.  We want

7    to get it out of the way.

8                THE COURT:  So that takes care of everything you

9    all were going to bring up in that motion that's been

10   denied; right?

11               MR. LEVINE:  Yes, Judge.

12               THE COURT:  Is this a jury trial or bench trial?

13               THE CLERK:  Jury.

14               MR. LEVINE:  Jury trial.

15               THE COURT:  What is the trial going to be about,

16   and how long is it going to take?

17               MR. OOSTDYK:  Judge, from the plaintiff's side,

18   it's going to be about NICO's systemic interference with

19   Ford's contracts with HDI-Gerling, and it's going to

20   take --

21               THE COURT:  I know, but --

22               MR. OOSTDYK:  It's going to take, we'd estimate

23   about four days of substantive testimony, five days

24   probably with a day of rebuttal but maybe four.

25               THE COURT:  How about you?  How long will your

1   case take?

2          MR. LEVINE:  Judge, probably about the same.  I'm

3   anticipating a week.

4          THE COURT:  You are anticipating the trial will

5   last a week, or you're anticipating your part --

6          MR. LEVINE:  For defendant's case, Judge.

7          THE COURT:  That's two weeks.

8          MR. OOSTDYK:  Yes.

9          THE COURT:  I don't understand what your case is

10  about.  What did they do?

11         MR. OOSTDYK:  They took complete control over a

12  --

13         THE COURT:  Who is "they"?

14         MR. OOSTDYK:  NICO.  They took $310 million worth

15  of reserves that -- actually worth of premium and treated

16  it as a float out of which they had to pay claims.  They

17  paid no claims -- they paid no non-batch claims, and they

18  asserted no defense to that while under complete control

19  of claims handling.  They did it for purposes --

20         THE COURT:  How could they not pay the claims --

21         MR. OOSTDYK:  That's the great question.

22         THE COURT:  -- without explaining the reason?

23         MR. OOSTDYK:  That's a great question.  There's

24  never been a reason.

25         THE COURT:  They refused to pay the claim -- they

1    denied the claim and didn't give you any reason.

2            MR. OOSTDYK:  Yes, sir.

3            THE COURT:  Did they say deny?

4            MR. OOSTDYK:  No.  They just didn't pay.  You

5    actually, Judge, read the letter in 2010 -- Mr. Levine put

6    it in front of you -- where we said, hey, these claims

7    have been pending a very long time, pay the claims, and

8    response to that we got, and it's in the complaint, Judge,

9    we got the direction to work with Mitigate to get your

10   stuff approved, and then work with Mitigate.

11           We did it.  Mitigate issued final reports in

12   March of 2011 and August of 2012.  Claims were all

13   cleared, expenses were all --

14           THE COURT:  What does "claims all cleared" mean?

15           MR. OOSTDYK:  The process they set up was that --

16           THE COURT:  Did Mitigate say, pay the claims?

17           MR. OOSTDYK:  Mitigate cleared through all

18   expenses Ford submitted.  There was no objections

19   registered to Ford.

20           THE COURT:  I don't understand what "cleared"

21   means.

22           MR. OOSTDYK:  What "cleared" means is that there

23   was no objections outstanding from Mitigate as to the

24   content of any claims submitted.

25           THE COURT:  So in the process, does Mitigate

1    recommend the payment of the claims, or does it not?

2              MR. OOSTDYK:  We're not exactly sure, because

3    that's something that's done between Mitigate and the

4    carriers, and they haven't produced any documents, so we

5    don't know what Mitigate is telling them.

6              All we know is on the back end, Mitigate is

7    telling us there's no deficiencies, and we've got no

8    payment of claim and we got no denial and we got no

9    coverage position taken by NICO.  So we don't know why we

10   haven't been paid 433 claims.

11             THE COURT:  And there are 433 claims?

12             MR. OOSTDYK:  433 claimants, but sometimes there

13   were five people in one car.  So it's about 318 claims and

14   433 claimants.

15             THE COURT:  Okay.  That's what this case is

16   about, the interference with the contracts in respect of

17   the payment of those 400-something claims.

18             MR. OOSTDYK:  That's right, Judge.

19             THE COURT:  And the violation of the business

20   conspiracy statute by virtue of the same essential

21   conduct?

22             MR. OOSTDYK:  Yes, Judge.

23             THE COURT:  Looks to me like it's fairly simple

24   to deal with that.  Now, you all have solved the problem

25   about the seven million documents.  You're not going to be

1   needing them; is that right?

