**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| FORD MOTOR COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:12-cv-839 |
| v. | ) | |
| | ) | |
| NATIONAL INDEMNITY COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT NATIONAL INDEMNITY COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PROTECTIVE ORDER**

**\*\*ORAL ARGUMENT REQUESTED\*\***

## Table of Contents

Page

Table of Exhibits ........................................................................................................ iii

Preliminary Statement ................................................................................................ 1

Background ................................................................................................................. 1

    I.      The Reinsurance Agreement Between NICO and HDI-Gerling................................ 1

    II.     Ford's Awareness of NICO's and Resolute's Role ..................................... 2

    III.    The Mitigate Claims-Handling Facility ......................................................... 4

    IV.    Ford's Attempt to Recover "Batch" Claims, and Its Impact on the Mitigate Process. ...................................................................................................... 5

    V.     Payments to Ford from September 2007 through Early 2011. ................... 7

    VI.    Ford Disrupts the Established Loss Verification and Payment Process. ................... 8

    VII.   The Arbitration Regarding the ASLP Is Ongoing. ................................... 10

This Discovery Dispute............................................................................................. 11

    I.      Ford's Requests for Documents Relating to Reserves............................. 11

    II.     Ford's Interrogatory for Reinsurance Information ................................... 12

Argument ................................................................................................................. 13

    I.      Rule 26 Authorizes the Court to Limit the Discovery of Irrelevant and Proprietary Information. ....................................................................... 13

    II.     Ford Is Not Entitled to HDI-Gerling's Reserves Information. ................. 14

        A.    Reserves are Unreliable, Irrelevant, and Not Discoverable. ......... 14

        B.    This is Not a "Bad Faith" Case. ................................................. 15

        C.    NICO's Evaluation of Reserves Information Is Highly Proprietary, and Its Disclosure Would Irreparably Harm NICO........................ 17

    III.    Ford Is Not Entitled to HDI-Gerling's Reinsurance Information............. 18

Conclusion ............................................................................................................... 18

**Table of Exhibits**

| Exhibit No. | Description |
|---|---|
| 1 | Reinsurance Agreement between National Indemnity Company and HDI-Gerling |
| 2 | Declaration of Steve Whitley |
| 3 | Declaration of Kevin Lewis |
| 4 | Feb. 29, 2008 Emails from John Yacoub to James Hopson and Dan Ames (FMC0010528-FMC0010529) (Under seal) |
| 5 | October 17, 2002 invoice for fee related to shared placements fees between Ford and Berkshire Hathaway (Under seal) |
| 6 | June 11, 2009 Resolute Payment Requisition to Ford |
| 7 | Ford Spreadsheet Tallying Gerling Payments (produced in native format at (NICO002286) (Under seal) |
| 8 | Excerpt of Feb. 7, 2013 Initial Pre-Trial Hearing Transcript |
| 9 | Jan. 17, 2011 emails between Scott Friedman and Scott Oostdyk |
| 10 | Ford's Second Supplemental Response to Interrog. No. 22 & Ex. B |
| 11 | April 2, 2013 Letter from Kevin Lewis to Scott Oostdyk |
| 12 | Ford's Motion to Compel Reinsurance and Reserves Information (Under seal) |
| 13 | HDI-Gerling's Opposition to Ford's Motion to Compel Reinsurance and Reserves Information (Under seal) |
| 14 | HDI-Gerling's Amended Arbitration Demand (Under seal) |
| 15 | Ford's First Request for Production of Documents |
| 16 | NICO's Objections to Ford's First Request for Production of Documents |
| 17 | NICO's First Privilege Log |
| 18 | Ford's Second Set of Interrogatories |
| 19 | NICO's Objections to Ford's Second Set of Interrogatories |
| 20 | NICO's Responses to Ford's Second Set of Interrogatories |

**Preliminary Statement**

Defendant National Indemnity Company (NICO) seeks a protective order that would preclude discovery of three categories of information that Ford has requested in discovery: (1) the loss reserve information of NICO and its reinsured, HDI-Gerling Industrie Versicherung AG (HDI-Gerling), relating to Aggregate Stop Loss Policies (ASLP) issued by HDI-Gerling to Plaintiff Ford Motor Company; (2) NICO's highly proprietary and confidential method of evaluating HDI-Gerling's reserves in connection with the negotiation of the Reinsurance Agreement with HDI-Gerling; and (3) HDI-Gerling's reinsurance information relating to the HDI-Gerling Ford ASLP.  Under settled law, this type of information is simply not discoverable.

Ford seeks to evade this law by characterizing this case as something it is not—a type of "bad faith" coverage case.  Ford has done so through factual allegations in the Complaint and statements by Ford's counsel on the record that are, at best, incomplete.  In some instances, they are demonstrably false.  The Court needs to hear the rest of the story.  NICO therefore includes in this brief a sample of some of the incontrovertible facts that have been developed in discovery to date.  These facts put this discovery into proper context and demonstrate why Ford has no right to NICO's and HDI-Gerling's reserve and reinsurance information.

