**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| FORD MOTOR COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) Civil Action No. 3:12-cv-839 |
| | ) |
| | ) |
| NATIONAL INDEMNITY COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

---

**PLAINTIFF FORD MOTOR COMPANY'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT NATIONAL INDEMNITY
COMPANY'S MOTION FOR PROTECTIVE ORDER**

Plaintiff Ford Motor Company ("Ford"), by counsel, states as follows in opposition to

Defendant National Indemnity Company's Motion for Protective Order (Docket No. 55)

("Motion") and Memorandum of Law in Support of Its Motion for Protective Order (Docket No.

56) ("Memorandum"):

**I.      INTRODUCTION**

In the Motion for Protective Order and Memorandum of Law in Support, Defendant

National Indemnity Company ("NICO") asks the Court to shield reserves and reinsurance

coverage from discovery by claiming that they are irrelevant and baldly asserting that their

disclosure to Ford would cause NICO to suffer competitive harm.  Rather than show good cause

as required by Fed. R. Civ. P. 26(c)(1), or address the discovery that the Court specified in its

Order of March 27, 2013, NICO instead diverts the topic entirely on the purported grounds that

"[t]he Court needs to hear the rest of the story."  (NICO's Memo., 1.)  This is a simple discovery

dispute.  NICO's detour is an obvious effort either to reargue its stay motion for the third time or to impugn Ford's credibility.   NICO fails on both of those fronts.  Ford will ignore much of NICO's opening diatribe and instead address only the points from NICO's "Background" most calling out for contradiction.

Ford respectfully submits that reserves and reinsurance are within the proper scope of discovery and that any concerns regarding confidentiality and proprietary methodologies can be adequately addressed under the Agreed Protective Order that the Court entered on March 27, 2013.  Moreover, reserve and reinsurance information relate directly to the elements of Ford's claims that NICO conspired with HDI-Gerling to harm Ford's business interests and tortiously interfered with claims handling, coverage determination, and payment of Ford's products liability insurance claims.  This reserve and reinsurance information will also lead to the discovery of admissible evidence regarding NICO's affirmative defense of agency by revealing that NICO's preoccupation with its own investments made with the premium that HDI-Gerling paid under the Reinsurance Agreement constitutes self-dealing beyond the scope of any alleged agency.

## II.     BACKGROUND

### A.     NICO Never Disclosed to Ford That It Was Funding and Handling Ford's Batch and Non-Batch Claims.

For what it is worth, Ford was in fact surprised in 2012 by the news that since 2007 NICO was funding and handling Ford's ASLP claims.  (*See* Ex. 1, Aff. of D. Ames, ¶6.)  NICO cannot prove otherwise, and its attempt to do so ranges from weakly contrived to outright strange.  For whatever reason, the fact that NICO did not disclose itself to Ford in 2007 as claims funder and claims handler role bothers NICO.  NICO cannot, however, evade the fact of non-disclosure.  Until Resolute's Robert Love blurted out in a September 21, 2012 deposition that

Resolute had no claims-handling contract with HDI-Gerling, but rather with NICO, Ford did not know, and had no basis to infer, that NICO's Kevin Lewis was actually running the non-payment of Ford's non-batch claims cleared by proper Mitigate audit.  (*Id*.)  It is uncontroverted that NICO refused to produce its Reinsurance Agreement in the arbitration between HDI-Gerling and NICO.  (*See* Ex.2, letter from C. Worcester to S. Oostdyk, 2 (Nov. 13, 2012 (stating that "[a]s we have articulated repeatedly, in correspondence from October 16, 2012, September 28, 2012, and September 20, 2012, reinsurance information is not relevant to the instant dispute."))  It was not until NICO finally produced its Reinsurance Agreement *in this case*, on January 14, 2013, after Ford pressed for production, that Ford learned of the total claims control of NICO.  Ford had no basis to know what NICO has secretively protected – that *Kevin Lewis* of NICO was calling the shots on whether or not Ford got paid on non-batch claims, and that *Mr. Lewis* managed an on-hand fund of $310 million dollars in premium transferred from HDI-Gerling intended and designated to pay Ford's claims.

