**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| FORD MOTOR COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:12-cv-839 |
| v. | ) | |
| | ) | |
| NATIONAL INDEMNITY COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT NATIONAL INDEMNITY COMPANY'S
REPLY IN SUPPORT OF
ITS MOTION FOR PROTECTIVE ORDER**

**\*\*ORAL ARGUMENT REQUESTED\*\***

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| Ex. 1 | Tribunal Order No. 1, April 6, 2013, from the private and confidential arbitration between HDI-Gerling Verischerung AG and Ford Motor Company (filed under seal) |
| Ex. 2 | February 6, 2002 Agenda for Ford Motor Company's Global Risk Management section of Corporate Insurance. |
| Ex. 3 | December 20, 2002 letter from Steven Betz, Counsel, General Litigation, Ford Motor Company to James Hopson, Marsh USA, Inc. (filed under seal) |
| Ex. 4 | Excerpts from Ford Motor Company's privilege log. |

**PRELIMINARY STATEMENT**

This case is not a "bad faith" insurance coverage dispute. As the cases Ford cites make clear, traditional "bad faith" cases typically involve whether an insurer had a good faith basis not to defend its insured, or not to settle a claim within the insurer's policy limits. None of those issues are at stake here. Indeed, to the extent there is any question as to coverage, Ford conceded months ago that such disputes are being determined in the pending arbitration. (Dkt. 14 at 3, 6.) Ford's efforts to obtain discovery related to NICO's and HDI-Gerling's reserves and reinsurance information in the arbitration failed, however, hence Ford's efforts to obtain the exact same discovery here.[1] But the Fourth Circuit does not permit litigants to obtain discovery as to issues governed by an arbitration clause, so Ford's attempt to do so should be rejected, and the Court should grant NICO's motion for a protective order.

The protective order should also be granted because the requested information is not relevant, and NICO will suffer irreparable harm if NICO is ordered to produce it to Ford. In Ford's contrived attempt to demonstrate the relevance of these materials, Ford's opposition brief

---

[1] This is underscored by the fact that on April 6, 2013, the Tribunal in the related arbitration issued a unanimous order rejecting all the motions Ford had pending before the panel. (Ex. 1.) Of most immediate relevance to this case, the unanimous Tribunal rejected Ford's dispositive motion for coverage, holding that the underlying insurance policy is "ambiguous on its face." (*Id.* at 32.) And, the unanimous Tribunal rejected Ford's bid to dismiss HDI-Gerling's rescission claim, which is based on evidence that Ford made material misrepresentations about the risk to be insured when it was negotiating the policy with HDI-Gerling. (*Id.* at 9-21.) Ford has been aware of the evidence supporting the rescission claim, including damaging testimony elicited from Ford's own agents, since at least the summer and fall of 2012—months before Ford filed this lawsuit—so it is not surprising that Ford convinced the Tribunal to delay a trial on the merits in the arbitration until January 2014 (it was scheduled for March 2013), and then subsequently asked this Court to schedule a trial in this case for this summer. Ford is facing the prospect of *paying HDI-Gerling* $100 million in the arbitration if HDI-Gerling's rescission claim prevails. NICO believes that the only reason Ford filed this case was as a litigation tactic—to leverage the threat of treble damages to exert pressure on NICO/HDI-Gerling, to obtain additional discovery here (such as NICO's reserves and HDI-Gerling's other reinsurance information), and to collaterally attack the arbitration proceedings.

resorts to factual misrepresentations. For example, Ford suggests that documents prepared by Mitigate are the very reserve and reinsurance information that is the subject of this motion. (Dkt. 59 at 4.) Not so. As HDI-Gerling explained in its opening papers and as Ford well knows, Mitigate's role was to audit claims and advise the insurers with respect to the amount of losses that could be payable under the ASLP. Mitigate did not reinsure HDI-Gerling or NICO, and Mitigate had no role with respect to the HDI-Gerling/NICO Reinsurance Agreement. Moreover, NICO's reserves are on NICO's books, and HDI-Gerling's reserves are on HDI-Gerling's books—not the Mitigate documents. Ford's allegation, then, that NICO is using Mitigate documents as both a sword and a shield (*id.*) is false.

