IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| FORD MOTOR COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:12-cv-839 |
| v. | ) | |
| | ) | |
| NATIONAL INDEMNITY COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT NATIONAL INDEMNITY COMPANY'S
OPPOSITION TO FORD'S MOTION TO COMPEL DISCLOSURE
OF FIFTY-FIVE PRIVILEGED DOCUMENTS**

REDACTED

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND.......................................................................................................2

ARGUMENT ...............................................................................................................................6

I.      THE 55 DOCUMENTS UNDER *IN CAMERA* REVIEW ARE PROTECTED
        FROM DISCLOSURE BY PRIVILEGE OR THE WORK PRODUCT
        DOCTRINE. ..................................................................................................................6

        A.      Communications Containing Legal Advice From Kevin Lewis And John
                Yacoub Are Privileged..........................................................................................6

        B.      Ford Fails To Identify A Single Document Withheld Under The Work
                Product Doctrine That Was Not Created In Anticipation of Litigation................10

        C.      NICO's Communications With The ASLP Carriers Regarding Legal
                Advice And Strategy Vis-à-Vis Ford's Claims Are Protected Under The
                Common Interest/Joint Defense Privilege. ...........................................................11

II.     NEITHER PRIVILEGE NOR WORK PRODUCT PROTECTION HAS BEEN
        WAIVED OVER ANY OF THE 55 DOCUMENTS. .......................................................16

        A.      NICO Timely Asserted Its Clawback Rights........................................................16

        B.      NICO's Production Of The 55 Documents Was Inadvertent. ...............................17

                1.      NICO Took Reasonable Precautions To Prevent Inadvertent
                        Disclosure. ...............................................................................................20

                2.      NICO Rectified The Error The Very Next Day.........................................20

                3.      The Error Occurred In The Course Of A Large-Scale Production,
                        And Less Than 0.2% Of Documents Produced Were Affected.................21

                4.      The Extent Of The Disclosure Was Minimal. ..........................................22

                5.      Fairness Dictates That The 55 Documents Retain The Privilege. .............22

        C.      NICO Did Not Selectively Claw Back Documents. ..............................................22

        D.      NICO's Subsequent Production Of Documents And Withdrawal of Certain
                Clawback Requests Does Not Yield A Categorical Waiver..................................23

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Safety Cas. Ins. Co. v. City of Waukegan*,
No. 07.................................................................................................................13, 14, 15, 16

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
160 F.R.D. 437 (S.D.N.Y. 1995) ...................................................................................15

*Chahoon v. Commonwealth*,
62 Va. (21 Gratt.) 822 (1871) ........................................................................................12

*Chaudhry v. Gallerizzo*,
174 F.3d 394 (4th Cir. 1999) .........................................................................................25

*Datel Holdings Ltd. v. Microsoft Corp.*,
No. C-09-05535 EDL, 2011 U.S. Dist. LEXIS 30872 (N.D. Cal. Mar. 11, 2011).................18

*Deel v. Bank of America, N.A.*,
227 F.R.D. 456 (W.D. Va. 2005).......................................................................................8

*Duplan Corp. v. Deering Milliken, Inc.*,
540 F.2d 1215 (4th Cir. 1976) .......................................................................................24

*ePlus Inc. v. Lawson Software, Inc.*,
No. 3:09CV620, 2012 WL 6562735 (E.D. Va. Dec. 14, 2012)..............................................23

*Ergo Licensing, LLC v. Carefusion 303, Inc.*,
263 F.R.D. 40 (D. Me. 2009).........................................................................................21

*Essex Ins. Co. v. Interstate Fire & Safety Equip. Co.*,
263 F.R.D. 72 (D. Conn. 2009)......................................................................................17

*F.C. Cycles International, Inc. v. Fila Sport, S.p.A.*,
184 F.R.D. 64 (D. Md. 1998)...........................................................................................9

*Fed. Deposit Ins. Corp. v. Marine Midland Realty Credit Corp.*,
138 F.R.D. 479 (E.D. Va. 1991) .............................................................................17, 19, 21

*Fed. Elections Comm'n v. Christian Coal.*,
178 F.R.D. 61 (E.D. Va. 1998) ......................................................................................23

*Fid. Nat'l Title Ins. Co. v. Captiva Lake Invs., LLC*,
No. 4:10 CV 1890 (CEJ), 2012 U.S. Dist. LEXIS 116206 (E.D. Mo. Aug. 17, 2012) ..........17

*Francisco v. Verizon S., Inc.*,
756 F. Supp. 2d 705 (E.D. Va. 2010) *aff'd*, 442 F. App'x 752 (4th Cir. 2011)......................18

*Fuller v. Interview, Inc.*,
No. 07 Civ. 572 (RJS) (DF), 2009 WL 3241542 (S.D.N.Y. Sept. 30, 2009) .............16, 17, 20

*In re Grand Jury Investigation*,
  142 F.R.D. 276 (M.D.N.C. 1992) ........................................................................20, 21, 22

*In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*,
  902 F.2d 244 (4th Cir. 1990) .......................................................................................12

*HSH Nordbank AG N.Y. Branch v. Swerdlow*,
  259 F.R.D. 64 (S.D.N.Y. 2009) ...................................................................................14

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ....................................................................................................24

*Inc. v. Lawson Software, Inc.*,
  280 F.R.D. 247 (E.D. Va. 2012) ...............................................................................9, 18

*Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*,
  No. 2:07-CV-116, 2012 U.S. Dist. LEXIS 121830 (S.D. Ohio, Aug. 28, 2012)..............21, 22

*JJK Mineral Co. v. Swiger*,
  -- F.R.D. --, No. 1:12 cv 00143, 2013 WL 663283 (N.D. W. Va. Feb. 22, 2013)..................24

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  104 F.R.D. 103 (S.D.N.Y. 1985) ..........................................................................19, 20, 21

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*,
  No. CCB-03-3408, 2012 WL 4378160 (D. Md. Sept. 24, 2012)............................................13

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*,
  967 F.2d 980 (4th Cir. 1992) .......................................................................................10