2            MR. LEVINE:  We have not solved that problem.

3            THE COURT:  Solve it.  Just understand you have a

4   limited base of claims here, and you need to go sit down

5   and solve it.  Don't bring it to me until you have sat

6   down and really dealt with it face to face.  Forget this

7   letter-writing campaign that you all are on and get it

8   done.

9            All right, have you all talked about a trial date

10  and the discovery plan, et cetera?

11           MR. OOSTDYK:  We did, Judge.

12           THE COURT:  What is the discovery plan?

13           MR. OOSTDYK:  We've already undertaken the

14  process, you know, first of all get the documents

15  together.  I was under the assumption, based on their

16  discovery requests, that, you know, we had to get all the

17  underlying claims files prepared which we're going to do.

18  Production starts March 1 and will be done April 1 of 2.5

19  million documents relating to the 433 claims.

20           THE COURT:  Are you doing it in a rolling

21  production?

22           MR. OOSTDYK:  Yes, yes, and we're going to be

23  starting that as soon as we have stuff.  Our view --

24           THE COURT:  I thought you already had it.

25           MR. OOSTDYK:  We do, Judge --

1        THE COURT:  And I thought they had it, submitted

2   to Mitigate.

3        MR. OOSTDYK:  Let me explain.  Judge, all of the

4   expense portion, which is what Mitigate -- all they ever

5   asked us to submit is all the expenses.  So when any law

6   firm sends a bill to Ford on a case, that's all covered on

7   this insurance.

8        All that expense process, all the underlying

9   claims files have gone in.  Mitigate's asked Ford for

10  everything they ever wanted to see from Ford.  Mitigate

11  has not one outstanding request on any of the 433.  That's

12  now either been solved or in the process of being solved

13  through the kind of process you wanted in discovery,

14  orderly communication back and forth.

15       THE COURT:  When you submit a claim to a claims

16  handler, you submit everything in the package.

17       MR. OOSTDYK:  That's correct.

18       THE COURT:  And it's already -- and that involves

19  what is the claim, what's the discovery we've taken, what

20  are the pleadings in the case, what does the doctor report

21  say, what does the opinion letter of the lawyer say, and

22  all that stuff goes to the claims representative; right?

23       MR. OOSTDYK:  Everything they've ever asked

24  for --

25       THE COURT:  No.  Is that the kind of stuff we're

1  talking about?  And there's bound to be a standard list of
2  things that you have to provide them.
3          MR. OOSTDYK:  Correct.
4          THE COURT:  And you've been given that.
5          MR. LEVINE:  No, Judge --
6          THE COURT:  Mitigate --
7          MR. LEVINE:  They have not provided the claim
8  files.  They've not provided the expert reports.  They've
9  not provided the pleadings, Judge, and that is the reason
10  that these claims have not been paid, because they've not
11  been tendered.
12          MR. OOSTDYK:  He's on treacherous territory,
13  Judge, because he does not know the facts.
14          MR. LEVINE:  Then demonstrate the facts, okay,
15  because the --
16          THE COURT:  No, no.  Huh-uh.  You're wrong about
17  that.  You came in here and make that kind of charge when
18  he says it has been provided, it's your obligation to go
19  to your claims people and look in there and see what they
20  have provided.
21          MR. LEVINE:  And, Judge, I've inquired.
22          THE COURT:  I didn't ask you to inquire.  I asked
23  you -- your duty is to go look at it.  You have to go see.
24          MR. LEVINE:  Judge, we're producing the
25  documents.  You ordered us --

1          THE COURT:  Here is the thing:  Why do you want
2     them to produce two million pages of stuff that's already
3     been produced to you?
4          MR. LEVINE:  Because nobody has ever tendered the
5     claims.  Nobody has ever submitted a claim.  Mitigate is
6     an auditor.  They're accountants.
7          THE COURT:  Nobody has ever submitted a claim?
8     Who is it that's required to submit --
9          MR. LEVINE:  Ford must tender claims under the
10    policies.
11         THE COURT:  To who?
12         MR. LEVINE:  To their insurance company, to
13    HDI-Gerling.  Let me back up, Judge.  NICO entered into a
14    transaction, a reinsurance transaction.  They purchased a
15    book of business from HDI-Gerling to administer Ford's
16    product liability claims.
17         THE COURT:  And to pay them.
18         MR. LEVINE:  To pay covered claims that are
19    submitted under the policies, that fit coverage under the
20    contours of the policies.  The claims that we're dealing
21    with here were never tendered under the policies.  They
22    were different --
23         THE COURT:  What do you mean by "tendered"?
24         MR. LEVINE:  They weren't submitted in the form
25    that a claim needs to be submitted setting out the date of