**Background**

**I.    The Reinsurance Agreement Between NICO and HDI-Gerling**

In December 2007, NICO agreed to reinsure a discrete portfolio of HDI-Gerling insurance policies, which included the Aggregate Stop Loss Policies underlying Ford's claims here (the "Covered Liabilities").  Ex. 1.   Under that agreement, HDI-Gerling transferred to NICO HDI-Gerling's "rights, duties and obligations, including direct payment rights, with respect to the administration, defense, negotiation, settlement or litigation of all Covered

1

Liabilities," subject to an aggregate limit.  Ex. 1 at 5 (Condition (1)).  NICO therefore is entitled

(if not required) by contract to administer Ford's claims under the HDI-Gerling policies.  NICO

engaged Resolute Management, Ltd. to perform this role, and HDI-Gerling transferred claims-

handling responsibility to Resolute in February 2008.  Ex. 2, Declaration of Stephen Whitley

(Whitley Decl.) ¶ 3.

Before entering into the Reinsurance Agreement, NICO carefully evaluated HDI-

Gerling's loss reserves on the portfolio of policies to be reinsured (of which the ASLP is only

part), to inform its determination of the premium NICO would require in exchange for taking

over HDI-Gerling's portfolio.  Unsurprisingly, the method NICO uses to evaluate such portfolios

is highly proprietary and confidential.  Ex. 3, Declaration of Kevin Lewis (Lewis Decl.) at ¶ 5.

## II.    Ford's Awareness of NICO's and Resolute's Role

Ford alleges that the Reinsurance Agreement was concealed from Ford, and that Ford

first learned of it at a deposition in 2012.  *See, e.g.,* Ford's Mem. in Opp'n to NICO's Mot. for a

Stay (Docket No. 14) at 4-5 and Ex. D.  This is false.  While neither NICO nor HDI-Gerling was

under any duty to disclose NICO's role as HDI-Gerling's reinsurer, the arrangement was by no

means hidden from Ford.

Indeed, documents produced in discovery in both this case and the related arbitration

show that Ford was made aware of the arrangement years before the 2012 deposition that Ford

cites as the "Aha!" moment.  Specifically, on February 28, 2008, HDI-Gerling told Dan Ames

(Ford's Associate Director for Corporate Insurance) that Resolute would be taking over the

handling of claims under the Ford ASLP.  Ex. 4 at FMC0010529 (Feb. 28, 2008 6:44 PM email

from John Yacoub).  Ford is a sophisticated player in the insurance industry, and anyone with

that kind of familiarity of the market knows who Resolute is—it is the third-party administrator

for Berkshire Hathaway's reinsurance business, which includes NICO.  But any ambiguity on

2

that score was resolved by an email from John Yacoub to Dan Ames the next day, explaining

why Resolute's Steve Whitley would not be attending a mediation in an underlying Ford auto

liability case:

> Steve Whitley is based in London, and is ***Berkshire Re's TPA***, so
> going to mediations is not part of his mandate.  And even if it
> were, he is currently wading through the tidal wave of information
> and paper that has been dropped on [him] ***as part of the transfer of
> the Gerling business to Berkshire***, so he would not be in a
> position to deal with this now, anyway.  In fact the considerable
> challenge that the transfer poses for all of us involved with it
> makes situations like this extremely difficult at the moment.

Ex. 4 at FMC0010528 (Feb. 29, 2008 6:00 PM email from John Yacoub) (emphasis added).

Were Ford curious about which Berkshire entity was involved, it did not need to look far.

Berkshire Hathaway's 2008 annual report specifically identifies NICO as "Berkshire Hathaway

Reinsurance Group's lead insurance entity."  *See* Berkshire Hathaway Inc. 2008 Annual Report

at 46, *available at* www.berkshirehathaway.com/2008ar/2008ar.pdf.   But Ford knew this

already—Ford was doing business with NICO as a reinsurer as early as 2002.  Ex. 5.  And an

invoice relating to that relationship produced by Ford in the arbitration makes clear the

connection between Berkshire and NICO.  *Id.*

        In sum, even though neither HDI-Gerling nor NICO had any obligation to disclose the

newly-executed reinsurance agreement between them, Ford was in fact informed of the

transaction.  Ford's allegation in this litigation that "Ford was not apprised in advance that the

party with substantial or principal responsibility for coverage had transitioned from Gerling to

NICO," Compl. ¶ 47, is—to be charitable—materially misleading.  And Ford's repeated

allegations of concealment, *see* Compl. ¶¶ 49, 50, are downright false.

### III.    The Mitigate Claims-Handling Facility

In a simple insurance coverage matter with one insured and one insurer and one policy year, claims handling can be fairly straightforward.  The insured suffers a loss, it notifies the carrier and submits a claim if it believes the loss is covered, and if the carrier agrees that claim is covered the carrier pays.  The Ford ASLP program at issue here was not so simple.