**B.    NICO Has Failed to Pay Ford for Non-Batch Claims**.

NICO made one thing crystal clear with its Motion: NICO *admits now that it owes Ford for every single non-batch claim identified by Ford in discovery in this case*.  To its Memorandum in Support, NICO attaches a desperation letter that Mr. Lewis sent to Ford just April 2, 2013.  (*See* Ex. 11 to NICO's Memo.)  This letter admits, for the first time, *a NICO obligation* to pay non-batch claims verified and owing, and admits the volume of that owed value to be $21,960,301.39 based on Ford's Exhibit B to its response of NICO's Interrogatory no. 22. (*See* Ex. 10 to NICO's Memo.)[1]  It amazes Ford that Mr. Lewis claims that the reason NICO did

---

[1]     Ford cannot accept NICO's offer, however, because in typical NICO fashion it is so riddled with caveats, exceptions and qualifications that is in fact merely a demand that Ford do what it has already done – certify the basis for the non-batch claims.  While the admission of liability for the payments in the Lewis letter is important, the offer is too contingent to be accepted.  (*See* Ex. 3, letter from D. Ames to K. Lewis (April 11, 2013).)  Moreover, it

not earlier offer to pay Ford in full was because "this was the first time that Ford identified with specificity an amount it believes is due under the HDI-Gerling policies for these non-batch claims." (Ex. 11 to NICO's Memo., 2.) In 2010, Ford cooperated fully with what Resolute' lawyer Kent Wilson told it to do – submit the non-batch claims support to Mitigate for verification. (Ex. 4, K. Wilson letter to S. Oostdyk (June 25, 2010).) Ford complied, and Mitigate accordingly verified the $21,960,301.39 readily presented in Mitigate's March 2011 and August 2012 reports.

It should be obvious from NICO's effort to excuse its misbehavior based on Mitigate's actions and conduct that Mitigate documents and Mitigate communications are core and essential to this dispute. This is ironic. The ostensible purpose of NICO's motion is to shield from discovery Mitigate documents and claims reserve information. Yet NICO spends paragraphs of its brief describing the Mitigate auditing process, loosely citing a declaration from Steve Whitley, but mostly just presenting a lawyer's narrative without attribution. (*See* Ex. 2 to NICO's Memo., Dec. of S. Whitley.) This is the classic "sword and shield" situation. While arguing in the back half of the brief that Mitigate documents are protected from discovery, and non-germane, NICO tries in the front part of the brief to ensure the Court is fully aware – from its unsupported counsel's perspective – what Mitigate does and how it does it. Ford welcomes the chance to depose Mr. Whitley on his declaration. But Ford and NICO are currently in the discovery phase of the case. Ford welcomes the chance to take Mr. Whitley's deposition, depose Mitigate, and properly present to the jury and Court what Migitate does and does not do. Ford will not do that in a discovery motion designed to ensure full and fair disclosure by a litigation adversary.

---

ignores any liability on NICO's part for non-payment interest, attorneys' fees and incurred litigation expenses, plus cognizable damages provable at trial. (*See* Ford's discussion, *infra*.)

The gist of NICO's diversion about Mitigate is that Ford took over Mitigate's function in verifying claims for NICO, that Ford directed Mitigate to stop issuing "Payment Requests" to NICO, and that NICO could not pay Ford without the analytical integration of a "Mitigate Payment Request." (NICO's Memo., 5-8.) Accordingly, NICO whines that "Ford brought the [Mitigate payment] process to a grinding halt." (*Id*. at 9.) NICO complains that "Mitigate did as Ford instructed." (*Id*.) It claims that neither "McGuireWoods nor Ford did anything to fill the void." (*Id*.) It asserts that Ford did not, until issuing Exhibit B to Interrogatory No. 22, "identif[y] the specific amounts it wants Resolute [on behalf of HDI-Gerling] to pay." (*Id*. at 10.) This is patently absurd.

The bottom line is that Mitigate is and always has been *NICO's agent*, and that Mitigate could perform *any* analysis, *any* study and any inquiry delegated to it by *NICO, at any time*. (*See* Def. NICO's Memo. in Opp. to Plf. Ford Motor Co.'s Mot. to Compel, 12 (Jan. 28, 2013) (Docket No. 23) (recognizing that "Mitigate was retained prior to NICO entering into the Reinsurance Agreement by Ford's aggregate stop loss insurers, collectively").) Furthermore, the Mitigate reports of March 2011 and August 2012 contain all the verification, auditing information, and analytical data that Resolute/NICO needed in order to pay Ford its non-batch claims, as it now concedes that it must. NICO cannot prove the contrary, or even argue the point with any credibility. Trial will be another story, however, and Ford welcomes the chance to expose an unfair insurance practice that has impaired companies dealing with NICO and Resolute around the country. *See Ashland, Inc. v. Nat. Indem. Co.*, No. 12-CI-4638 (Cir. Ct. Fayette Co., Ky., filed Oct. 12, 2012).