Indeed the entire premise of Ford's case is false. Ford alleges that "since" NICO became HDI-Gerling's claims agent, NICO has been "directing non-payment of claims to Ford." (Dkt. 21 at 1.) And as NICO noted in its opening brief, Ford's counsel stated unequivocally on the record to this Court that NICO "***paid no claims—they paid no non-batch claim***s." (Dkt. 56 at 8 (emphasis added).) But Ford does not deny that Ford's *own documents* prove that ***NICO/Resolute has paid $50 million in non-batch claim payments***, and Ford does not deny that that those payments continued until December 2010. Those payments stopped only when Ford and its claims handler McGuireWoods asked the insurers in January 2011 to hold payments going forward. (Dkt. 56 at 7-9.)

Ford does not deny that in January 2011, Mitigate (which Ford recognizes as HDI-Gerling's agent (Dkt. 59 at 5)) sent an email confirming Ford/McGuireWoods' instructions that "Ford does not want the insurers to issue payments at this time, even on claims that may not be in dispute." (Dkt. 56-9.) Instead, Ford represents to this Court that "NICO fails to mention or address" Mr. Oostdyk's response. (Dkt. 59 at 6.) Again, *not* true. NICO noted that his response

4

in fact confirmed that Ford/McGuireWoods "will coordinate with [insurers] directly the payment process to Ford." (Dkt. 56 at 9.)[2] And Ford/McGuireWoods did nothing in Mr. Oostdyk's email or elsewhere to *correct* the insurers' *understanding* that they were to hold payments until the batch claims were resolved. No correction was needed, though, because that was in fact what Ford/McGuireWoods wanted. And after instructing the insurers that Ford/McGuireWoods would be contacting the insurers "directly" to "coordinate" the "payment process" going forward, Ford cannot point to any instance in which Ford/McGuireWoods asked HDI-Gerling/NICO "directly" for payment on the claims at issue here before this Action was filed.

What's more, within a week of Ford identifying for the first time—just three weeks ago, March 25—the amounts Ford wanted to be paid on the claims at issue here (Dkt. 56-10), NICO offered (on behalf of HDI-Gerling) to pay those claims, subject to the claims and defenses in the Arbitration, if Ford could confirm that it was not assuming recovery on the disputed batch claims to calculate the amounts HDI-Gerling owed. (Dkt. 56-11.) Ford's response is on file as Dkt. 59-3 and reflects Ford's lack of good faith with respect to this litigation and the claims at issue. Ford refused to provide the confirmation NICO requested, and refused to even engage in a good faith dialogue on the amounts to be paid. It is therefore clear that Ford would rather postpone receiving payments on these claim amounts, in order to lend ballast to requests for discovery that it does not need, and that in any case should be unavailable to it.

The only relevant question in this case as to NICO's "state of mind" is what NICO believed Ford/McGuireWoods' January 2011 instruction to be. There is nothing in NICO's reserves that would have any bearing on that question, and requiring NICO to produce that

---

[2] In a carefully crafted sentence, Ford states that Mr. Oostdyk's response "refutes and does not accept any suggestion that payments would stop." (Dkt. 59 at 6.) That's not a denial of NICO's contentions.

5

information would compromise NICO's proprietary information. Therefore, this motion for a protective order should be granted.

## ARGUMENT

I.  **NICO'S RESERVES AND REINSURANCE INFORMATION ARE NOT DISCOVERABLE HERE**

    A.    **NICO's Reserves and Reinsurance Information Are Irrelevant to NICO's State of Mind In This Case**

Ford argues that NICO's reserve information, the "value" NICO placed on "the Ford business," and "how they arrived at those values" are "highly relevant" to NICO's "state of mind" and whether NICO acted "intentionally, purposefully, and without lawful jurisdiction." (Ford Br. 9.) Given that NICO has paid approximately $50 million in claims since becoming HDI-Gerling's claims agent, and given that NICO has offered to pay the claims at issue here (subject to the claims and defenses, and assuming they are properly calculated), the only basis for the reserves and reinsurance information Ford requests here is to use it to argue the underlying coverage dispute with HDI-Gerling. Months ago, however, Ford represented to this Court that "[a]t issue in the arbitration between Ford and HDI-Gerling are questions of coverage under the Gerling insurance policies. Ford's claims against NICO require proof of different elements than the contractual coverage issues in the arbitration." (*Id.* at 6.) Such discovery is not permitted by the Fourth Circuit, which has held that issues properly subject to an arbitration clause should be shielded from discovery. *See Maxum Found., Inc. v. Salus Corp.*, 779 F.2d 974, 983 (4th Cir. 1985) ("party confronted with a claim of arbitrability may pursue an order insulating it from discovery that could not be had if the underlying claim is properly the subject of arbitration").