*Pensacola Firefighters' Relief Pension Fund Bd. of Trs. v. Merrill Lynch
  Pierce Fenner & Smith,  Inc.*,
  265 F.R.D. 589 (N.D. Fl. 2010) ....................................................................................16

*In re Sealed Case*,
  737 F.2d 94 (D.C. Cir. 1984) .....................................................................................6, 7

*In re Sulfuric Acid Antitrust Litig.*,
  235 F.R.D. 407 (N.D. Ill. 2006).................................................................................17, 20

*United States v. BDO Seidman, LLP*,
  492 F.3d 806 (7th Cir. 2007) ......................................................................................14

*United States v. Jones*,
  696 F.2d 1069 (4th Cir. 1982) .....................................................................................24

*Upjohn Co. v. United States*,
  449 U.S. 383 (1981)...................................................................................................7, 8

*Waller v. Fin. Corp. of Am.*,
  828 F.2d 579 (9th Cir. 1987) ......................................................................................13

**Rules / Statutes**

FED. R. CIV. P. 26 ................................................................................................................. 4, 5, 16

FED. R. CIV. P. 26(B)(3) ................................................................................................... 10, 11, 24

FED. R. CIV. P. 26(B)(5)(B) ..................................................................................................... 2

FED. R. CIV. P. 26(E)(1) .......................................................................................................... 2

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 .................................................. 8

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 70 .................................................. 8

National Indemnity Company ("NICO") submits this Memorandum of Law in Opposition to Ford Motor Company's ("Ford") Motion to Compel Disclosure of Fifty-Five Privileged Documents (Motion to Compel, ECF No. 107, Memorandum of Law at ECF No. 108 ("Ford Br.")).

## PRELIMINARY STATEMENT

This Court now has not one, but two motions pending before it, filed by Ford, to compel production of 55 documents clearly protected by the attorney-client privilege, the work product doctrine, or both.  Yet, while Ford provides a few examples of the documents it challenges, with one exception, it fails to challenge any specific document on NICO's clawback list, instead making only generalized and meritless assertions that whole categories of documents are not privileged.

Moreover, Ford has repeatedly alleged that NICO's inadvertent disclosure of certain documents on May 5, and immediate clawback of those documents the next day, was, in fact, a strategic plan to selectively disclose certain documents by NICO.  This makes no sense.  Why would NICO disclose documents it didn't want Ford to see, only to claw them back the next day? As NICO has repeatedly advised Ford and this Court (*see, e.g.*, Exh. 1 at 28:9-28:10; Exh. 2 at 92:11-92:12), NICO's disclosure of those documents—55 of which it has submitted to the Court *in camera* per the Court's May 9 Order (Exh. 1 at 29:16-30:7)—was entirely accidental, the result of coding errors in the course of an expedited review of thousands of documents.

By contrast, Ford's zeal to review NICO's privileged documents—many of which will reveal the litigation strategy of NICO's counsel, including its outside counsel, Quinn Emanuel, in this case, as well as HDI-Gerling's strategy in its pending arbitration with Ford to Ford's counsel in that case, McGuireWoods (*see* Exh. 1 at 21:25-22:5)—demonstrates Ford's desperation, both

1

here and in the arbitration, to find a plausible hook for its claims.  Under settled law, Ford has no

basis to discover NICO's privileged documents and the work product of its attorneys.

## FACTUAL BACKGROUND

Since March 25, 2013—when Ford, for the first time, identified the particular insurance

claims with which it alleged NICO had tortiously interfered (*see* Exh. 3)—eight attorneys plus

over 30 contract attorneys have reviewed, at a rapid pace, thousands of documents from Resolute

that NICO believed might be responsive to Ford's earlier-promulgated document requests,

pursuant to its duty to supplement under Rule 26(e)(1) of the Federal Rules of Civil Procedure.

On May 5, 2013, NICO produced 2,967 documents (constituting over 20,000 pages) to

Ford by making them available for download on a password-protected FTP site, as is the parties'

custom.  (Lacey Decl. ¶ 4; Exh. 4).  Shortly after providing Ford the password (Exh. 5), NICO

discovered that numerous privileged documents, as well as non-privileged documents that

included reserves and/or reinsurance information covered by NICO's pending motion for a

protective order, had been included in the production.  NICO advised Ford of the error the next

day, and stated that it would re-load a new production, absent the offending material.  (Exh. 6).

It requested that Ford delete the materials previously produced.  (*Id.*).

Ford, however, refused to delete the production.  (Exh. 7).  Instead, Ford stated that it

would "of course be happy to honor [NICO's] request to claw back inadvertently produced

privileged documents," and accordingly promised that,

> *If you will please provide a list of the Bates numbers of the*
> *documents which you feel were inadvertently produced, we will*
> *refrain from using those documents*.  Once we receive your revised
> production and have had a chance to process it, we will use that
> version going forward.  *We will destroy or sequester the*
> *documents NICO claims were privileged as required by Fed. R.*
> *Civ. P. 26(b)(5)(B).*

(*Id.*) (emphases added).

2

Meanwhile, in accordance with Ford's request, NICO agreed, in light of upcoming depositions, to work "as quickly as possible to compile a list of Bates numbers that correspond to the inadvertently produced documents," stated that it would be "providing that list to [Ford] on a rolling basis," and, within four hours of Ford's email, sent Ford an initial list.  (Exh. 8).  Over the next day, NICO identified additional documents —including both privileged documents and those subject to NICO's pending motion for a protective order—that were inadvertently included in its May 5 production, for a total list of 300 documents.  (*Id.*; Exh. 9).

During this time, NICO investigated the cause of the error—and discovered that, although the contract attorneys had been received substantial training (both initially and over the course of the review) on the software, the case background, and how to correctly categorize attorney-client privileged communications and attorney work product, had received a packet of materials summarizing these issues and the relevant players (including the names of in-house and outside counsel and the law firms involved), and had been in close contact with NICO's counsel in order to ask questions and receive guidance, the inadvertently produced documents had been marked as responsive to Ford's requests, but had not been coded as privileged.  Had these documents been coded "privileged" as per the training guidelines, they would not have been produced.