1   the occurrence, that damages are because of bodily injury

2   or property damages, that they otherwise satisfy the terms

3   and conditions --

4          THE COURT:  What did Ford send to Mitigate?

5          MR. LEVINE:  They sent a bunch of numbers.  They

6   said, these are our expenses, these are our invoices, and

7   Mitigate, being a claim auditor, i.e., an accountant,

8   crunched the numbers and said, these are the dollar

9   values.

10         They never said the claims were covered.  They

11  never told Ford, you're going to get payment.  Ford never

12  submitted --

13         THE COURT:  This is what I'm hearing you say:

14  Ford is here in court alleging interference with the

15  claims handling process for claims that Ford never

16  submitted to anybody.

17         MR. LEVINE:  That's correct.

18         THE COURT:  Is that right?

19         MR. LEVINE:  That is correct, Judge.

20         THE COURT:  I want you to understand what you

21  just said.  You just said that they violated Rule 11.

22         MR. LEVINE:  That's not what I'm saying.

23         THE COURT:  Yes, you are saying that.  When you

24  say --

25         MR. OOSTDYK:  That's what he's saying.

1             THE COURT:  I don't think you have your facts

2   straight, and I think you better get them straight.

3             MR. LEVINE:  Judge, the difference here is that

4   they're saying they submitted --

5             THE COURT:  Because it's not in your answer that

6   you say that.

7             MR. LEVINE:  What I'm saying, and I want to be

8   clear, Judge, because this is important --

9             THE COURT:  You are dancing, and I'm very

10   frustrated with it.  It's impossible for me to believe

11   that you wouldn't have asserted in your answer that they

12   never submitted any claims.

13             MR. LEVINE:  We did, Judge.

14             THE COURT:  Maybe I missed it.

15             MR. LEVINE:  We raised it as an affirmative

16   defense that they didn't comply with the terms and

17   conditions of coverage, they didn't establish an

18   occurrence, they didn't establish and satisfy the

19   retentions.  These are the issues, Judge, and these are

20   going back to what we discussed earlier.  This is why --

21             THE COURT:  Here's your answer.  Would you help

22   me out by showing me where it says that they never

23   tendered the claims, never submitted them?

24             MR. LEVINE:  Judge, it should be under the

25   affirmative defenses.

1          THE COURT:  I'm terribly sorry if I missed it.

2    Do you want my copy?  Which affirmative defense is it?

3          MR. LEVINE:  Affirmative defense number 15,

4    Judge, claims barred to the extent it's determined that

5    Ford is not entitled to coverage under the policies.

6          MR. OOSTDYK:  To the extent?

7          THE COURT:  Okay, let me explain something.  That

8    isn't right.  That doesn't even address what I asked you,

9    and if that's the way you're going to approach the defense

10   of the case, you're going to be in trouble and your client

11   is going to be in trouble, and you're going to start

12   paying legal fees for making statements that aren't right.

13          Now, you are in trouble right now, because, in

14   essence, you have told me that you have pled something

15   that you can't point to and that the basis of your defense

16   is really that they never submitted a claim for payment,

17   they never tendered it.

18          Now, it's one thing to say that a company

19   tendered the claim but it was incomplete.  It's one thing

20   to say the company tendered the claim but it was legally

21   insufficient to warrant payment.

22          It's quite another thing to say the claim wasn't

23   tendered, and you must be careful in what you are saying,

24   Mr. Levine, because you told me something that I don't --

25   is not in your pleadings, and when I ask you to stand and

1  deliver, you pointed to a provision of your answer that

2  doesn't even remotely relate to that point.

3          MR. LEVINE:  Judge, if I may explain --

4          THE COURT:  I'm going to set a trial -- I don't

5  want any explanation.  So what I want you to do is get

6  yourself sorted out.  You have some people here in town

7  who probably understand how this Court operates.  It might

8  behoove you to use them.