Ford's coverage regime included no fewer than 20 insurers, each of which had its own unique set of coverage obligations.  So when Ford suffered a loss, such as an adverse verdict in a product liability suit, a series of questions had to be answered to determine what each insurer was required to pay:  Where did the loss occur?  When did it occur?  Has Ford exhausted its self-insured retention?  Have certain layers of coverage been exhausted, thus triggering subsequent layers of coverage?

Because Ford's coverage program was so complex, the process of presenting loss information to the array of carriers was anything but straightforward.  The process was so complicated that in 2002 the insurers engaged Mitigate, Inc. to analyze loss information submitted by Ford, verify that Ford made payments in connection with losses that were potentially covered, and then allocate payments among the insurers.  To be clear, Mitigate was not charged with making coverage determinations.  Ex. 2, Whitley Decl. ¶ 4.  It rather verified loss information provided by Ford and allocated payment responsibility for those losses among Ford and the participating insurers.

As a general matter, the Mitigate process consisted of four sequential steps.  Ex. 2, Whitley Decl. ¶ 4.  First, Ford would advise Mitigate that Ford had incurred losses that Ford believed were covered and invite Mitigate to review the relevant case files.  This was not a "claim submission"—Ford would not, for example, tell Mitigate that it has paid X amount in a given case and then provide its own calculation of what each insurer should pay.  Ford would

4

simply ask Mitigate to come and tally what Ford had paid in certain cases and come up with its own recommended allocation.

Second, Mitigate would conduct its review of Ford's case files and generate a "Payment Recommendation." This recommendation would reflect Mitigate's first cut at allocating losses (assuming they were covered) to Ford and the various participants. Third, Mitigate would send that draft report to the insurers for review. This step was critical. The insurers did not give Mitigate any authority to approve claims or to conclusively allocate costs among the various layers of insurance. Instead, it was up to each insurer to either accept or reject the payment recommendation.

Finally, after each insurer had accepted the recommendation, Mitigate would generate a formal Payment Request to each insurer. *See e.g.,* Ex. 2, Whitley Decl. Ex. A.

From the time that Resolute began administering claims on behalf of HDI-Gerling after the execution of the Reinsurance Agreement until early 2011, this process worked well and resulted in Ford being paid on a regular basis, primarily for non-"batch" claims. The audit and ultimate payment on a group of "Land Rover" claims in 2010 demonstrate how the process worked. On June 1, 2010, Scott Friedman at Mitigate sent an email to representatives for the various insurers that included a "Payment Recommendation" report. By November 9, 2010, all participating insurers had approved the June 1, 2010 recommendation, so Friedman issued a formal Payment Request that asked Resolute (acting on behalf of HDI-Gerling) to pay $1,940,754.48. Ex. 2, Whitley Decl. Ex. A. Ford's documents show that payment posting to Ford's account on December 13, 2010. Ex. 7.

## IV. Ford's Attempt to Recover "Batch" Claims, and Its Impact on the Mitigate Process.

The Mitigate facility functioned reasonably smoothly during the pre-2010 time period—until Ford tendered the "batch" claims to the ASLP.

Generally speaking, the batch claims are those for which Ford has noticed an "integrated occurrence" (or "batch") under policies issued prior to HDI-Gerling's coverage, primarily from two Bermuda-based "batch" carriers—ACE and XL. "Exclusion L" to the ASLP excludes all claims that are part of a batch that was declared to the batch carriers, unless the batch policies' limits have been exhausted, at which time the HDI-Gerling policies provide excess coverage for batch claims. Ford has taken the position that Gerling's obligation is triggered if the batch carriers do not pay for any reason, and HDI-Gerling brought the arbitration to resolve that dispute.[1]

This disagreement between Ford and HDI-Gerling (and certain other insurers) over the meaning of Exclusion L (and similar exclusions on other insurers' policies) had two important implications for the processing of claims. First, and most obviously, it meant the "batch" claims were in dispute, with Ford arguing that coverage had been triggered, and some insurers arguing it had not. Payment on those claims would depend on resolution of those coverage disputes through arbitration.

But these disputes were important for a second, less obvious reason—if Mitigate included batch claims in audit reports, the amounts payable by each insurer on undisputed non-batch claims could change. One insurer's obligation for a given non-batch loss could be one amount if batch losses are deemed covered, while it could be another amount if the batch claims are not deemed covered. Specifically, under Ford's interpretation of the ASLP, it must satisfy a $50 million self-insured aggregate retention in each year the HDI-Gerling policies were in place before accessing the coverage that it claims NICO interfered with. Because HDI-Gerling asserts that the batch claims are not covered as presented by Ford, they cannot be used to satisfy any

---

[1] Other carriers have similar exclusions in their policies and similarly dispute Ford's reading of the scope of that exclusion.

applicable $50 million aggregate retention. Thus, to the extent that Ford insists on using disputed batch claims to exhaust a $50 million aggregate retention in any policy year, payment obligations for the non-disputed non-batch claims could be impacted. Similarly, even if Ford's aggregate retention in any given year was exhausted only by non-batch claims, the ASLP policies are issued in layers, and the insurers' participation in each layer differs, such that inclusion of batch claims could change the obligations of various carriers.