## C.     Ford Did Not Direct Anyone to Withhold Payment.

NICO relies on an e-mail from Scott Friedman of Mitigate to Scott Oostdyk of

McGuireWoods LLP dated January 17, 2011, to support its claim that "McGuireWoods (acting

for Ford) instructed Mitigate to tell the insurers like HDI-Gerling that Ford no longer wanted to

receive 'interim' payments—even on claims that were not in dispute" and that this alleged action

"killed the Mitigate process." (NICO's Memo., 9 (referring to Ex. 9 NICO's Memo

(NICO302857-NICO302858.)  Nothing could be farther from the truth.  The self-serving words

that NICO relies upon were written by its agent, Mr. Friedman of Mitigate.  Mr. Oostdyk's

response – which NICO fails to mention or address in its Memorandum – refutes and does not

accept any suggestion that payments should stop.  (Ex. 9 to NICO's Memo, NICO302857.)

Instead, Ford's goal was to accelerate payment and recovery on the aggregate stop loss policies

by finalizing the verification process because the insurance carriers "have made it clear to us that

a pre-requisite to that payment is a final Mitigate Report on all potentially-insured Ford Agg

Stop Loss claims."  (*Id.*)

## D.     HDI-Gerling Is Alone in Denying Ford's Non-Batch Claims Due to NICO's Tortious Conduct.

In footnote one of its brief, NICO asserts, without citation, that "[o]ther carriers have

similar exclusions in their policies and similarly dispute Ford's reading of the scope of that

exclusion."  (NICO's Memo., n. 1.)  Ford is on notice of no denial of claim by any other

coalition besides HDI-Gerling and NICO, which is funding and non-paying claims. For

emphasis, NICO reiterates that "some insurers" argue NICO's point – that Exclusion L to the

Aggregate Stop Loss policies has been triggered.  (NICO's Memo., 8.)  NICO fails, again, to

identify those "insurers" and cite to proof of their denial of claim.  If they mean Swiss Re, it paid

Ford $117 million on these policies.  If they mean Zurich, it paid Ford over $25 million.  If

6

NICO means AIG, it paid Ford over $22 million.  The list goes on.  In point of fact, all first-tier

carriers have paid Ford's batch and non-batch claims based on Mitigate's claim verifications, and

without muss, fuss, or self-dealing reserve hoarding.  (*See* Ex. 1, Aff. of D. Ames, ¶ 3.)

## II.    DISCOVERY AT ISSUE

Ford has challenged NICO's objections and responses to Ford's Requests for Production

Nos. 1, 2, 3, 4, 5, 6, 8, 10, 11, 13, and 15 of Ford's First Requests for Production and seeks full

disclosure of redacted documents that are responsive to these discovery requests.  (*See* Ex. 5,

Ford Motor Co's First Reqs. for Prod. to Def. NICO (Dec. 7, 2012)).  Ford has provided NICO

with a list of documents with the redactions that Ford disputes.  (*See* Ex. 6, Ford' Challenge to

NICO's 3/22/13 Priv. Log (with cover letter from S. Oostdyk to M. Levine dated March 28,

2013).)  Ford has also challenged NICO's objections to Interrogatory No. 1 of Ford's first

interrogatories to NICO and Interrogatory No. 6 of Ford's second interrogatories to NICO.  (*See*

Ex. 7, Plf. Ford Motor Co.'s First Interrogs. To Def. NICO (Dec.7, 2012); Ex. 8, Plf. Ford Motor

Co.'s Second Interrogs. to Def. NICO (March 1, 2013)).

The parties have already met-and-conferred regarding these issues and brought this

discovery dispute to the Court's attention.  After conducting a telephone hearing on March 25,

2013, the Court entered an Order directing NICO to file the Motion for Protective Order and

setting a briefing schedule.  (*See* Order (March 27, 2013) (Docket No. 51).)

## IV.    ARGUMENT

### A.    Fed. R. Civ. P. 26 Permits Discovery That Is Reasonably Calculated to Lead to the Discovery of Admissible Evidence.

Fed. R. Civ. P. 26(b)(1) governs the scope of discovery and states that "[p]arties may

obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or

defense."  Relevant information "need not be admissible at the trial" and is discoverable "if the

discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Relevance is construed broadly to include "[a]ny matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 (1978). A request for discovery "should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Cappetta v. GC Servs. Ltd. P'ship*, No. 3:08CV288, 2008 U.S. Dist. LEXIS 103902 (E.D. Va. Dec. 24, 2008) (citing *In re Folding Carton Antitrust Litig.*, 83 F.R.D. 251, 254 (N.D. Ill. 1978)). The burden falls on the party resisting production to show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each discovery request is not relevant. *Id.* (citing *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292, 296 (E.D. Pa. 1980)).