The "bad faith" cases Ford cites (Dkt. 59 at 9-10) are inapposite. This is not a traditional bad faith case where the insurer's reserves may be relevant to determining whether the insurer

6

had a good faith basis for its coverage determinations, and the insurer's good faith turns on such issues such as a "lost policy" defense, or whether and when the insurer had a duty to defend. *See e.g. Stonewall Ins. Co. v. Nat'l Gypsum Co.*, No. 86 CIV 9671 (SWK), 1988 WL 96159, at *6 (S.D.N.Y. Sept. 6, 1988). Reserves in those cases may be relevant, for example, to determining whether the insurer thought that there could be coverage, which would therefore trigger the duty to defend.

Here, by contrast, NICO does not assert those kinds of defenses. The claims at issue here are listed on Exhibit B to Ford's Supplemental Response to Interrogatory No. 22 (Dkt. 56-10 at 7-14) (Exhibit B). They first appeared on the March 2011 and August 2012 audit reports, which was *after* Ford/McGuireWoods instructed the insurers in January 2011 to hold further payments until the batch coverage dispute was resolved, and the insurers could issue "one check" for all amounts. (Dkt. 56-9.) There were good reasons for NICO to have believed that this was a genuine request by Ford. First, two-thirds of the amounts listed on Exhibit B represent newly-audited amounts for claims on which NICO and/or HDI-Gerling had already made previous (and significant) payments. Second, in many cases, these newly audited amounts were relatively small. For example, the amount listed for claimant Susan Peters is for $0.05. (*Id.* at 11.) Fourteen of the amounts are under $10, forty of them are under $100, and eighty-three are under $1,000. Third, the amounts listed on Exhibit B are calculated incorrectly. Among other things, Ford has assumed recovery on the batch claims and that such amounts went toward satisfying the $50 million aggregate retention. Thus, if the batch claims are not covered under the ASLP, the amounts on Exhibit B are wrong. Ford's inability to do these calculations correctly while the batch claims are still pending underscores why NICO (and HDI-Gerling) would have thought the "one check" approach proposed by Ford/McGuireWoods was sensible. Even as of last week,

7

Ford still refuses to engage in a good faith dialogue about the amounts that could be paid on these claims while the batch claims are still in dispute. (Dkt. 59-3.) These factors make NICO's state of mind an appropriate inquiry for discovery, but only as to what it understood from Ford/McGuireWoods' January 2011 instructions, and NICO's reserves are irrelevant to that question.

Ford also argues that NICO's reserves information is relevant to potential expert testimony that NICO's supposed mishandling and "slow-payment" of claims was out of step with industry standards. (Dkt. 59 at 10-11.) But Ford does not explain what relevance reserves information has to that inquiry, nor does Ford cite any affidavit from a purported expert explaining how reserves information could provide evidence of "slow pay" as compared to the rest of the industry. This is mere *ipse dixit* reasoning. If anything, Ford would simply need to know the dates Ford submitted the claims, when those claims were audited, and when those claims were paid—information Ford already has. Nor does Ford articulate what NICO's submissions to industry regulators have to do with anything. The supposed evidence Ford cites for the relevance of such inquiry (Dkt. 59 at 11) does not support its claim. The cash flows Ford references appear to be picked out of the regulatory filing at random, with no attempt to tether them to the claims at issue in this case. The $6.115 billion in cash dividends Ford cites was paid to investors between June 29, 2006 and December 4, 2007 (Dkt. 59-9 at 5), and the credit line was extended on December 1, 2001. (*Id.* at 9.) All of these events occurred *before* the NICO/HDI-Gerling Reinsurance Agreement was even executed on December 27, 2007 (Dkt. 56-1 at 13), long before Ford contends NICO implemented its nefarious plan in January 2011 (it being apparently coincidental that this was also the time Ford instructed the insurers to hold payments) to invest float, and long before the claims at issue in this case first appeared on the

8

March 2011 and August 2012 audit reports. (Dkt. 59-3 at 2.) These cash flows thus have literally nothing to do with reserves NICO may have had with respect to the claims relevant to this case, and absolutely nothing to do with why these claims have not been paid.