Although it was Ford who refused NICO's suggestion for Ford simply to delete the flawed production and review instead a new production—by far the easier path for Ford than individually sequestering each privileged document by Bates number—on May 7, Ford's counsel stated that he found NICO' clawbacks "very confusing."  (Exh. 10).  The next day, May 8, NICO received a formal letter in which Ford again stated that it would sequester the documents identified by NICO.  However, having reviewed the documents identified on NICO's clawback

lists, instead of sequestering them, Ford argued that the privilege had been waived over NICO's privileged documents because they were "unquestionably responsive to Ford's document requests."  (Exh. 11 at 2-3; *see also* Exh. 1 at 9:6-9:13 (statement of Ford's counsel to the court that the inadvertently produced documents were "Resolute documents")).  Ford thus demanded to see every single document that NICO had identified as containing proprietary business information, an issue already under the Court's consideration, as well as every single privileged communication between NICO and its attorneys.  (Exh. 11 at 3).

At a meet-and-confer that same day, despite prior promises to sequester all inadvertently-produced material, Ford again took the position that it would continue to sequester NICO's privileged documents, but would disregard NICO's request to claw back documents relating to reinsurance and reserves that were subject to NICO's pending motion for a protective order.  (*See* Exh. 2 at 92:8-92:22).  With little choice, but reserving all rights, NICO removed all non-privileged documents subject to its motion from its clawback list (*see id.*), leaving only the 102 documents covered by the attorney-client privilege or work-product doctrine.  (Exh. 12).

The next day, May 9, the parties came before the Court.  Although NICO dramatically reduced its clawback list in an effort to alleviate Ford's concerns, Ford nonetheless requested that the Court declare that NICO's inadvertent production had waived privilege over *all* of the inadvertently produced documents, and that the Court order the remaining 102 documents produced because all 102 documents were overdue Resolute documents.  (Exh. 1 at 11:9-15:8.).  Despite his recognition of his obligations under Rule 26, however, Ford's counsel described in detail one of NICO's clawed-back documents to the Court.  (*Id.* at 25:21-26:22.)

The Court ordered NICO to produce a notebook of the inadvertently-produced privileged documents to the Court for *in camera* review, and a privilege log to both the Court and Ford.

(*Id.* at 29:16-32:8). It also authorized Ford to file a motion pending service of those items by

NICO. (*Id.*)

Following the hearing, NICO further reduced its clawback list to 55 documents (the "55

Documents"), which, together with explanations of the applicable privilege, were submitted for

the Court's *in camera* review on May 24, 2013. (Exh. 13; *see* Ford Exh. 1). On May 31, Ford

filed its amended Motion to Sanction NICO. (ECF No. 96). In that Motion, Ford requested,

*inter alia*, that the Court make the following findings:

> 1. Finding that the Resolute documents produced by NICO
> on May 5, 2013, are not proper objects of a claw back that NICO
> initially demanded on May 6, 2013, and has subsequently
> amended;
>
> 2. Finding that NICO produced the Resolute documents on
> May 5, 2013, as a consequence of NICO's conscious decision to
> produce them rather than inadvertence, or as a consequence of
> NICO's inconsistent assertions of the attorney-client privilege,
> work-product doctrine, or the common interest privilege;
>
> 3. Finding that NICO has waived all claims of attorney-
> client privilege, work product protection, and common interest
> protection for any Resolute documents that NICO failed to identify
> or produce on or before February 13, 2013, including, but not
> limited to the Resolute documents that NICO produced on May 5,
> 2013, and seeks to "claw back"….

(ECF No. 96 ¶¶ 1-3). Ford thus requested that the Court

> Direct[] NICO to produce to Ford all Resolute documents that
> NICO failed to identify or produce on or before February 13, 2013,
> in un-redacted form, *including all Resolute documents that NICO*
> *produced to Ford on May 5, 2013, and seeks to claw back* ….

(*Id.* ¶ 4) (emphasis added). In the accompanying Memorandum of Law, Ford argued, *inter alia*,

that NICO had failed to demonstrate that the attorney-client privilege or work-product protection

applied to the 55 Documents (ECF No. 97 at 21-27); and that, even if the 55 Documents were

privileged, the privilege had been waived (ECF No. 97 at 15-21). NICO filed its Opposition to

Ford's Motion to Sanction NICO on May 14, 2013. (ECF No. 117).

One week later, on June 7, 2013, Ford filed this Motion to Compel, making the same

arguments and asking for the same relief.

## ARGUMENT

**I.     THE 55 DOCUMENTS UNDER *IN CAMERA* REVIEW ARE PROTECTED FROM DISCLOSURE BY PRIVILEGE OR THE WORK PRODUCT DOCTRINE.**

Ford fails to challenge any of the 55 Documents individually. Instead, it argues that

whole categories of documents on NICO's clawback list are not privileged or protected work

product. Specifically, it argues that neither communications with nor work product of

NICO/Resolute in-house counsel Kevin Lewis and HDI-Gerling counsel John Yacoub (Ford Br.

7-12) are protected; nor are documents between and among the ASLP carrier group (the "Carrier

Group") regarding legal strategy with respect to Ford's claims under the ASLP (*id.* at 12-16).

Ford's contentions lack merit under clearly established law.

### A.     Communications Containing Legal Advice From Kevin Lewis And John Yacoub Are Privileged.

Ford first argues that, because John Yacoub at HDI-Gerling and Kevin Lewis at

NICO/Resolute have both legal and business responsibilities, the "attorney-client privilege

cannot attach to claw back documents based on [their] inclusion in those communications."

(Ford Br. 9; *see id.* at 8-11). That is clearly not the law. The fact that in-house counsel may

serve a have both legal and non-legal responsibilities "does not dilute the privilege" that attaches

when the attorney acts in a legal capacity. *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ As Ford acknowledges elsewhere in its Brief (Ford Br. 7), communications with in-house counsel are privileged so long as the communication was made for the purpose of providing legal advice.  *See Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981) (attorney-client privilege attached to communications made by "Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel"); *In re Sealed Case*, 737 F.2d at 101 (affirming district court's conclusion that conversation between senior executive and in-house counsel in which executive sought advice regarding company's legal matters was privileged).