9          I'm not sitting here spending -- I'm not spending

10  any of this Court's time in making anybody else have --

11  them or you or your client or their client have a

12  litigation over something so fundamentally basic as

13  whether or not a claim has been submitted.  They've either

14  been submitted or it wasn't.  It's that simple.  What

15  trial date did you all discuss?

16          MR. OOSTDYK:  Your Honor, I was targeting July

17  just because I was looking at the fact we have a rolling

18  production that will be concluded in the spring.  There's

19  going to have to be -- there will be some 30(b)(6)

20  depositions to clarify issues before then, but some will

21  be --

22          THE COURT:  How many depositions are you talking

23  about taking from your side?

24          MR. OOSTDYK:  I think probably eight is my guess

25  based on the people they identified as being material.  Is

1  that right, Matt?  Maybe ten?

2          MR. FENDER:  Eight to ten.

3          THE COURT:  How about you, Mr. Levine?

4          MR. LEVINE:  Judge, about the same on

5  depositions.

6          THE COURT:  Same people?

7          MR. LEVINE:  Eight to ten depositions.

8          THE COURT:  Same people?

9          MR. LEVINE:  No, Judge, same number, about eight

10  to ten depositions.

11          THE COURT:  Where are they?  Where are the

12  deponents situate?

13          MR. OOSTDYK:  Well, some are in the NICO

14  operations in Connecticut, I assume.  One they've named is

15  an official of HDI-Gerling who is in Germany.

16          THE COURT:  It takes a long time to take a German

17  deposition.

18          MR. OOSTDYK:  It does.

19          THE COURT:  Unless you can get the German person

20  to come over here or you can get it done -- you've got all

21  the across-the-international-borders issues in taking

22  international discovery.

23          MR. OOSTDYK:  Yeah.  I just took a German

24  deponent from the same company that the parties agreed to

25  put up in London in another matter, and that solved the

1   whole problem of the German procedures.

2          So then -- so there's that, and then I don't know

3   where the rest of their witnesses are located.  I assume

4   Mr. Lewis and Ms. Raiguel, and then you mentioned that

5   deputy general counsel may or may not have known anything

6   about this.  So mostly Connecticut.

7          THE COURT:  So you have maybe 20 witnesses to

8   depose.

9          MR. LEVINE:  That's right.

10         THE COURT:  And they're all parties basically, or

11  nonparties.

12         MR. LEVINE:  There are some nonparties, Judge.

13         THE COURT:  How many nonparties?

14         MR. LEVINE:  We're looking at witnesses form Ace

15  and XL, both nonparties.  Those witnesses are, I believe,

16  based down in the Caribbean in Bermuda.  There are

17  witnesses from Marsh who is Ford's broker.  Those

18  witnesses, correct me if I'm wrong, are in London.

19         MR. OOSTDYK:  No.  Well, one is no longer with

20  Marsh, but the one that's with -- actually both of the

21  ones you are talking about, Ms. Elvidge and Mr. Bacon, are

22  no longer with Marsh.

23         MR. LEVINE:  Your Honor, the Ford employees are

24  in Michigan for the most part.

25         MR. OOSTDYK:  A lot of them are no longer with

1   Ford, but they are accessible to Ford and cooperate.

2           MR. LEVINE:  Judge, going back to the documents

3   if I may, we're going to be receiving two and a half

4   million pages of material from Ford by April 1.  NICO is

5   entitled to a fair opportunity to review that material.

6           This is material that is Ford's proprietary

7   information.  They've had this under their breast for

8   years.  Mr. Oostdyk is familiar with it.  He's been

9   involved in the arbitration for years.  This is

10  information that we'll see for the first time April 1, and

11  we will need a fair opportunity to review that before we

12  get into the depositions, Judge.  Two and a half million

13  pages is a lot of paper to go through.

14          MR. OOSTDYK:  Two responses, Judge.  First of

15  all, we indicated we'll start the rolling production

16  March 1.  Secondly, I'm growingly getting steamed about

17  this idea that this is the first opportunity that anybody

18  has had to ask for case files --

19          THE COURT:  Don't get steamed, because we don't

20  have a steam relief valve.

21          MR. OOSTDYK:  I know that, but if I have to hear

22  one more time that Ford -- the first time Ford has ever

23  been asked for any of these materials relating to these

24  433 claims is Mr. Levine's document request.

25          THE COURT:  I thought you told me you gave them

1    all this stuff before.