Through the end of 2010, Mitigate included only non-batch claims in its requests. That effectively avoided any dispute over the batch claims and allowed Ford to get paid on a regular basis for its non-batch claims. Excluding the batch claims meant Mitigate's Payment Recommendations were relatively uncontroversial and could be approved by the insurers. With that collective approval, Mitigate could issue formal Payment Requests to individual insurers, and the insurers could pay Ford for losses where coverage was not in dispute.[2]

## V.     Payments to Ford from September 2007 through Early 2011.

Ford asserts that after NICO entered the Reinsurance Agreement, payments from HDI-Gerling dried up. Ford specifically alleges in its Complaint that "NICO … directed the non-payment of Ford's non-batch claims," and that "NICO pursued a sharp and vexatious path of declining to pay Ford's non-batch claims … ." Compl. ¶¶ 45, 55. During the February 7, 2013 Initial Pretrial Conference, Ford's counsel doubled down on this dubious claim, stating unequivocally and on the record:

---

[2] Indeed, this may explain why Ford waited so long to tender the batch claims to HDI-Gerling. Ford tendered batch claims to the batch carriers between 1990 and 1995—months (in some cases, years) before the HDI-Gerling policies incepted. And Ford and XL arbitrated coverage for one of the batches in 2002, resulting in a final award that Ford has kept confidential. Even though Ford understood that it would not be able to collect from XL as a result of that award, it waited until 2010—nearly eight years—to press for coverage of batch losses with HDI-Gerling and other ASLP carriers.

> [NICO] took $310 million worth of reserves that—actually worth
> of premium and treated it as a float out of which they had to pay
> claims.  ***They paid no claims—they paid no non-batch claims,
> and they asserted no defense to that while under complete control
> of claims handling.***

Ex. 8, Excerpts of Tr. of Feb. 7, 2013 Hearing at 31 (emphasis added).

These statements are flat-out false.  Between February 2008 (when Resolute took over claims-handling) and June 2011, Resolute paid Ford no less than $49 million on claims under the ASLP.  Ex. 2, Whitley Decl. ¶ 6.   Indeed Ford's own records show payments from Resolute of $53,326,948.93 on non-batch claims.  Ex. 7.  Moreover, Resolute has never refused to pay a non-batch claim in response to a Mitigate Payment Request.  Ex. 2, Whitley Decl. ¶ 6.  So the truth— as undisputed evidence makes clear—is that until early 2011, the Mitigate process worked as it always had, with Resolute making payments just as HDI-Gerling had before Resolute got involved.  What changed in 2011 was that Ford—not HDI-Gerling, not NICO, and not Resolute—disrupted this process.

**VI.     Ford Disrupts the Established Loss Verification and Payment Process.**

As noted above, verification and payment of claims had been working smoothly because batch claims were not being submitted to Mitigate.  In February 2010, however, Ford floated the idea of tendering the batch claims to the ASLP insurers in a "draft" letter.  Notably, this letter was sent to the insurers directly, and *not* to Mitigate.  HDI-Gerling and certain other insurers disputed Ford's presentation of the batch claims, and after sustained (but unsuccessful) dialogue throughout 2010, HDI-Gerling filed an arbitration demand in November 2010 in an attempt to resolve the coverage dispute with respect to the batch claims.  Ford then counter-claimed and demanded a judgment on all unpaid claims under the ASLP, including the non-batch claims at issue in this litigation, but curiously never alleged the specific amount it believed was due.

8

Notwithstanding the dispute as to the batch claims and the subsequent arbitration demands, the Mitigate process continued to function as normal throughout 2010.  Mitigate audited non-batch losses; the insurers approved those reports; Mitigate issued formal payment requests; and the insurers (including Resolute on behalf of HDI-Gerling) paid Ford.  In fact, Resolute continued to make payments on non-batch claims on behalf of HDI-Gerling through December 2010—a month after HDI-Gerling filed its arbitration demand.

In January 2011, however, **Ford** brought the process to a grinding halt.  Specifically, McGuireWoods (acting for Ford) instructed Mitigate to tell the insurers like HDI-Gerling that Ford no longer wanted to receive "interim" payments—even on claims that were not in dispute.  Ex. 9; Ex. 2, Whitley Decl. ¶ 8.  Instead, Ford wanted Mitigate to audit and verify all losses that Ford contended were covered, and then send each insurer a single bottom-line number reflecting that insurer's payment obligation, if Ford's view regarding coverage for "batch" claims (among other things) proved to be correct.  Ford would then deal with each insurer independently to negotiate payment.  Ex. 9; Ex. 2, Whitley Decl. ¶ 8.