> **B.      Reserves and Reinsurance Information Relate Directly to Ford's Allegations of Tortious Interference with Contract and Conspiracy.**

NICO and HDI-Gerling's reserves relating to Ford's insurance policies are highly relevant to this litigation, which differs from coverage litigation, to which reserves are sometimes ruled irrelevant. In coverage litigation, reserves are often sought to establish that the insurer must have believed there was coverage or it would not have established a reserve. Courts recognize that reserves are based on regulatory and other concerns having nothing to do with an insurer's opinion as to whether there may be coverage. Hence, the somewhat routine denial of relevance in coverage matters.

Here, however, there is no dispute that there is coverage: Mr. Lewis has admitted that in his Declaration. Instead, the dispute is whether NICO intended to non-pay or slow-pay Ford's claims to acquire, retain, and invest the HDI-Gerling premium for as long as possible, thereby maximizing NICO profits. The value NICO and HDI-Gerling placed on the Ford business, what

they disclosed to each other, and how they arrived at values are highly relevant in comparison to

the premium HDI-Gerling paid.  Thus, reserve information relates directly to Ford's burden of

proving that NICO acted "intentionally, purposefully, and without lawful justification" in

violation of Virginia's civil conspiracy statute, Va. Code § 18.2-500, and establishing NICO's

legal malice in interfering with Ford's existing contract with Gerling.  *Station #2, LLC v. Lynch*,

280 Va. 166, 174, 695, S.E.2d 537, 542 (2010); *Advanced Marine Enters. v. PRC, Inc.*, 256 Va.

106, 117, 501 S.E.2d 148, 154 (1998); *Commercial Bus. Sys. Inc. v. Bellsouth Servs., Inc.*, 249

Va. 39, 47, 453 S.E.2d 261, 266-267 (1995).

Moreover, the amount and accessibility of funds held in reserve and available as

reinsurance could lead to or serve as circumstantial evidence to establish NICO's state of mind.

*See Groben v. Travelers Indem. Co.*, 266 N.Y.S.2d 616, 619 (N.Y. Sup. Ct. 1965) (recognizing

that "examination with respect to the reserve may develop evidence on the issue of defendant's

bad faith… which must be established by circumstantial evidence").  Courts across the country

recognize the relevance of reserve and reinsurance information in disputes involving the intent,

purpose, and justification of a non-paying insurer and permit discovery of such information.  *See*

*Madison v. Nationwide Mut. Ins. Co.*, 2012 WL 4592135 (W.D.Ky. Oct. 1, 2012) (allowing

discovery of reserves); *First Tenn. Bank. Nat. Ass'n. v. Republic Mortgage Co.*, 276 F.R.D. 215,

221-222 (W.D. Tenn. 2011) (finding that reserves are relevant and discoverable in bad faith

claims); *U.S. Fire Ins. Co. v. Bunge*, 244 F.R.D. 638, 643-644 (D. Kan. 2007) (requiring

production of reserve information in litigation over coverage and bad faith claims); *Nicholas v.*

*Bituminous Cas. Corp.*, 235 F.R.D. 325, 331 (N.D.W.Va. 2006) (concluding that "Bituminous's

reserve information is relevant to whether it acted in bad faith and is discoverable unless it is

protected by the work-product doctrine."); *Champion Int'l Co. v. Liberty Mut. Ins. Co.*, 1989 US.

DIST. LEXIS 12929 (S.D.N.Y. 1989); *Stonewall Ins. Co. v. Nat. Gypsum Co.*, 1988 WL 96159, *6-*7 (S.D.N.Y. 1988) (permitting discovery of reserve information in insurance coverage litigation); *Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803 (Ky. 2004) (permitting discovery of reserve discovery in bad faith litigation); *Lipton v. Superior Court*, 48 Cal. App. 4th 1599, 56 Cal. Rptr. 2d 341 (1996) (ruling that reserve information is discoverable because such information would assist the plaintiff in evaluating his bad faith case and in preparing for trial); *Tackett v. State Farm Fire & Cas.*, 558 A.2d 1098, 1105 (Del. Super. 1988).

Even the authority that NICO relies upon concedes that reserves can be relevant. *See Heights at Issaquah Ridge Owners Ass'n. v. Steadfast Ins. Co.,* C07-1045RSM, 2007 WL 4410260, at *3 (W.D. Wash. Dec. 13, 2007)*; Mirarchi v. Seneca Specialty Ins.Co.*, CIV.A. 10-3617, 2011 WL 2982401 (E.D. Pa. July 22, 2011); *Safeguard Lighting Sys., Inc. v. N. Am. Specialty Ins. Co.*, CIV.A.03-4145, 2004 WL 3037947, at *3 (E.D. Pa. Dec. 30, 2004); *Fid. & Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 525 (E.D. Pa. 1996).  Significantly, other decisions from the same or neighboring U.S. District Courts have determined that reserves are relevant and properly subject to discovery.  *See Consugar v. Nationwide Ins. Co. of America*, No. 3:10CV2084, 2011 WL 2360208 (M.D.Pa. June 9, 2011) (holding that "[t]he Reserve amount is therefore relevant or could potentially lead to relevant information, and the court will order disclosure of such information."); *Lexington Ins. Co. v. Swanson*, 240 F.R.D. 662 (W.D.Wash. 2007) (recognizing that a "liability insurer's reserve information was relevant as to bad faith claims brought against insurer by insured's assignee, where such information would assist assignee in evaluating bad faith claim and preparing it for trial").