> B. **NICO's Reserves And Reinsurance Information Are Not Relevant to NICO's Agency Defense**

Ford contends that NICO's reserves and reinsurance information are relevant to NICO's agency defense. (Dkt. 59 at 11-13.) The argument goes like this: because NICO asserts agency, and because Virginia common law imposes a fiduciary duty on agencies generally, NICO's reserves may be (without explaining how) relevant to determining whether NICO was slow-paying, because NICO's slow-paying *Ford* may have somehow been self-dealing in a way that injured *HDI-Gerling*, such that NICO may have breached its fiduciary duty to HDI-Gerling, which may be relevant to NICO's agency defense. Needless to say, this argument is a stretch. It is also wrong.

First, for its agency defense to apply, NICO need show only that its actions here were within the scope of its duties as defined by the Reinsurance Agreement with HDI-Gerling. *See Fox v. Deese*, 234 Va. 412, 427-28. Assuming Ford even has standing to challenge the scope of NICO/HDI-Gerling relationship, there can be no reasonable dispute that NICO was acting within its delegated authority. As even the case Ford cites makes clear, "[t]he question of agency *vel non* is one of fact for the fact finder **unless** the existence of an agency relationship depends upon unambiguous written documents or undisputed facts." *See Reistroffer v. Person*, 247 Va. 45, 48 (1995) (emphasis added). Here the NICO / HDI-Gerling Reinsurance Agreement is unambiguous on its face and provides: "[HDI-Gerling] assigns to [NICO] and [NICO] accepts all rights, duties and obligations, including direct payment rights, with respect to the administration, defense, negotiation, settlement or litigation of all Covered Liabilities." (Dkt. 56-1 at 6 ¶1.) And

9

HDI-Gerling's control over NICO in this regard is reinforced by other provisions of the contract (*see, e.g., id.* at ¶ (3)), including that "[HDI-Gerling] shall have the right, but not the obligation to assume control of the administration, defense, negotiation, settlement or litigation of any Covered Liability." (*Id.* at ¶ 4.)

Moreover, Ford has repeatedly relied on the language in this very Reinsurance Agreement to argue that NICO has control over Resolute and HDI-Gerling's claims handling. In its opposition to this motion, Ford stated that NICO has "total claims control." (Dkt. 59 at 3.) Elsewhere Ford has used the Reinsurance Agreement to assert NICO's control of Resolute's and HDI-Gerling's documents for claims handling purposes, and also has represented to this Court that "NICO has been running the arbitration in the name of HDI-Gerling." (Dkt. 21 at 8.) After making these representations to the Court, and deriving benefits from them, Ford cannot "play fast and loose" with the Court, and disclaim now the very representations it made to the Court earlier. *See Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982) ("[A] party may properly be precluded as a matter of law from adopting a legal position in conflict with one earlier taken in the same or related litigation. Judicial estoppel is invoked in these circumstances to prevent the party from 'playing fast and loose' with the courts, and to protect the essential integrity of the judicial process." (internal citations and quotations omitted)).

Nor can Ford seriously maintain the position that NICO was somehow acting outside the scope of the NICO/HDI-Gerling Reinsurance Agreement. (Dkt. 59 at 13.) If that were the case, then HDI-Gerling did not agree with NICO to engage in NICO's supposedly nefarious conduct, and there was therefore no conspiracy under Virginia law. *See* Va. Code. 18.2-499.

The reserves information Ford seeks cannot lead to the discovery of admissible evidence because the unambiguous language of the NICO/HDI-Gerling Reinsurance Agreement, and Ford's prior representations to the Court, foreclose consideration of such evidence.