Ford challenges only one entry on NICO's privilege log on these grounds (Ford Br. 9 (quoting Ford Exh. 1 at 1 (Tab 4))); and it is clear that that communication was made for the purpose of providing legal advice.  Tab 4, which Ford challenges, is a "[c]ommunication from Steve Whitley to [attorney] Kevin Lewis, as in-house counsel forwarding and discussing analysis by [attorney] Kent Wilson and [attorney] John Ya[c]oub, acting as coverage counsel, of various coverage issues stemming from Ford's January 2010 notice that it would be submitting [the] batch claims for payment under the Aggregate Stop Loss policies."  (Ford Exh. 1 at 1 (Tab 4)). Whether Ford has coverage under the ASLP as a matter of law is clearly a legal issue, and counsel's analysis of that issue is privileged.

Next, Ford makes the two-fold argument that "multiple emails on NICO's privilege log reflect communications between in-house counsel and numerous non-lawyers, and multiple

7

emails are forwarded to non-lawyers, destroying the privilege." (Ford Br. 11). Both of these assertions are meritless.

The first of these two arguments is frivolous. Privilege is not destroyed by a communication between a non-lawyer and a lawyer. In fact, it is hornbook law that the attorney-client privilege attaches to communications between the attorney and the *client*, not just between two attorneys. *See* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 70 (2000) ("RESTATEMENT") ("Privileged persons … are the client (including a prospective client), the client's lawyer, agents of either who facilitate communications between them, and agents of the lawyer who facilitate the representation."). Of course, the Supreme Court has long held that, where in-house counsel is concerned, the "client" may be the corporation's employee. *See Upjohn Co.*, 449 U.S. at 394-95 (1981). Ford does not point to a single entry on NICO's privilege log in which the non-lawyer participant(s) were not part of the privileged group.

Ford's second argument—that privilege is waived over a privileged communication forwarded to a non-lawyer—is only true if the individual to whom the communication is forwarded is not a "privileged person." *See* RESTATEMENT §§ 68, 70. "A corporation does not waive its privilege when non-lawyer employees send or receive communications because corporate communications which are shared with those having need to know of the communications are confidential for purposes of the attorney-client privilege." *Deel v. Bank of America, N.A.*, 227 F.R.D. 456, 460 (W.D. Va. 2005); *see also Upjohn*, 449 U.S. at 394 (attorney-client privilege attached to communications made by "Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel" (footnote omitted)).

*ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247 (E.D. Va. 2012), *enforcement granted in part, denied in part*, No. 3:09CV620, 2012 WL 6562735 (E.D. Va. Dec. 14, 2012), is not to the contrary.  In that case, the court recognized that "[t]he fact that certain entries refer to documents which forward legal advice or contain such advice does not necessarily constitute waiver with respect to those entries," and in fact found that those entries remained privileged. *Id.* at *253-54.  Nor does *F.C. Cycles International, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64 (D. Md. 1998),[1] support Ford's case.  The court there held that "[c]ommunications between corporate counsel and company personnel are privileged so long as the information is relayed for the purpose of obtaining legal advice."  *Id.* at 70-71.  Accordingly, the court examined each document to determine whether the communication was made for such purpose.  *See id.* at 71-72. Each of examples that Ford cites (Tabs 1, 6, 7) were indisputably made (and, in the case of Tab 7, forwarded) for the purpose of providing legal advice:

- **Tab 1** (Ford Exh. 1 at 1):  "Redacted email communication from counsel K. Wilson to Ford ASL carriers discussing various disputes with Ford, including national defense costs dispute, coverage issues related to batch claim dispute, and requesting information from the carriers to enable the further rendering of legal advice in dispute with Ford."

- **Tab 6** (*id.* at 2):  "Redacted communication from carrier counsel Kent Wilson to Steve Whitley and other representatives of the carrier group providing advice and analysis regarding the batch claims dispute."

- **Tab 7** (*id.*):  "Redacted communications forwarded by Steve Whitley [to Julia Price, Nick Watson, and Robert Love, all of Resolute; Price and Love were both deposed in this litigation] reflecting discussion, analysis and advice of Kevin Lewis (in-house counsel), John Yacoub and Brad Rosen (both outside counsel) regarding disputed coverage

---

[1]   Ford cites to "*Cohen*, 184 F.D.R. at 71." (Ford Br. 11).  No such citation exists; but as Ford appears to have attempted to reference *F.C. Cycles International*, NICO addresses that case herein.

issues related to batch claims and the manner of classifying those claims."

As Ford fails to point to any communication withheld on the basis of attorney-client privilege that was not made for the purposes of providing legal advice, the Court should reject Ford's argument that no communications involving John Yacoub and Kevin Lewis are privileged.[2]

### B.   Ford Fails To Identify A Single Document Withheld Under The Work Product Doctrine That Was Not Created In Anticipation of Litigation.

Ford asserts (Ford Br. 12) that "most of" the documents withheld as the work product of John Yacoub or Kevin Lewis do not fall within the work product doctrine because they "appear to have been created for business purposes such as running the insurance claims and administering NICO's reinsurance business rather than because of litigation."  Ford, however, does not cite to a single entry on NICO's privilege log withheld under the work product doctrine that does not meet this test.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co.*, 967 F.2d 980, 985 (4th Cir. 1992) ("In short, to resolve whether Rule 26(b)(3) grants immunity from discovery, the district court must determine, from an examination of the documents or their circumstances, whether they were prepared in anticipation of litigation or for trial.  If so and if the documents embody opinions and theories about the litigation, discovery is refused without further inquiry.").