2              MR. OOSTDYK:  No, Judge.  What I told you is

3    everything that they asked for to audit the claim, we gave

4    them.  It's not Ford's job to submit to the auditor what

5    Ford wants the auditor to see.  The auditor gives a big

6    list of what it wants from Ford.

7              Ford -- they've cleared $112 million of claims,

8    other claims, using this same exact procedure, okay,

9    before NICO was running the show and holding up all the

10   flow.  That procedure has been in place per the parties

11   since 2001.

12             THE COURT:  So one of the issues is why did NICO

13   change the procedure.

14             MR. OOSTDYK:  Exactly.  We think we know.

15             THE COURT:  All right.  So what is your point

16   about these documents apart from the first time you asked

17   for them or whenever you asked for them?

18             MR. LEVINE:  The point is, Judge --

19             THE COURT:  What point are you making?

20             MR. LEVINE:  -- that they are being produced in

21   this litigation.

22             THE COURT:  But the point is, what do you want?

23             MR. LEVINE:  I want time to review them.

24             THE COURT:  I know.  How much?

25             MR. LEVINE:  If I receive those documents, two

1    and a half million pages by April 1, I'm going to need --

2            THE COURT:  You're going to get them before

3    April 1.

4            MR. LEVINE:  Between March and April.  So that's

5    one month right there.  I'm going to need at least three

6    months to review these materials, Judge, and then take the

7    depositions.

8            THE COURT:  What I'm asking you is what do you

9    want in the way of time, and I'm not going to sit here and

10   do the calculation for you.  I want you to tell me.

11           MR. LEVINE:  I think we can start depositions,

12   Judge, in July, and we can then -- we've got 20 or so

13   witnesses.  I would imagine over the course of two

14   months --

15           THE COURT:  This is painful.  How about what

16   trial date do you suggest in order to give yourself the

17   time you think you need?  Let's try that.

18           MR. LEVINE:  I would think something at the end

19   of the year, Judge.

20           THE COURT:  The end of the year?

21           MR. LEVINE:  End of 2013.

22           MR. OOSTDYK:  Judge, could I be heard on this?

23   The two and a half million pages of documents pertain to

24   matters that his witnesses aren't going to know anything

25   about because they never saw.  So, therefore, they could

1    have asked for any of that stuff.

2            I don't know why, with all the lawyers he has

3    available to him, he can't put together in 45 days a

4    review of 433 repetitive underlying claim files.  All you

5    have to adduce out of that was, what's the nature of the

6    accident, is it covered by the policy or not.

7            It's something they should have done reflexively

8    when they first started receiving these claims in 2001,

9    and when Mitigate issued the reports --

10           THE COURT:  I'm not sure what that's got to do

11   with anything in the case anyway.

12           MR. OOSTDYK:  I don't know either.

13           THE COURT:  Your theory is not -- your theory is

14   that they adopted a business practice which stopped the

15   payment.

16           MR. OOSTDYK:  That's right.

17           THE COURT:  And did not allow for the handling of

18   the claim.  They just arbitrarily did it, not on the

19   merits of the claim.

20           MR. OOSTDYK:  Exactly, Judge.

21           THE COURT:  So we're not going back and litigate

22   the merits of the claim.  Did your clients review the

23   merits of the claim?

24           MR. LEVINE:  Judge, we haven't seen the claims.

25           THE COURT:  Did your clients review the merits of

1    the claim?

2          MR. LEVINE:  Judge, they reviewed what was

3    provided to them by Ford.

4          THE COURT:  Did your clients deny a claim on the

5    basis of its merits?

6          MR. LEVINE:  Judge, the claims weren't tendered;

7    therefore, they couldn't be denied.

8          THE COURT:  Then you're not going to need to get

9    into whether or not a claim ought to be denied or not

10   denied on the basis of the underlying merit of the

11   individual claim.  You're not going to get into that.

12   Your review doesn't really need to do that.

13         You can't now bootstrap what you did before.

14   You're going to litigate what it is that you did and

15   whether or not that was what you had to do.  That's what

16   it's all about.  So you're not going to need all that time

17   that you think you're going to need.  Or if you do, you're

18   going to have to hustle to get it done.

19         MR. OOSTDYK:  We'd propose a July trial, Judge,

20   and we'd be -- we think the parties can clearly organize

21   and discipline themselves with good cooperation to do

22   that.

23         MR. LEVINE:  Judge, I disagree.  They are

24   producing that volume of material by April 1.  A July

25   trial is impossible.  It would be highly prejudicial.