Mitigate did as Ford instructed.  But in so doing, it could no longer execute the process that had worked well to deliver undisputed payments to Ford.  By including the batch claims in its audit and verification reports—claims that Mitigate knew some insurers disputed—Payment Recommendations would have been futile.  That killed the Mitigate process.  So McGuireWoods stated instead that it "will coordinate with [insurers] directly the payment process to Ford."  Ex. 9; Ex. 2, Whitley Decl. ¶ 8.

Critically, neither McGuireWoods nor Ford did anything to fill the void.  Ex. 2, Whitley Decl. ¶ 9.  Indeed, the first time Ford made any effort to quantify the amount that HDI-Gerling owed on non-batch claims since Resolute's last payment in early 2011 was March 25, 2013—

*just last week*—when, after substantial prodding from NICO, Ford supplemented its responses to

NICO's interrogatories, and identified for the first time the specific amounts it wants Resolute

(on behalf of HDI-Gerling) to pay on the non-batch claims at issue in this litigation.  Ex. 10,

Second Supplemental Response to Interrogatory No. 22 & Ex. B.  Ford had not even provided

that information in the pending arbitration, which the arbitration panel recently noted at a hearing

in March 2013.  Approximately one week after Ford provided this information, Resolute offered

to pay Ford for the claims specified on Exhibit B (provided that Ford verifies it is not improperly

using disputed batch claims to calculate its claims), without prejudice to the claims and defenses

HDI-Gerling has asserted in the arbitration.  Ex. 14.[3]

## VII.    The Arbitration Regarding the ASLP Is Ongoing.

As noted above, HDI-Gerling commenced Arbitration of the batch claims in 2010, and

Ford counter-claimed for all unpaid claims under the ASLP, including the claims at issue in this

litigation.    The pending arbitration is highly relevant to this case, both generally and specifically

with respect to the present dispute over the discoverability of reserve information.  Most

significantly, Ford has sought in the arbitration the very information from HDI-Gerling that it

seeks from NICO here—HDI-Gerling's reserves information.  Ex. 12.  HDI-Gerling has resisted

those requests, citing well-established law holding that this information is not discoverable.  Ex.

13.  HDI-Gerling also has learned in the arbitration that Ford made material misrepresentations

to HDI-Gerling in the negotiation of the ASLPs, so HDI-Gerling amended its arbitration demand

to seek rescission of those policies.  Ex. 14.  If that rescission claim (and other claims and

defenses HDI-Gerling has asserted in the arbitration) is granted, then HDI-Gerling may have no

---

[3] Resolute has made this offer to Mr. Oostdyk in his capacity as Ford's insurance claims
representative, not as a settlement document.

coverage obligation to Ford with respect to any claims under the ASLP, including the non-batch claims at issue here.

## This Discovery Dispute

### I. Ford's Requests for Documents Relating to Reserves

On December 7, 2012, Ford requested that NICO produce:

> **REQUEST FOR PRODUCTION NO. 5:** All documents that refer to, relate to, or embody the policies, processes, or procedures used by NICO or Resolute to process, adjust, *set reserves on*, pay and/or deny or decline to pay insurance claims, including any Gerling or HDI-Gerling policies, processes, or procedures adopted or used by NICO or Resolute.

> **REQUEST FOR PRODUCTION NO. 6:** Documents sufficient to show *the history of claim reserves maintained by Gerling, HDI-Gerling, NICO, Resolute, or each or any of them with respect to Ford's claims under the Gerling Aggregate Stop Loss Policies* including, without limitation, the expected returns on the investment of such funds and the expected rate of depletion.

Ex. 15, Ford's First Request for Production of Documents (emphasis added).  Taken together, these requests seek two categories of information that are irrelevant and highly proprietary:  (1) HDI-Gerling's and Resolute's reserve information with respect to the Ford ASLP; and (2) NICO's method of evaluating HDI-Gerling's reserves in connection with its negotiation of the Reinsurance Agreement.

NICO timely objected to these requests on the basis of attorney work product privilege and on relevance grounds.  Ex. 16, NICO's Objections to Ford's First Req. for Produc., General Objections 1 & 3 and Specific Objections to Request Nos. 5 & 6 ("[F]urther object[ing] to th[ese] Document Request[s] on the ground that [they] seek[ ] information concerning the setting of reserves, which are irrelevant to the issues in this litigation."); *see also* Ex. 17, NICO's First Privilege Log at 1 ("**Reserves information has been redacted based on work product and because it constitutes highly sensitive business and proprietary information.").

11

Numerous documents responsive to document requests other than the objectionable

portions of Requests 5 and 6 contain reserve information that is not discoverable.  But NICO did

not withhold these documents from production.  It instead redacted the portions of the documents

containing reserve information, logged the basis for the redaction on its privilege log and

produced the documents.  Ex. 17, NICO's First Privilege Log.  All told, NICO's production of

documents to Ford has been substantial.  Including a production made on April 4, 2013, NICO

has produced 27,133 documents (comprising 410,843 pages) to Ford.  And of the 27,133

documents produced to date, NICO has redacted reserve information from only 138.