Discovery of NICO's reserves and reinsurance information will allow Ford to analyze NICO's submissions to insurance industry regulators and to develop expert testimony that NICO

deliberately and intentionally mishandled or slow-paid Ford's claims contrary to generally accepted reinsurance industry accounting standards so that NICO could profit from the investment of HDI-Gerling's premium.  During 2006 and 2007 alone, NICO paid $6,115,000,000 in cash dividends and extended a revolving credit line of $5,000,000,000 to related companies.  (Ex. 9, Report of Examination of Financial Condition, 5, 9.)  Under these circumstances, evidence regarding reserve levels and the presence or absence of reinsurance would demonstrate that NICO's intention regarding payment of insurance claims and motivation to generate profits through the investment of HDI-Gerling's reinsurance premium.

### C.   NICO's Agency Defense Requires Disclosure of Reserves and Reinsurance Information.

The information regarding reserves and reinsurance is also discoverable because it relates to NICO's Sixth Affirmative Defense: "Ford's claims are barred in whole or in part to the extent that NICO, as agent of Gerling, cannot interfere with a contract of Gerling's that is within the scope of NICO's agency."  (Answer and Affirmative Defenses of Def. NICO (Jan. 7, 2013) (Docket No. 12).)  To disprove this claim of agency and refute its alleged scope, Ford must have access to the financial underpinnings of the alleged agency relationship and investigate the expectations of the putative agent and principal.  Evidence that NICO maintained low reserves and managed assets solely for its own benefit without regard to claims asserted against HDI-Gerling could prove that NICO was not HDI-Gerling's agent.

As defined by the Supreme Court of Virginia, "[a]gency is a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control."  *Reistropper v. Person*, 247 Va. 45, 48, 439 S.E.2d 376, 378 (1994).  As a fiduciary, an agent "owes total fidelity to the interests of his principal," "must put the interests of his principal ahead of his own," and "may engage in no self-dealing which

11

may have any adverse effect on the interests of his principal." *State Farm Mut. Auto. Ins. Co. v. Floyd*, 235 Va. 136, 366 S.E.2d 93, 97 (Va. 1988) (noting that if the alleged fiduciary has the right to protect his own interests pursuant to a contract, then no fiduciary relationship exists.) The existence of agency cannot "ordinarily be proved solely by the utterances of the purported agent." *Drake v. Livesay*, 231 Va. 117, 121, 341 S.E.2d 186, 189-190 (1986).  Instead, "[A]gency must be inferred from the conduct of the parties and from the surrounding facts and circumstances." *Id.*, 231 Va. at 121, 341 S.E.2d at 190.  Thus, Ford is not limited to NICO's *ipse dixit* assertion that it was HDI-Gerling's agent.  Instead, Ford is entitled to investigate both NICO and HDI-Gerling's conduct and the surrounding facts and circumstances as to an agent-principal relationship.

Determining the fiduciary nature of the relationship between NICO and Gerling requires disclosure of how NICO structured its reserves and managed the run-off business.  Accounting and financial data on reserves would show whether NICO was self-dealing and acting in its own interest, mismanaged the run-off of HDI-Gerling's aggregate stop-loss coverage, and refused to pay on undisputed claims.  Nebraska regulators have already noted that NICO's retroactive reinsurance business depends on self-serving conduct and delayed payments: "[T]hrough the Company's investment of the original premium, the Company presumes to be able to eventually create a profit as the actual claim payments occur over an extended period of time."  (Ex. 9, Report of Examination of Financial Condition, 23.)  Berkshire Hathaway seems to confirm this modus operandi in its Annual Report:

> [T]he insurance group [which includes NICO] delivered an underwriting gain for the sixth consecutive year.  This means that our $58.5 billion of insurance "float" – ***money that doesn't belong to us but that we hold and invest for our own benefit*** – cost[s] us less than zero.  In fact, we were paid $2.8 billion to hold our float during 2008.  Charlie [Munger] and I find this enjoyable.

(Ex. 10, Berkshire Hathaway, Inc., 2008 Annual Report, 4)(emphasis added).)  Reserves may reveal that HDI-Gerling's premium for the Reinsurance Agreement was part of this "float" and that NICO intended to use the premium for its own profit and not in HDI-Gerling's best interest in the face of claims made by Ford.