## II. DISCLOSURE OF NICO'S RESERVES AND REINSURANCE INFORMATION WOULD HARM NICO COMPETITIVELY

### A. NICO Demonstrated That Disclosure of Its Reserves and Reinsurance Information Would Irreparably Harm NICO

Ford argues that NICO "relies exclusively upon the Declaration of Kevin Lewis" to establish "good cause for a protective order." (Dkt. 59 at 14.) Not true. As NICO argued in its moving papers, a protective order is appropriate when the information requested is not relevant (Dkt. 56 at 13), and NICO explained in that brief and above why the information Ford requests is not relevant. NICO also relied on the affidavit of Kevin Lewis to establish that the disclosure of the requested reserve and reinsurance information would irreparably harm NICO. (Dkt. 56 at 17-18, Ex. 3.)

Ford first objects to Mr. Lewis, an Assistant Vice President of NICO, discussing HDI-Gerling's rights. (Dkt. 59 at 14.) This is another example of Ford ignoring the NICO/HDI-Gerling relationship when it is convenient for Ford, and relying on it otherwise. Ford cannot have it both ways. Moreover, Mr. Lewis's actual testimony is that "NICO is under an obligation to maintain the confidentiality asserted by HDI-Gerling over its loss reserves, which constitute confidential, proprietary and sensitive business information set by HDI-Gerling according to, among other things, HDI-Gerling's unique and proprietary processes." (Dkt. 56-3 at ¶ 3.)

With respect to both HDI-Gerling's and NICO's reserves and reinsurance information, Ford objects that the Lewis Affidavit as not sufficiently "concrete." (Dkt. 59 at 14.) Mr. Lewis testified, however, that "NICO evaluates such loss reserves pursuant to highly confidential and proprietary methodologies." (Dkt. 56-3 at ¶ 5.) He also noted that "NICO competes with direct

11

insurers who are potential cedents of NICO's," and "in that regard, the information that Ford seeks to discover is used by NICO to competitively price the reinsurance that it markets to these potential cedents," that NICO still uses "substantially the same evaluative strategies and methodologies that Ford seeks to discover here," and that disclosing such strategies to future potential cedents would "substantially prejudice NICO" by granting future cedents "critical insight into NICO's business operations" and "placing NICO at a significant competitive disadvantage." (*Id.* at ¶ 7.)

It is not clear what more Ford could reasonably have expected. Ford appears to be arguing, without citation, that Mr. Lewis should have actually described NICOs' confidential, proprietary methodologies in his affidavit. But that, of course, would defeat the stated purpose of keeping this information confidential, and NICO is aware of no authority that would require NICO to do so.

Critically, Ford offers no evidence to rebut Mr. Lewis's testimony, so it is therefore undisputed. And as a matter of common sense, the only way NICO can profitably reinsure its cedents and maintain a competitive bargaining position with respect to both cedents and other reinsurers, is if its methods of evaluating risk are kept confidential.

### B. A Protective Order Is Not Sufficient To Protect NICO's Interests

Ford is also off base by arguing that the protective order governing this case should alleviate NICO's concerns because "Ford is not [NICO's] competitor." (Dkt. 50 at 15.) As the exhibits NICO submitted with its motion make clear, however, NICO reinsures Ford and Ford's captive insurance company Transcon. (Dkt. 56-5.) Thus NICO is directly across the bargaining table from Ford and its insurer. Providing Ford with NICO's internal strategies and confidential proprietary methodologies will compromise NICO's bargaining position in any future transaction between Ford/Transcon and NICO. Ford does not address this at all.

Nor does the mere appearance of attorneys from Quinn Emanuel in this case compromise NICO's concerns of competitive harm. (Dkt. 59 at 14.) HDI-Gerling is not a party to this case and the documents NICO wants to keep confidential have not even been produced in this case. Quinn Emanuel representation of NICO in this litigation and HDI-Gerling in the arbitration, does not mean that both clients have consented to Quinn Emanuel sharing all of one client's confidential, non-produced documents in one action with the other. Quinn Emanuel assures the Court that this "inter-client-open-files" approach is not standard practice at Quinn Emanuel, and it is not how Quinn Emanuel has conducted itself with respect to this case.