An examination of NICO's privilege log reflects that Ford seeks the production of non-discoverable work product.  For example, the documents in Tab 12 (Ford Exh. 1 at 3), are "[c]ommunications between John Yacoub, acting as counsel, and Gerling [naming individuals] providing advice and reflecting strategy regarding interacting with Gerling facultative reinsurer

---

[2]   Ford's suggestion (Ford Br. 11) that NICO's "track record" has been "to hide damaging emails behind attorney-client privilege" is unsupported by the record, as Ford's motion makes clear.

with whom arbitration is imminent."  Similarly, Tab 45 (*id.* at 6), is a "[c]ommunication from S. Whitley [of Resolute] to [attorney] K. Lewis discussing and forwarding communications between N. Watson and S. Whitley providing information to facilitate legal advice and strategy with regard to disputed claim, as well as attaching communications with various outside counsel (QE) [Quinn Emanuel] regarding same."  As the arbitration referenced in Tab 12 was "imminent," and the claim referenced in Tab 45 was already under dispute, and each of these documents reflects the mental impressions of counsel regarding these issues, there can be no doubt that the "because of" standard set forth in *National Union Fire Ins. Co.* is met.

> **C.    NICO's Communications With The ASLP Carriers Regarding Legal Advice And Strategy Vis-à-Vis Ford's Claims Are Protected Under The Common Interest/Joint Defense Privilege.**

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████ and (3) NICO/HDI-Gerling did not share a common interest with any of the other Carriers (*id.* at 14-15).[3]  As to each of those arguments, Ford is wrong.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[3]  Ford's additional argument (Ford Br. 15) that "HDI-Gerling was waiving its privilege by disclosing documents to a third party [NICO]" during the due diligence period, before the parties shared a common interest, and therefore that "documents pre-dating" the reinsurance agreement between NICO and HDI-Gerling are not covered by the common interest privilege is mere speculation. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████ ██████████████████████████████████████████████████
██████████████████████████████████████████



It is well-established, in this Circuit as well as under Virginia law, that "a joint defense privilege cannot be waived without the consent of all parties who share the privilege." *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129*, 902 F.2d 244, 248 (4th Cir. 1990) (citing *Chahoon v. Commonwealth*, 62 Va. (21 Gratt.) 822, 842 (1871)).  Thus, in no event can any action of either HDI-Gerling or NICO have waived privilege over the common interest materials.

---

[4]   The relevant discussion at the March 25 hearing was as follows:

> THE COURT:  I'm going to tell you what you're going to do with this problem, Mr. Levine.  We are not dealing with it right, so we're going to deal with it correctly.
>
> *Mr. Oostdyk, you are required to notify—if there's a common interest privilege, you have to notify the other people about it and bring them in to litigate over it and move to compel. I want the documents produced here, I want a schedule fixed, and I want—we'll solve it that way.*

(Exh. 15 at 20:5-21:19) (emphasis added).



Ford's further contention (Ford Br. 14-15) that the common interest privilege is not applicable because the Carriers did not share "a common legal interest," but only overlapping

business strategies, is also unavailing.  It is well-established that an alignment in business interests does not present a bar to invocation of the common interest privilege where those interests are the product of contract, and the parties' communications related to their legal strategies.  *See City of Waukegan*, No. 07 C 1990, slip op. at 5 (Exh. 16) (rejecting insured's contention that communications among its insurers and their counsel were "part of the ordinary insurance business and [were] not privileged" because "[i]nsurers are entitled to seek legal advice to assist them in determining their obligations under the insurance contracts and such communications are privileged").[5]

The Carrier Group has a common interest by virtue of its shared aggregate liability exposure to Ford under the ASLP.  The same was true of the insurers in *City of Waukegan*, No. 07 C 1990 (Ex. 16).  In that case, Northfield Insurance Co. ("Northfield") and Certain Underwriters of Lloyd's of London ("Underwriters") apportioned liability on the same policies issued to the City.  Slip op. at 2.  The City sought discovery of communications between Northfield and counsel for Underwriters, as well as internal documents in Northfield's claims files reflecting the substance of those communications.  *See id.* at 3 & 7.  The court held that, because Northfield and Underwriters shared the risk on the City's policies, "they ha[d] common interests regarding certain legal issues related to coverage for the City's claim."  *Id.* at 5.

_____

[5]  *See also United States v. BDO Seidman, LLP*, 492 F.3d 806, 817 (7th Cir. 2007) (opinion memorandum exchanged for purpose of coordinating client relations was protected by common interest privilege; "[c]ommunications do not cease to be for the purpose of receiving legal services just because the recipient intended to use the fruits of the legal services to guide its relations with customers"); *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 73 (S.D.N.Y. 2009) ("While the lenders' business interests may coincide or overlap with their legal interests, the obligations they seek to enforce are grounded in contract and, by definition, involve the pursuit of legal rights and remedies.  This is underscored by the fact that the very subject of the communications was what legal strategy would best serve the interests of Nordbank and the non-party lenders.  Under these circumstances, Nordbank's showing clearly satisfies the requirements for application of the common interest doctrine.").

Accordingly, their "attorney-client communications in furtherance of those common interests" were protected by the common interest privilege.  *Id.* at 5.

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437 (S.D.N.Y. 1995), cited by Ford (Ford Br. 15), is not to the contrary.  In that case, the parties had not "demonstrated cooperation in formulating a common legal strategy."  *Id.* at 447.  ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████ [6]

Ford fails to challenge any particular entry on NICO's privilege log withheld under the common interest doctrine, and those communications withheld reflect that they are privileged. The documents in Tab 2 (Ford Exh. 1 at 1), for example, are "[e]mail communications from Kent Wilson to ASL carrier group, including John Yacoub, providing information regarding the audit of Ford's Stop Loss Aggregate Report and Ford's recent demand letter for Unallocated National Defense Costs in order to facilitate the carrier group's development of legal advice and strategy to pay only covered claims under the ASLP."  Ford does not explain how the carrier group's development of a common legal strategy in response to Ford's demand letter to multiple carriers for Unallocated National Defense Costs is not covered by the common interest privilege.  Ford's blanket assertions should therefore be rejected.

---

[6] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

## II.      NEITHER PRIVILEGE NOR WORK PRODUCT PROTECTION HAS BEEN WAIVED OVER ANY OF THE 55 DOCUMENTS.

Ford argues (Ford Br. 16) that it is entitled to discover all 55 inadvertently produced documents because NICO's clawback was untimely, its production was not inadvertent at all, but was instead selective and strategic, and because the subject matter of those documents has been waived by the production of similar documents.  As demonstrated below, none of Ford's arguments has merit.