1          THE COURT:  Oh, I don't think so, Mr. Levine.  I

2    think you could try it in July, to tell you the truth, but

3    we will begin the trial on the 3rd day of September at

4    9:30 in the morning.  It's a jury trial; right?

5          MR. OOSTDYK:  Yep.

6          THE COURT:  Anybody can't do that?

7          MR. OOSTDYK:  Nope.

8          THE CLERK:  On the 3rd of September.

9          THE COURT:  Right.  That's the day after Labor

10   Day.

11         MR. OOSTDYK:  How long are you allocating for

12   that, Judge?

13         THE COURT:  I don't really know.  I'll look at it

14   at two weeks.  I just don't think -- if your time estimate

15   is based on the assumption you're going to go now back

16   through and litigate each -- and decide whether each

17   individual claim has merit, and you didn't ever do that to

18   begin with, then you are not going to be able to present

19   that kind of evidence, I don't think, and you may want to

20   revise your time estimate.

21         I can't envision how that would be pertinent,

22   because the issue is what did you do and why did you do

23   it, and were you authorized to do it, and you tell me that

24   you never got the claims so you never ever looked at them

25   on their merits.  So that can't possibly be the basis for

1    anything.

2         MR. LEVINE:  Judge, if I may, it's difficult in

3    the abstract without having seen this material to

4    determine exactly what issue we're going to try, but I can

5    tell you this:  That those documents may hold the key as

6    to why Ford didn't present all of the information to

7    Mitigate, and that's certainly a relevant issue for this

8    case, Judge.

9         THE COURT:  When are you going to file your

10   response to this reconsideration motion?  I just haven't

11   calculated the dates.  I don't know when it's due.

12        MR. OOSTDYK:  We got served yesterday, Judge.

13        THE COURT:  So you have 11 days.

14        MR. OOSTDYK:  Yes, but we don't want this hanging

15   over our heads, so we're going to try to get it done as

16   early in the week as we can next week.  We think it's kind

17   of an easy reply given the standard is a manifest error of

18   law.

19        THE COURT:  He's also saying that we don't have

20   subject matter jurisdiction for the first time in this

21   case, and it is correct that it should have been raised

22   earlier, but if there is a question of subject matter

23   jurisdiction, then I have to decide that.

24        MR. OOSTDYK:  We will look at that, Judge.  I'd

25   be shocked if there were.

1          THE COURT:  I think he's saying -- I haven't

2   studied this.  I think he's saying that by virtue of

3   something that was in the opinion or that I concluded, now

4   there isn't any case or controversy.  Isn't that what you

5   are saying?

6          MR. LEVINE:  That's correct, Judge.

7          THE COURT:  I don't know any more than what I

8   just told you because I haven't studied it.

9          MR. OOSTDYK:  We haven't studied it either.  We

10  just got it last night, but we believe it to be pretty

11  easy to dispense with.

12         THE COURT:  All right, Magistrate Judge Novak

13  will be your settlement judge.

14         THE CLERK:  How many days are you allowing for

15  the trial?

16         THE COURT:  Two weeks.  I don't know they're

17  going to need it, but let's see.  That's September 3

18  through -- what is that date?

19         MR. LEVINE:  Two weeks would be the 17th.

20         THE COURT:  All right, the final pretrial

21  conference will be August 5 at 10:00 a.m.  I want you to

22  go put -- you have to do a date -- how about your experts?

23  Do you have any experts that are going to be used?

24         MR. OOSTDYK:  Yes, Judge.

25         THE COURT:  How many, what kind?

 1          MR. OOSTDYK:  We will have two that I'm aware of

 2     right this minute.  One would be an expert in what a

 3     proper claims handling process is for purposes of

 4     insurance claims submission, and then the second will be

 5     an expert on the damages, the rightness and reasonableness

 6     of the extra work that was done by Ford to prepare its

 7     claim for submission and would be validating those costs

 8     as reasonable in the markets in which they've been

 9     provided.

10          THE COURT:  Are you claiming attorneys' fees as

11     part of your case?

12          MR. OOSTDYK:  We are but in two ways.  One is

13     they are part of the tort damages in that Ford had a

14     higher hill or had more weight in the saddlebags because

15     of all the claims, obstreperous claims behavior to which

16     Ford was exposed, and, therefore, there were lawyers' fees

17     that were involved, but they are really just the cost to

18     Ford of bringing the claims that it should not have had to

19     borne but for the tortious interference.