## II.    Ford's Interrogatory for Reinsurance Information

Ford also has requested  information about NICO's reinsurance, a topic that is closely

related to loss reserves.  Specifically, Ford, in its Interrogatory No. 9, asked NICO:

> **FORD'S INTERROGATORY NO. 9:** Identify each and every
> person and/or entity that Reinsurer or Reinsured under the
> agreement memorialized in the document entitled "Reinsurance
> Agreement," a copy of which has been produced in this matter by
> defendant, NICO, bearing Bates Numbers NICO000698 through
> NIC0000711, viewed as of December 27, 2007, as a potential
> source of funds that could be received from salvage, subrogation,
> retrocession, reinsurances, funds held, trust funds, claims against
> insolvent estates, letters of credit, or other applicable security
> protecting or arising out of the Business Covered ...," as referenced
> in Section (6) under the heading "CONDITIONS" on Page 7 of
> that document, including without limitation the name of the person
> or entity, the upper limit of the potential amount understood to be
> potentially available from that person or entity, and the category
> into which such amount was understood to fall, whether salvage,
> subrogation, retrocession, reinsurances, funds held, trust funds,
> claims against insolvent estates, letters of credit, or other
> applicable security.

Ex. 18, Ford's Second Set of Interrogatories.

NICO objected to this interrogatory for several reasons, including that "whether there are

potential recoverables for claims paid by NICO under the Reinsurance Agreement between

12

NICO and HDI-Gerling is not relevant to the claims that Ford has made against NICO… [and] the heavy burden of scrutinizing every potential source of recoverable funds for each of potentially thousands of claims – the number and facts of which are unknown and unknowable at this juncture – far outweighs any potential relevance, which is likely none." Ex. 19, NICO's Objection to Ford's Interrog. No. 9. NICO responded to Ford's Interrogatory No. 9 on April 1, 2013, indicating that it would it would seek a protective order for the same reasons it would seek a protective order with respect to requests for reserves. Ex. 20, NICO's Resp. to Ford's Interrog. No. 9.

## Argument

### I.     Rule 26 Authorizes the Court to Limit the Discovery of Irrelevant and Proprietary Information.

Fed. R. Civ. P. 26(c)(1) provides that a "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." "To obtain a protective order under Rule 26(c), the party resisting discovery must establish that the information sought is covered by the rule and that it will be harmed by disclosure." *In re Wilson*, 149 F.3d 249, 252 (4th Cir. 1998) (citations omitted). Proprietary information is explicitly enumerated by the Rule as information appropriately the subject of a protective order. Fed. R. Civ. P. 26(c)(1)(G). And, although the Fourth Circuit has yet to address the issue, other federal courts indicate that a lack of relevance satisfies the good cause requirement for issuance of a protective order. *See, e.g.*, *Smith v. Dawson*, 158 F.R.D. 138, 140 (D. Minn. 1994) (granting protective order on basis of lack of relevance of information sought and noting that other courts were using Rule 26(c) as a basis to curtail discovery requests for irrelevant information).

II.     **Ford Is Not Entitled to HDI-Gerling's Reserves Information.**

Insurance reserves are established in one of two ways:  they are set by statute or some type of business judgment that has no probative value as to the legal validity of a claim, in which case they are irrelevant and misleading; or they reflect a legal analysis of the viability of the claim, in which case they are privileged.  Under either scenario, they are not discoverable.

A.     **Reserves are Unreliable, Irrelevant, and Not Discoverable.**

The case law almost uniformly holds that an insurer's loss reserves are not discoverable. As one court recently explained,  "[A reserve] is … merely a business judgment made by an insurance company to guard against future loss; it does not reflect a legal determination of the validity of an insured's claim against the company." *U.S. Fire Ins. Co. v. City of Warren*, 2012 WL 1454008, *10 (E.D. Mich. Apr. 26, 2012);  *see also Indep. Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 117 F.R.D. 283, 288 (D.D.C. 1986).  Insurers frequently set reserves based on a host of business considerations that have absolutely nothing to do with any amounts that the insurer expects to pay on a particular claim. *See, e.g., Hoechst Celanese Corp. v. National Union Fire Insurance Co.*, 623 A.2d 1099 (Del. Super. Ct. 1991) (reserves information was "irrelevant" because "[r]eserves are accounting entries which an insurance company regularly uses to set aside sufficient funds in the event of policyholder liability" and, rather than serving as admissions of liability, "the establishment of reserves is an appropriate business decision justified by the necessity of preserving financial stability in the event of liabilities which cannot be predicted with any degree of certainty.").

To the extent claims reserves are not dictated by law or business reasons, they are privileged work product.  Ample case law provides that "a reserve essentially reflects an assessment of the value of a claim taking into consideration the likelihood of an adverse judgment." *Indep. Petrochemical Corp.*, 117 F.R.D. at 288. As a result, "[w]here the reserves

14

have been established based on legal input, the results and the supporting papers most likely will

be work product and may also reflect attorney-client privileged communications." *Id.* This

provides another reason why courts place reserve information off-limits in discovery.