With respect to the scope of any alleged agency, a comparison of the reserves that each party to the Reinsurance Agreement set on Ford's claims could show limitations on the scope of agency and that NICO exceeded its authority by delaying or withholding payment on claims.  As the reinsured, HDI-Gerling may not have intended NICO to slow-pay Ford's claims or to underwrite Berkshire Hathaway's "float" investment strategy.  If HDI-Gerling, as the claimed principal, set different reserves on Ford's claims than NICO did, as the alleged agent, one possible inference would be that HDI-Gerling intended to pay claims and that NICO's investment program exceeded the scope of agency.

### D.      NICO Fails to Establish Good Cause for a Protective Order.

Under Fed. R. Civ. P. 26, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1). "The party seeking a protective order has the burden of establishing 'good cause' by demonstrating that 'specific prejudice or harm will result if no protective order is granted.'"  *United States ex rel. Davis v. Prince*, 753 F. Supp. 2d 561, 565 (E.D. Va. 2010) (quoting *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002)). Good cause cannot be shown with mere "stereotyped and conclusory statements" of harm.  *Great Am. Ins. Co. v. Gross*, No. 3:05cv159, 2007 WL 1577503, at *12 (E.D. Va. May 30, 2007) (quoting *S.E.C. v. Dowdell*, No. 3:01cv116, 2002 WL 1969664, at *2 (W.D. Va. Aug. 21, 2002)).

## 1. The Declaration of Kevin Lewis Is Insufficient to Establish Good Cause for Entry of a Protective Order.

To establish good cause for a protective order, NICO relies exclusively upon the Declaration of Kevin Lewis.  Mr. Lewis, however, offers only stereotyped and conclusory statements, fails to make any particular or specific demonstration regarding any harm that might be suffered, and ignores the appearance by Quinn Emmanuel Urquhart & Sullivan LLP as NICO's counsel.

Although Mr. Lewis identifies himself as an "Assistant Vice President" of NICO, he purports to assert how HDI-Gerling might be affected by disclosure of documents without mentioning any harm that HDI-Gerling might suffer. (Ex. 3 to NICO's Memo., Dec. of K. Lewis, ¶ 3.)  Other than representations that "Ford has sought to discover HDI-Gerling's loss reserves" in the arbitration and "HDI-Gerling has asserted confidentiality" objections, Mr. Lewis provides nothing concrete to the Court regarding alleged harm.  (*Id*. at ¶ 4.)

Mr. Lewis also states that NICO "evaluates loss reserves pursuant to highly confidential and proprietary methodologies" and that disclosure of its reserves relating to the Reinsurance Agreement "would place NICO at a substantial competitive disadvantage in both the reinsurance and direct insurance industries."  (*Id*. at ¶ 5.)  The only harm that Mr. Lewis seems able to articulate is that disclosure of "proprietary methodologies" to Ford would somehow end up in the hands of NICO's competitors.  The Agreed Protective Order would alleviate these concerns, however.  (*See* Agreed Protective Order (March 26, 2013) (Docket No. 49).)

Mr. Lewis and NICO's concerns of competitive harm appear baseless (or at least self-inflicted) in light of this Court's orders allowing five lawyers from Quinn Emmanuel Urquhart & Sullivan LLP to appear *pro hac vice* as NICO's counsel in this case.  (*See* Docket. No. 45 (Michael Carlinsky); Docket No. 46 (Brad Evan Rosen); Docket No. 47 (Jane Marie Byrne);

Docket No. 48 (Jason Toji Calabro); Docket No. 53 (Corey Worcester).)  These same five Quinn Emmanuel lawyers have represented HDI-Gerling in the insurance arbitration against Ford, some since 2010.  If NICO does not consider Quinn Emmanuel's dual representation of HDI-Gerling as a conflict of interest, disqualification, or threat to future business deals with HDI-Gerling, then disclosure of the reserve and reinsurance information to Ford can do no competitive harm.

Now that Ford has pointed out the deficiencies in Mr. Lewis's declaration and the holes in NICO's arguments, it would be fundamentally unfair to permit NICO, as the party with the burden, to submit another declaration from Mr. Lewis or someone else.  Moreover, such an effort would exceed the proper scope of reply permitted by the Court's Order and Local Rule 7(F)(1).  (*See* Order (March 27, 2013), 4 (Docket No. 51).)

> ### 2.     Ford's Discovery of Reserves and Reinsurance Information Will Not Harm NICO.