Moreover, HDI-Gerling's relevance to this case does not derive from Quinn Emanuel's appearance. It is Ford that has demanded the depositions of HDI-Gerling witnesses and, not just any HDI-Gerling witnesses, but the very HDI-Gerling representatives that sat across the table from NICO when HDI-Gerling and NICO negotiated the Reinsurance Agreement. The Protective Order governing this case permits parties to share "Confidential" information with deposition witnesses, so NICO now faces the prospect that Ford will take NICO's confidential information relating to how NICO evaluates reinsurance transactions, and use that information when Ford deposes the very people that NICO was negotiating with when NICO created these highly confidential and proprietary documents, and the very people that NICO may negotiate against in the future on similar transactions.

### C. Ford is Free to Review NICO's Publicly Available Reserves and Reinsurance Information

Ford also argues that a protective order is not justified here because some of NICO's reserve and reinsurance information is publicly available. (Dkt. 59 at 16.) This argument is an obvious red herring. It suffices to say that if the specific reserve and reinsurance information Ford is requesting is publicly available, then Ford is welcome to review it.

**III. NICO HAS NOT WAIVED WORK PRODUCT PROTECTION**

Despite Ford's suggestions to the contrary, NICO did argue that reserves are protected by work product. (Dkt. 56 at 14-15.) Ford simply ignores NICO's argument and then represents to the Court that "the documents at issue are dated 2007 and 2008 and precede the disputes among HDI-Gerling, NICO, and Ford by a matter of years." (Dkt 59 at 19.) This was disingenuous because Ford knows that the parties have been anticipating litigation since at least 2002, (Ex. 2, 2/6/02 agenda; Ex. 3, 12/2002 Betz letter.) Indeed, Ford's own privilege log asserts work product on documents dating back to 2002. (Ex. 4 Priv Log excerpts.)

**IV. FORD HAS NOT ARGUED ANY BASIS FOR NICO'S PRE-2011 RESERVES AND REINSURANCE INFORMATION**

For the reasons stated above, NICO believe that NICO's reserves and reinsurance information are not discoverable, and that a protective order should be issued. But even if the Court is inclined to order the production of some of these documents, NICO noted that such production should be limited to only the reserves and reinsurance information concerning the claims at issue in this case. (Dkt. 56 at 17.) In its opposition, Ford articulated no basis to justify anything broader than that. Accordingly, if the Court is inclined to order discovery of reinsurance and reserve information, the Court should limit such order to only those reinsurance and reserve documents that specifically break out reserves for the claims at issue in this case, which Ford has now identified on Exhibit B to its Supplemental Responses to NICO's Interrogatory No. 22. (Dkt. 56-10.) There is simply no basis to grant Ford a broader fishing expedition as to claims not at issue in this litigation and that are pending in the related arbitration.

**NATIONAL INDEMNITY COMPANY**

By:    /s/ George P. Sibley, III

George P. Sibley, III (VSB No. 48773)
gsibley@hunton.com
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200

Walter J. Andrews (VSB No. 46031)
wandrews@hunton.com
Michael S. Levine (VSB No. 48013)
mlevine@hunton.com
Hunton & Williams LLP
1751 Pinnacle Drive
Suite 1700
McLean, Virginia 22102
(703) 714-7400

Jane M. Byrne (*pro hac vice*)
janebyrne@quinnemanuel.com
Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
J. Toji Calabro (*pro hac vice*)
tojicalabro@quinnemanuel.com
Brad Evan Rosen (p*ro hac vice*)
bradrosen@quinnemanuel.com
 Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Defendant,*
*National Indemnity Company*

## Certificate of Service

I certify that on the 15th day of April 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

        Scott C. Oostdyk (VSB No. 28512)
        soostdyk@mcguirewoods.com
        J. Tracy Walker (VSB No. 31355)
        twalker@mcguirewoods.com
        H. Carter Redd (VSB No. 34392)
        hredd@mcguirewoods.com
        Matthew D. Fender (VSB No. 76717)
        mfender@mcguirewoods.com
        MCGUIRE WOODS LLP
        One James Center
        901 E. Cary St.
        Richmond, Virginia 23219
        Tel: (804) 775-1000


          /s/ George P. Sibley, III
        George P. Sibley, III (VSB No. 48773)
        gsibley@hunton.com
        Hunton & Williams LLP
        Riverfront Plaza, East Tower
        951 E. Byrd Street
        Richmond, Virginia 23219
        (804) 788-8262
        (804) 788-8218 (fax)