### A.      NICO Timely Asserted Its Clawback Rights.

Ford first argues (Ford Br. 16-17) that NICO waived protection over the 55 Documents by failing to produce a privilege log identifying such documents by February 13, 2013.  This argument makes no sense.  NICO had not identified any of the 55 Documents as responsive as of February 13; therefore, NICO could not possibly have included them in a privilege log by that date.[7]  *See Fuller v. Interview, Inc.*, No. 07 Civ. 572 (RJS) (DF), 2009 WL 3241542, at *5 n.5 (S.D.N.Y. Sept. 30, 2009) (failure to produce privilege log where privileged documents are withheld from set not yet produced does not yield waiver).

None of the three cases Ford cites (Ford Br. 16-17) supports its argument that privilege is waived by failure to submit a privilege log identifying a document before that document has even been identified as responsive, where the party supplements its production as required by Rule 26 and produces a privilege log corresponding to the supplemental production.  *See Pensacola Firefighters' Relief Pension Fund Bd. of Trs. v. Merrill Lynch Pierce Fenner & Smith,*

---

[7]


*Inc.*, 265 F.R.D. 589, 593-95 (N.D. Fl. 2010) (giving defendant four weeks to comply with court order to respond to plaintiff's document requests and provide privilege log); *Essex Ins. Co. v. Interstate Fire & Safety Equip. Co.*, 263 F.R.D. 72, 76-77 (D. Conn. 2009) (privilege was waived where party delayed response to several requests for production by asserting frivolous privilege objections and ultimately produced privilege log containing only one entry); *Fid. Nat'l Title Ins. Co. v. Captiva Lake Invs., LLC*, No. 4:10 CV 1890 (CEJ), 2012 U.S. Dist. LEXIS 116206, *9-10 (E.D. Mo. Aug. 17, 2012) (privilege was waived where party failed to include item on privilege log with "no explanation").

Moreover, Ford has only ever produced to NICO, on March 1, 2013 a "partial privilege log." (*See* Exh. 22). If Ford were correct, Ford's failure to submit the remainder of its privilege log has effected a waiver of the attorney-client privilege and work product doctrine over all of the documents Ford has withheld as well.

In any event, "[t]he relevant time frame" for determining whether a party has delayed in asserting its clawback rights "runs not from the time the inadvertent disclosure is made, but rather from the time it is discovered." *Fuller*, 2009 WL 3241542, at *4; *see In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 407, 419 (N.D. Ill. 2006) (measuring delay from date party learned privileged document was produced, which occurred months after production). NICO acted within hours to assert privilege over the documents accidentally produced. NICO notified Ford *the very next day*, and began working immediately to load a corrected production. (*See* Exhs. 7 & 8). NICO could not have acted more promptly to assert its clawback rights.

**B.    NICO's Production Of The 55 Documents Was Inadvertent.**

Ford's cases (Ford Br. 17) acknowledge that "waiver does not typically occur unless a known right is deliberately relinquished." *Fed. Deposit Ins. Corp. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 481 (E.D. Va. 1991). Thus, Ford contends (Ford Br. 17-19) that

NICO's inclusion of the 55 Documents waived the applicable protection over every document because NICO's production was voluntary, rather than inadvertent. But, as Ford's cases (Ford Br. 17-18) also recognize, "[a]n inadvertent waiver would occur when a document, which a party intended to maintain confidential, was disclosed by accident such as ... the inadvertent *inclusion of a privileged document with a group of nonprivileged documents* being produced in discovery." *Francisco v. Verizon S., Inc.*, 756 F. Supp. 2d 705, 719 (E.D. Va. 2010) *aff'd*, 442 F. App'x 752 (4th Cir. 2011) (emphasis in original); *accord ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 255 (E.D. Va. 2012) enforcement granted in part, denied in part, 3:09CV620, 2012 WL 6562735 (E.D. Va. Dec. 14, 2012).

Unlike the "voluntary production" cases Ford cites (Ford Br. 17-18), in which the producing party intended to produce the actual documents, NICO intended to withhold every document clawed back from the May 5 production. *See Francisco*, 756 F. Supp. 2d at 24 (finding privilege waived because the party knew it was producing the document in question); . Nor does *Datel Holdings Ltd. v. Microsoft Corp.*, No. C-09-05535 EDL, 2011 U.S. Dist. LEXIS 30872 (N.D. Cal. Mar. 11, 2011), support Ford's case. There, a team of defense attorneys "carefully reviewed documents to identify privileged communications" but "a computer glitch truncated" the portion of the documents indicating the privileged nature of the emails. *Id.* at *9-10. The court held that, "[u]nder these circumstances, production of these six documents was inadvertent." *Id.* at *10.[8]

---

[8]   Ford suggests, at footnote 1 of its Brief, that "the Court may wish to consider NICO's privilege claims" regarding the email from Brad Rosen, of Quinn Emanuel, to Steve Whitley, of Resolute Management Ltd., dated February 28, 2011 (NICO476764). As the production of the Rosen email was due to a technical glitch (Lacey Decl. ¶ 11), under *Datel Holdings*, the Court should find that production of the Rosen email was inadvertent and decline to Order its production.

Ford appears to contend, as a factual matter, that NICO's attorneys did, in fact, review these documents for privilege and reached the conclusion that they were not privileged and should otherwise be produced. (*See* Ford Br. 18 ("NICO's disclosure of the Resolute documents was part of a deliberate and planned production on May 5, 2013.")). But this was not the case. Ford's unsupported allegation that NICO's production was voluntary rather than inadvertent does not pass muster.

Ford contends further (Ford Br. 18-19) that, even if NICO's disclosure was inadvertent, privilege has still been waived the documents because they may have been collected, but not produced, prior to February 13, or, if they were not collected until after February 13, because NICO missed the Court's deadline for production. Ford's first argument is factually incorrect, as addressed *supra* note 8. Ford's second argument is in fact a request for waiver as a sanction, which Ford has already addressed at length in its Motion for Sanctions. Ford cites no authority in support of its argument that privilege is waived over documents inadvertently produced in the course of a supplemental production.