20          And then separately, of course, Your Honor, we

21     get -- under the statutory conspiracy, we get fees for

22     bringing this suit.

23          THE COURT:  If you win on that, are those issues

24     decided by the jury, or are they decided by the Court as

25     to, A, whether you get attorneys' fees and how much under

1   18.2-499-500?

2        MR. OOSTDYK:  Mixed.  The part of our damages

3   that were the heavier saddlebags would be a jury issue, we

4   believe, and then the part that would be for bringing the

5   litigation starting with our bringing the claim would be

6   an issue for the Court is the way I view it.

7        THE COURT:  Do you agree with that, Mr. Levine?

8        MR. LEVINE:  Judge, honestly, I would have to

9   take a closer look at that statute.

10        THE COURT:  I think you better look at it.  My

11   recollection is that the attorneys' fees question is

12   decided by the Court insofar as reasonableness and the

13   quantum of it, but whether or not you get attorneys' fees

14   may be decided by the jury.  I can't remember now.

15        MR. OOSTDYK:  We'll look at that, Judge.

16        THE COURT:  Judge Novak for settlement.  It's

17   plaintiff's responsibility to get a date with Magistrate

18   Judge Novak.  Let me tell you, you may as well understand

19   right now that you have an obligation to participate in

20   good faith in the settlement, and you might as well tell

21   Mr. Lewis that's right.

22        Mr. Lewis is certainly welcome to attend the

23   settlement, but it's not sufficient.  You have to have a

24   business person attend the settlement.

25        MR. LEVINE:  I was going to suggest, my

1    experience is these conferences are typically more

2    productive if a party is required to do that.

3           THE COURT:  And the same thing for you.  You can

4    have counsel attend if you want to, but the businesspeople

5    have to attend.

6           MR. OOSTDYK:  We have a businessperson arranged

7    to participate.  Judge, we've talked to Judge Novak's

8    chambers just because we know dates fill up fast, and he

9    had March 18th.

10          THE COURT:  How did you talk to Judge Novak?

11          MR. OOSTDYK:  Well, we misunderstood that from

12   your initial pretrial order as an obligation of the

13   parties to do during the preceding arrangement.

14          THE COURT:  Not until somebody has been assigned.

15          MR. OOSTDYK:  Right.  So we just assumed that and

16   made contact for date purposes, because the businesspeople

17   get so busy, we just wanted to make sure they had

18   availability.

19          THE COURT:  I want you all to take the scheduling

20   order, and I want you to use that, and I want the dates

21   for the depositions built in.  I want you to do a pretrial

22   order that has the expert depositions and disclosures and

23   all of that stuff in it and not use this X days before the

24   trial, and kick everything -- everything now gets kicked

25   not from the trial date but to the final pretrial

1  conference date.  So everything has to be done before

2  then.  That's how you build your schedule.

3          MR. OOSTDYK:  Got it.

4          THE COURT:  All right.  I want you all to review

5  it, go over it, get it back here so I can sign off on it.

6          THE CLERK:  Do you want me to just not send this

7  one out?

8          THE COURT:  That's fine.  I'm talking about the

9  scheduling order.  You still have to do the things that

10 are in this for the final pretrial order.  In the initial

11 pretrial conference order, it sets out what you have --

12 what the form of the final pretrial order is.  You still

13 have to do that, but I'm talking about Pretrial Schedule A

14 and how you are scheduling things.

15         Plus, I want you to build in -- I want the

16 deposition dates.  You don't have to have a specific date,

17 but you have to have the periods during which you're going

18 to be taking depositions, and you can agree on a discovery

19 cutoff that makes sense.

20         Just understand something.  I don't see how this

21 can be a summary judgment case, but if anybody does, you

22 have to have all your discovery done before I entertain

23 summary judgment.  Anything else?

24         MR. OOSTDYK:  Nope.  All set.

25         THE COURT:  All right, thank you all very much.

1           MR. OOSTDYK:  Thank you, Judge.

2           MR. LEVINE:  Thank you, Judge.

3

4               (End of proceedings.)

5

6

7       I certify that the foregoing is a correct

8   transcript from the record of proceedings in the

9   above-entitled matter.

10

11

12   _____/s/_____              _____
     P. E. Peterson, RPR                Date
13

14

15

16

17

18

19

20

21

22

23

24

25