For these reasons, requests for reserve information are not reasonably calculated to lead

to the discovery of admissible evidence. *See, e.g., Continental Ins. Co. v. Beecham, Inc.*, 836 F.

Supp. 1027, 1047 n. 12 (D.N.J. 1993) ("The mere setting of a reserve by an insurer does not have

the probative force of an admission."); *Leksi, Inc. v. Fed. Ins. Co.*, 129 F.R.D. 99, 106 (D.N.J.

1989), *disapproved on other grounds by Armotek Indus. v. Employers Ins.*, 952 F.2d 756 (3d Cir.

1991) ("The purpose of discovery—expedition of the litigation by narrowing the area of

controversy or by avoiding unnecessary testimony or by providing a lead to evidence—will not

be served by allowing discovery of reserves."); *Union Carbide Corp. v. Travelers Indem. Co.*, 61

F.R.D. 411, 413 (W.D. Pa. 1973) (observing that it was possible that, "the contingent and

uncertain nature of reserves could render questions about reserves tantamount to hypothetical

questions. Questions calling for an opinion based on hypothetical facts have been held

improper.").

Under this established authority, Ford is not entitled to HDI-Gerling's or NICO's reserve

information.

### B.      This is Not a "Bad Faith" Case.

To evade this settled law, Ford suggests that this case is not a "coverage" case, but rather

a "bad faith" case.  It is not.  Ford has not asserted an actual "bad faith" claim, and in all events,

subject to the claims and defenses HDI-Gerling has asserted in the Arbitration, NICO

acknowledges that these claims are covered under the ASLP and has even offered to pay them.

Ex. 11.  Moreover, the evidentiary centerpiece of this theory—Ford's assertion that

NICO/Resolute has "paid no … non-batch claims," Ex. 8 at 31—is demonstrably false in at least

three respects:

> (1)    Resolute paid Ford roughly $50 million for non-batch claim after it
> assumed responsibility for claims-handling, ***a fact demonstrated by
> Ford's own documents***, *see* Ex. 7;
>
> (2)    Ford—not Resolute, NICO or any other insurer—decided to terminate the
> Mitigate practice of auditing and verifying separately the undisputed non-
> batch claims, *see* Ex. 9; Ex. 2, Whitley Decl. ¶ 8; and
>
> (3)    Until it served its supplemental response to Interrogatory No. 22 on March
> 25, 2013 (just last week), Ford had never specified to NICO, Resolute or
> HDI-Gerling, the claims or the amounts it said were owed on the non-
> batch claims at issue in this case, Ex. 2, Whitley Decl. ¶ 9.

These undisputed facts, and NICO's offer to pay the claims at issue in this case one week

after Ford first articulated the amount it believes was due from HDI-Gerling for the non-batch

claims, forecloses any plausible "bad faith" argument here.  So any authority suggesting that this

type of information is discoverable in bad faith cases is simply inapposite.[4]  Moreover, absent

---

[4] In true "bad faith" cases, "the question is closer."  *See Mirarchi v. Seneca Specialty Ins.
Co.*, CIV.A. 10-3617, 2011 WL 2982401 (E.D. Pa. July 22, 2011).  But even in those cases, "the
relevance of the loss reserve information is not a foregone conclusion." *Id.*; *see also Heights at
Issaquah Ridge Owners Ass'n. v. Steadfast Ins. Co.*, C07-1045RSM, 2007 WL 4410260, at *3
(W.D. Wash. Dec. 13, 2007) (citation omitted) (denying a motion to compel production of
reserves information, explaining, that, "loss reserve information may or may not be relevant in a
subsequent bad faith action, depending on the issues presented", and holding that, "the relevance
of the requested information must be tied to the specific issues presented, and the issue
determined on a case-by-case basis").  Courts have refused discovery of loss reserves in bad faith
cases for largely the same reasons courts have refused that discovery in coverage cases. *See,
e.g., Safeguard Lighting Sys., Inc. v. N. Am. Specialty Ins. Co.*, CIV.A.03-4145, 2004 WL
3037947, at *3 (E.D. Pa. Dec. 30, 2004) (where plaintiff asserted, *inter alia*, a bad faith claim,
holding that "there is a tenuous link between reserves and actual liability given that numerous
considerations factor into the calculation of reserves in accordance with statutory requirements,"
and that in the case at bar, reserves were not calculated to lead to information about policy
interpretation, and declining to "require production of defendant's reserve information"); *Fid. &
Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 525 (E.D. Pa. 1996) ("While the
relevancy of the reserve data to the bad faith counterclaim presents a slightly closer question in
terms of the case law, we find Plaintiff's objection convincing. We fail to see how compelling
production of reserve information would bring [insured] any closer to proving bad faith on
Fidelity's part. At most, such data would merely suggest what [insured] can already demonstrate

any patina of bad faith, Ford's claims against NICO can be seen for what they actually are—an insurance coverage dispute masquerading as tort claims, and an attempt to extract discovery from NICO in this Court that Ford was unable and not entitled to obtain from HDI-Gerling in the arbitration.