NICO argues that discovery of its reserves information would cause irreparable harm by granting competitors access to confidential and proprietary information.  With respect to confidentiality, this argument contradicts NICO's prior positions in that reserves are irrelevant because they are merely statutory while disregarding NICO's regular disclosures of reserve and reinsurance information to regulators.  As far as competitive harm is concerned, NICO seems to forget that Ford is not its competitor and overlooks the appearance of HDI-Gerling's lawyers from the arbitration proceedings against Ford as NICO's counsel in this litigation.  Regardless, the Agreed Protective Order will shield NICO's reserve and reinsurance information from broader circulation if NICO follows the established procedures.

First and foremost, Ford disputes whether the reserves and reinsurance information are actually confidential or proprietary.  On one hand, NICO argues that reserves "are set by statute." (NICO's Memo., 17.)  To the extent that NICO sets its reserves based on a statutory minimum

requirement, the determination of reserves would be subject to a publicly-known standard and neither proprietary or confidential.  *See* Neb. Rev. Stat. § 44-401 *et seq.* (2012).

On the other hand, NICO claims that it derives its reserves and reinsurance coverage by a proprietary method that it wants to shield from competitors.  NICO, however, reports its reserve and reinsurance information to insurance industry regulators, and those regulatory agencies, in turn, make reserve and reinsurance information available to the public.  The Nebraska Department of Insurance receives quarterly and annual financial statements from NICO and will provide NICO's regulatory submissions to the public upon request.  Indeed, the Nebraska Department of Insurance has already provided Ford with NICO's annual statements (and amendments thereto) for 2007-2012, NICO's quarterly statements for 2007-2012, Deloitte & Touche LLP's audited financial statements for NICO for 2007-2012, and NICO's management discussions for 2007-2012.

Additionally, examinations of NICO's financial condition are regularly performed under guidelines established by the National Association of Insurance Commissioners, and the reports from those examinations are made available to the public.  The Nebraska Department of Insurance posts these reports on its website, one of which details NICO's financial condition from the period January 1, 2006, through December 31, 2008.  (Ex. 9, Report of Examination of Financial Condition.)  This 2008 report shows the "reserves carried" by NICO on particular reinsurance contracts and identifies how NICO reinsured or "ceded" other liabilities (*Id*. at pp. 13, 17, 22, 23.)  Two curious entries in the 2008 Report may suggest how NICO valued the Reinsurance Agreement with HDI-Gerling and disposed of the $310,600,000 premium.  (*Id*. at p. 30) (showing losses of $310,671,934.00 for 2008 relating to retroactive insurance assumed or ceded).  Such a public accounting hardly seems confidential or proprietary.

16

Even if the information sought by Ford is confidential and/or proprietary, NICO's defenses undermine any claim that NICO will suffer competitive harm through disclosure to Ford. As NICO asserts in its Seventh Affirmative Defense, "NICO and Ford are not competitors." (Answer and Affirmative Defenses of Def. NICO, 9 (Docket No. 12).) Indeed, NICO has criticized Ford for not alleging "that there was any competitive relationship among Ford, an automaker, […] and NICO, a reinsurer." (Def. NICO's Mot. to Dismiss or, in the Alternative, to Stay, 8, 10) (Docket No. 11).) If NICO can be taken at its word, then making reserve and reinsurance information available to Ford would not constitute disclosure to a competitor, and there would be no competitive harm.

### 3. The Agreed Protective Order Adequately Addresses NICO's Concerns.

NICO fails to consider the Agreed Protective Order that was entered in this case on March 26, 2013, to protect "(a) trade secrets, (b) proprietary business information or (c) information invasive of an individual's legitimate privacy interests." (Agreed Protective Order, ¶ 2 (Docket No. 49).) This protective order sets procedures permitting disclosure of confidential information while limiting disclosure to the parties and their counsel. The protective order affords this protection by allowing parties to designate documents and testimony as "CONFIDENTIAL." (*Id.* at ¶ 5.) The procedures are simple and straightforward, and NICO could limit how reserves and reinsurance information are distributed notwithstanding Quinn Emmanuel's dual representation of HDI-Gerling.

### E. NICO Fails to Address the Work-Product Protection Asserted in Its Privilege Log.

Ford seeks full disclosure of dozens of documents that NICO redacted and claimed to be protected from disclosure by the work-product doctrine. (Order (March 27, 2013), 4 (Docket

No. 51)).  On March 28, 2013, at the Court's direction, Ford provided NICO with a list of documents that contained the disputed redactions.  (*See* Ex. 6, Ford' Challenge to NICO's 3/22/13 Priv. Log.)  NICO's motion for protective order, however, does not address Ford's challenges to the redacted documents with any particularity or explain how or why the challenged documents are protected from discovery by the work-product doctrine.  NICO's failure to do so waives the claimed privilege, and Ford is entitled to full disclosure of the documents in question.