Ford also argues (Ford Br. 19) that NICO's inadvertent production waives privilege because the number of inadvertently produced documents was relatively high. However, in this district, five factors are relevant to the determination of whether privilege is waived over documents inadvertently disclosed: "'(1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness.'" *Fed. Deposit Ins. Corp. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 482 (E.D. Va. 1991) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985)). NICO considers each factor in turn.

19

1.      NICO Took Reasonable Precautions To Prevent Inadvertent Disclosure.

Ford asserts (Ford Br. 18) that NICO's "painstaking review" prior to its May 5

production indicates that NICO's production of the 55 Documents was voluntary.  Ford's

analysis, however, is flawed.  The fact that "an army of attorneys reviewed, analyzed, coded, and

processed NICO's document productions" (*id.* at 18 (citing ECF No. 66, Hr'g Tr. May 9, 2013,

20:21-20:24)) demonstrates not that these documents were voluntarily produced (indeed, if they

were, NICO would not be seeking to claw them back) but that the precautions NICO took to

avoid disclosure of privileged documents and attorney work product were reasonable.  *See In re*

*Grand Jury Investigation*, 142 F.R.D. 276, 280 (M.D.N.C. 1992) ("[W]hat is required of a party

producing documents is *reasonable* precaution to avoid inadvertent disclosure of privileged

documents.  Obviously, if *perfect* precaution were required, the court would hardly be applying a

'balancing test,' but would instead be applying a strict rule of waiver."); *In re Sulfuric Acid*

*Antitrust Litig.*, 235 F.R.D. at 417 (recognizing that, "[w]here discovery is extensive, mistakes

are inevitable and claims of inadvertence are properly honored so long as appropriate precautions

are taken").  As even Ford concedes that the precautions NICO took were reasonable, and

NICO's counsel confirms the measures taken, this factor weighs in favor of concluding that

privilege has not been waived.  *See Fuller*, 2009 WL 3241542, at *4 (sworn affidavit submitted

by defendants' counsel "attesting to the nature of the precautions taken by Defendants in

screening documents for privilege … demonstrate[d] that, as a general matter, Defendants took

reasonable care to prevent the disclosure of privileged information.").

2.      NICO Rectified The Error The Very Next Day.

As discussed in Section II.A *supra*, NICO advised Ford that its May 5 production

included privileged documents the very next day, began compiling a list of the inadvertently

produced documents, and took steps to load a corrected production.  This factor, too, weighs in

factor of finding no waiver. *See id.* at \*5 (assertion of privilege on April 16 was timely asserted where production had been made the previous December but defendants' counsel did not review the documents again until April 13).

> ### 3. The Error Occurred In The Course Of A Large-Scale Production, And Less Than 0.2% Of Documents Produced Were Affected.

As this court has noted, "time constraints may also bear significantly on what precautionary efforts would be reasonable in the circumstances. Thus, a party may be excused from the waiver consequences of an inadvertent disclosure where the number of documents to be screened is large and the time for screening short." *Fed. Deposit Ins. Corp.*, 138 F.R.D. at 483. Here, having discovered that supplementation to its February 13 production was required, NICO had reviewed thousands of documents, and was making rolling productions to Ford on an expedited basis. The 55 inadvertently produced documents constitute less than 0.2% of NICO's production to date, and only 1.8% of its May 5 production (*see* Lacey Decl. ¶¶ 4 & 6)—not nearly enough to effect a waiver. *See In re Grand Jury Investigation*, 142 F.R.D. at 281 (18 inadvertently produced documents out of 300,000 pages reviewed was insufficient to suggest waiver); *Lois Sportswear*, 104 F.R.D. at 105, *cited with approval in, Fed. Deposit Ins. Corp.*, 138 F.R.D. at 482 (privilege was not waived over 22 documents "out of some 16,000 pages inspected and out of the 3,000 pages requested to be produced").

In *Ergo Licensing, LLC v. Carefusion 303, Inc.*, 263 F.R.D. 40, 47 (D. Me. 2009), cited by Ford (Ford Br. 19), "nearly 6% *of the total production*" was inadvertently produced, yet the court concluded that privilege had not been waived. *Id.* at \*47 (emphasis added). *Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, No. 2:07-CV-116, 2012 U.S. Dist. LEXIS 121830 (S.D. Ohio, Aug. 28, 2012), which Ford also cites (Ford Br. 19) is simply inapposite, as

the 1.8% error rate of the May 5 production, never mind the 0.2% error rate overall, does not approach the 4.6% error rate in that case.  *See id.* at *12.

4.    <u>The Extent Of The Disclosure Was Minimal.</u>

For this factor, the court considers whether "the inadvertently disclosed  documents … have … worked their way into the fabric of the case."  *In re Grand Jury Investigation*, 142 F.R.D. at 281.  Because NICO asserted its clawback rights the day after the documents were produced, neither party had the opportunity to make use of the documents before the NICO's privilege claim was known, and thus confidentiality can easily be restored.  *See id.* at 281.

5.    <u>Fairness Dictates That The 55 Documents Retain The Privilege.</u>

The courts have declined to apply a one-size-fits-all test to ascertain fairness.  Here, many of the documents at issue relate directly to NICO's strategy in this  litigation, or HDI-Gerling's strategy in the pending arbitration—the results of which will affect whether Ford is entitled to recover for the claims it asserts here.  As disclosure of these documents would do irreparable harm to both NICO and HDI-Gerling, a non-party to this suit, fairness, too, weighs in favor of finding that the privilege is retained.

* * *

Thus, all five factors indicate that a finding of waiver due to NICO's May 5 production is inappropriate here.