Ford's alleged need for reserve and reinsurance information is premised entirely on this not being a coverage case, that it relates to NICO's bad faith non-payment of undisputed claims since the inception of the reinsurance agreement.  But as noted above, that premise is demonstrably and entirely false.  The Court should not allow Ford to make an end run around the limits on discovery in the arbitration by making blatantly false allegations of bad faith claims practices.  It should grant NICO's motion for a protective order that precludes the discovery of HDI-Gerling's and Resolute's reserve information.

In the alternative, should the Court be inclined to allow Ford any discovery of this information (which NICO disputes), it should be limited to reserves information relating specifically to the undisputed non-batch claims that Ford argues are at issue here, and which Resolute has now offered to pay.   Limiting Ford's discovery in this way would prevent the possibility of Ford evading discovery limits in the arbitration.

### C.    NICO's Evaluation of  Reserves Information Is Highly Proprietary, and Its Disclosure Would Irreparably Harm NICO.

NICO's evaluation of HDI-Gerling's reserves as part of evaluating Gerling's loss portfolio should be off-limits for similar reasons.  NICO's reinsurance of HDI-Gerling has no effect on Ford's insurance claims against HDI-Gerling or the terms and conditions of the policies that govern those issues.  Ford has not and cannot demonstrate otherwise.  Therefore, there is no legitimate basis upon which to deviate from established decisional law that reserves should not

---

and what Fidelity would surely concede, namely, that the cost of defending the … claims increased over time.").

be disclosed in discovery, or to order discovery into NICO's proprietary pricing models.  And allowing such discovery would result in irreparable harm to NICO.  Disclosure of NICO's pricing models would put NICO at a competitive disadvantage vis-à-vis its competitors.  Ex. 3, Lewis Decl. ¶ 6.  Moreover, one of the insurers with whom NICO may negotiate reinsurance agreements in the future—HDI-Gerling—is inextricably intertwined in this litigation.  Ex. 3, Lewis Decl. ¶ 7.  In sum, disclosure of this information would result in real harm to NICO and yield zero discovery benefit.

**III.    Ford Is Not Entitled to HDI-Gerling's Reinsurance Information.**

Reinsurance information is irrelevant for the same reasons that reserves information is irrelevant.  Like reserves, the existence and amount of any reinsurance is the product of business decisions that have little bearing on issues of coverage and therefore are generally deemed non-discoverable.  *See, e.g., Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 268 F.R.D. 692, 695 (S.D. Fla. 2010).  Moreover, whether Ford is entitled to HDI-Gerling's reinsurance information is the subject of pending motion practice in the arbitration, and Ford should not be permitted to avoid the discovery limits imposed by the arbitration panel by confecting a "bad faith" claim against NICO using demonstrably false assertions concerning the non-payment of claims by Resolute.

<u>Conclusion</u>

For the foregoing reasons, NICO respectfully requests that the Court enter a protective order precluding discovery of  (1) the loss reserve information of NICO and its reinsured, HDI-Gerling Industrie Versicherung AG (HDI-Gerling), relating to Aggregate Stop Loss Policies issued by HDI-Gerling to Plaintiff Ford Motor Company; (2) NICO's highly proprietary and confidential method of evaluating HDI-Gerling's reserves in connection with the negotiation of

the Reinsurance Agreement with HDI-Gerling; and (3) HDI-Gerling's reinsurance information

relating to the HDI-Gerling Ford ASLP.

**NATIONAL INDEMNITY COMPANY**


By:    /s/ George P. Sibley, III

George P. Sibley, III (VSB No. 48773)
gsibley@hunton.com
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200

Walter J. Andrews (VSB No. 46031)
wandrews@hunton.com
Michael S. Levine (VSB No. 48013)
mlevine@hunton.com
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, Virginia 22102
(703) 714-7400

Jane M. Byrne (*pro hac vice*)
janebyrne@quinnemanuel.com
Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
J. Toji Calabro (*pro hac vice*)
tojicalabro@quinnemanuel.com
Brad Evan Rosen (p*ro hac vice*)
bradrosen@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendant,*
*National Indemnity Company*

19

**Certificate of Service**

I certify that on the 4th day of April 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Scott C. Oostdyk (VSB No. 28512)
soostdyk@mcguirewoods.com
J. Tracy Walker (VSB No. 31355)
twalker@mcguirewoods.com
H. Carter Redd (VSB No. 34392)
hredd@mcguirewoods.com
Matthew D. Fender (VSB No.  76717)
mfender@mcguirewoods.com
McGuire Woods LLP
One James Center
901 E. Cary St.
Richmond, Virginia 23219
Tel: (804) 775-1000


    /s/  George P. Sibley, III
George P. Sibley, III (VSB No. 48773)
gsibley@hunton.com
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, Virginia 23219
(804) 788-8262
(804) 788-8218 (fax)

20