Rule 26(b)(3)(A) outlines the basic precepts of the work-product privilege and codifies the holding in *Hickman v. Taylor*, 329 U.S. 495 (1947).  *See Sanford v. Virginia*, No. 3:08cv835, 2009 U.S. Dist. LEXIS 66484, 7-8 (E.D. Va. July 31, 2009).  Under this rule, a party may not ordinarily "discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed.R.Civ.P.26(b)(3)(A).  As this Court has explained in the past, "[i]t is the burden of the party asserting work product privilege to show that the privilege applies, and to meet this burden, the party asserting privilege must show, 'as to each document, that the work product in question was: (1) prepared by, or under the direction of, an attorney and, (2) was prepared in anticipation of litigation.'"  *E.I. du Pont de Nemours & Company v. Kolon Indus.*, No. 3:09cv58, 2010 U.S. Dist. LEXIS 36530 (E.D. Va. Apr. 13, 2010) (citing *Rambus, Inc. v. Infineon Techs. AG*, 220 F.R.D. 264, 272 (E.D. Va. 2004)).

Nothing on the record before the Court establishes that the documents at issue were prepared by, for, or under the direction of an attorney or in anticipation of litigation.  Although NICO offers the Court the Declaration of Kevin Lewis, Mr. Lewis does not provide any information that could trigger the work-product doctrine.  Moreover, as described by Mr. Lewis,

the documents appear to have been generated in the ordinary course of business as part the

business transaction memorialized by the Reinsurance Agreement rather than in anticipation of

litigation against Ford.  Indeed, NICO argues that reserves are "merely a business judgment

made by an insurance company to guard against future loss" and that "insurers frequently set

reserves based on a host of business considerations." (NICO's Memo,14 (citing *U.S. Fire Ins.

Co. v. City of Warren*, 2012 145008, *10 (E.D. Mich. Apr. 26, 2013); *Hoechst Celanese Corp. v.

Nat. Union Fire ins. Co.*, 623 A.2d 1009) (Del. Super Ct. 1991).)  Additionally, the documents at

issue are dated 2007 and 2008 and precede the disputes among HDI-Gerling, NICO, and Ford by

a matter of years, rendering any claim that the documents were created in anticipation of

litigation dubious at best.  (*See* Ex. 6, Ford' Challenge to NICO's 3/22/13 Priv. Log).

### F.    NICO Abandoned Its Claims for a "Confidential/Proprietary" Privilege for Reserves and Reinsurance Information.

Although NICO previously withheld the redacted documents under "an alleged

confidential/proprietary privilege," NICO omits any argument regarding this novel privilege

from its motion for protective order and fails to cite any authority supporting the application of

such a privilege to the documents in question.  (Order (March 27, 2013), 4 (Docket No. 51).)

Instead, NICO seems to have transformed this claimed privilege into an argument that disclosure

will cause it suffer competitive harm.  The Agreed Protective Order should provide adequate

protection to NICO's claimed interests.

## V.    CONCLUSION

For the reasons stated above, Ford moves this Court to deny NICO's Motion for

Protective Order in its entirety.

Dated: April 11, 2013                            Respectfully Submitted,


                                                 _____/s/_____

                                                 Scott C. Oostdyk (VSB#28512)
                                                 soostdyk@mcguirewoods.com

                                                 J. Tracy Walker (VSB#31355)
                                                 twalker@mcguirewoods.com

                                                 H. Carter Redd (VSB#34392)
                                                 hredd@mcguirewoods.com

                                                 Matthew D. Fender (VSB# 76717)
                                                 mfender@mcguirewoods.com

                                                 McGuireWoods LLP
                                                 One James Center
                                                 901 E. Cary St.
                                                 Richmond, VA 23219
                                                 Tel: (804) 775-1000
                                                 Fax: (804) 775-1061

                                                 *Counsel for Ford Motor Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 11, 2013, I filed the foregoing on the Court's CM/ECF system

which will cause a Notice of Electronic Filing (NEF) to be sent to the following counsel of

record for National Indemnity Company:

> Michael S. Levine, Esq.
> Hunton & Williams LLP
> 1751 Pinnacle Drive, Suite 1700
> McLean, Virginia  22102
> Tel: (703) 714-7602
> Fax: (703) 918-4050
> E-mail: mlevine@hunton.com
>
> Walter J. Andrews, Esq.
> Hunton & Williams LLP
> 1751 Pinnacle Drive, Suite 1700
> McLean, Virginia  22102
> Tel: (703)714-7642
> Fax: (703) 918-4020
> E-mail: wandrews@hunton.com

> ___/s/_____
> Counsel

47202332_2