**C.    NICO Did Not Selectively Claw Back Documents.**

Ford also asserts (Ford Br. 19) that NICO's reduction of its clawback list "suggests a deliberate decision and strategy to produce privilege[d] documents that benefit NICO, while hiding documents that hurt NICO or may be helpful for Ford."  Ford's argument, however, is not consistent with the facts.  It was *Ford* who refused to allow NICO to reissue a corrected production (Exh. 7), and then *Ford* who complained about the number of documents NICO

22

requested to claw back (Exh. 11), leading NICO to narrow its clawback list.  Moreover, of the

300 documents NICO initially sought to claw back, only 102 were protected on attorney-client

privilege or work-product grounds; as the remainder were not privileged but were instead clawed

back as subject to NICO's pending motion for a protective order, their removal from the

clawback list cannot demonstrate any "selective" disclosure of privileged documents.

Ford misconstrues *ePlus Inc. v. Lawson Software, Inc.*, No. 3:09CV620, 2012 WL

6562735 (E.D. Va. Dec. 14, 2012).  In that case, the court did *not* "hold[] that a party's discovery

production of various documents containing information about  product development resulted in

subject-matter waiver," as Ford contends (Ford Br. 19), but rather *declined* to order production

of 815 documents, subject to further review by counsel, on grounds that their subject-matter was

distinct from, and therefore not included in, the court's prior order to produce documents due to a

subject-matter waiver.  *Id.* at *3-4.

### D.   NICO's Subsequent Production Of Documents And Withdrawal of Certain Clawback Requests Does Not Yield A Categorical Waiver.

Ford finally argues (Ford Br. 19-22), without citation, that two groups of communication

are subject to full categorical waiver because of NICO's alleged decision to produce certain non-

privileged documents of the same type.  However, production of documents on the same subject

matter that do not have a claim to privilege does not effectuate a waiver.  Even if the court

determines NICO produced privileged documents, "subject matter waiver is appropriate only

when the party seeking the privilege previously waived the attorney-client privilege to make

some tactical use of the documentation."  *Fed. Elections Comm'n v. Christian Coal.*, 178 F.R.D.

61, 74 (E.D. Va. 1998), *aff'd in part, modified in part*, 178 F.R.D. 456 (E.D. Va. 1998).  As

noted above, the production of the 55 Documents was inadvertent, not calculated, and NICO has

made no strategic use of them.

Ford's cases (Ford Br. 19) are inapposite:  in both of *United States v. Jones*, 696 F.2d 1069 (4th Cir. 1982) (per curiam), and *JJK Mineral Co. v. Swiger*, -- F.R.D. --, No. 1:12 cv 00143, 2013 WL 663283 (N.D. W. Va. Feb. 22, 2013), the defendants placed their attorney-client communications at issue by relying on counsel's advice in their defense.  *See Jones*, 696 F.2d at 1072; *JJK Mineral*, 2013 WL 663283, at *6.  That is plainly not the case here:  NICO does not assert the advice of counsel in any of its defenses.[9]

Specifically, Ford contends (Ford Br. 21) that privilege has been waived, first, over all communications on NICO's clawback log involving John Yacoub because "NICO withdrew claims of privilege involving similar communications between Mr. Yacoub and Resolute employees regarding legal advice on reserves and analysis policy coverage positions."  As Ford argues elsewhere, however (Ford Br. 8-11), John Yacoub functions as both resident U.S. counsel and an international claims manager at HDI-Gerling.  As such, Ford's argument that NICO has waived privilege over all documents that "include communications with John Yacoub" is absurd on its face, since Yacoub's business communications are, by their nature, not subject to privilege.

███████████████████████████████████

███████████████████████████████████

████████████████████████████  As Ford notes (Ford Br. 8-11), the line between business and legal communications can be murky, and a later decision by NICO that certain documents are not, in fact, privileged does not constitute a "strategic" decision amounting to subject matter waiver.

---

[9]  Moreover "broad concepts of subject matter waiver analogous to those applicable to claims of attorney-client privilege are inappropriate when applied to Rule 26(b)(3) [work product]."  *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1222 (4th Cir. 1976).  Thus, to the extent any of the documents Ford asserts are subject to a category waiver are protected work product, there can be no waiver.  *See id.* at 1223 (4th Cir. 1976) (citing *Hickman v. Taylor*, 329 U.S. 495, 508 (1947)).

Ford contends (Ford Br. 22) that a subject matter waiver also applies to all documents relating to "Quinn Emmanuel's [sic] collection of documents from Resolute, Resolute's litigation hold, and the use of outside vendors" because NICO has produced invoices and emails relating to HDI-Gerling's document collection efforts in the arbitration. ███████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████ The documents currently withheld, by contrast, are privileged.  *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999) ("[T]he identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege. However, correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege.").  Because the cited documents have no claim to privilege, their production cannot effect waiver over NICO's privileged documents.

## CONCLUSION

For the foregoing reasons, NICO respectfully requests that the Court deny Ford's Motion.

Respectfully submitted,


Dated:  June 18, 2013

/s/ George P. Sibley, III
_____
Walter J. Andrews (VSB No. 46031)
wandrews@hunton.com
Michael S. Levine (VSB No. 48013)
mlevine@hunton.com
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, VA 22102
(703) 714-7400

George P. Sibley, III (VSB No. 48773)
gsibley@hunton.com
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200

Jane M. Byrne (*pro hac vice*)
janebyrne@quinnemanuel.com
Andrew M. Berdon (*pro hac vice*)
andrewberdon@quinnemanuel.com
Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Toji Calabro (*pro hac vice*)
tojicalabro@quinnemanuel.com
Brad Rosen (*pro hac vice*)
bradrosen@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Defendant*
*National Indemnity Company*

## CERTIFICATE OF SERVICE

I certify that on June 18, 2013, I caused a true and correct copy of the foregoing to be filed on the Court's CM/ECF system, which will cause of a notice of electronic filing to be served on the following counsel for Ford Motor Company:

Scott C. Oostdyk, Esq.
J. Tracy Walker, Esq.
H. Carter Redd, Esq.
Matthew D. Fender, Esq.
McGuireWoods LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219


/s/ George P. Sibley, III
George P. Sibley, III (VSB No. 48773)
gsibley@hunton.com
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200