# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

FORD MOTOR COMPANY          )
                                       )
        Plaintiff,          )
                                       )     Civil Action No. 3:12-cv-839
        v.                )
                                       )
NATIONAL INDEMNITY COMPANY   )
                                       )
        Defendant.     )

## DEFENDANT NATIONAL INDEMNITY COMPANY'S
## REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO
## COMPEL THE DEPOSITION OF SCOTT C. OOSTDYK, ESQ.

## **Table of Contents**

Table of Contents ............................................................................................................... i

Table of Authorities ......................................................................................................... ii

Preliminary Statement .......................................................................................................1

Facts ...................................................................................................................................3

     I.      Ford Does Not Dispute the Facts Critical to This Motion. ......................................3

     II.    Ford's Communications Through Oostdyk to Other Carriers After January 2011 ..........................................................................................................................4

     III.   Timeline and Content of Pleadings in the Arbitration ...........................................7

Argument .........................................................................................................................11

     I.      NICO Knows Friedman's Version of Events—It Needs to Learn Whether and How Mr. Oostdyk Will Dispute It.................................................................11

     II.    Mr. Oostdyk's Testimony Is Relevant to the Intent Element of Ford's Affirmative Claims as Well as NICO's Properly-Pleaded Estoppel Defense. ...............................................................................................................13

     III.   Ford's Demand for Depositions of NICO's Lawyers Is a Red Herring. ...............17

Conclusion .......................................................................................................................17

i

## Table of Authorities

### FEDERAL CASES

*17th St. Assocs., LLP v. Markel Int'l Ins. Co. Ltd.*,
  373 F. Supp. 2d 584 (E.D. Va. 2005) ...................................................................13

*Cascone v. Niles Home for Children*,
  897 F. Supp. 1263 (W.D. Mo. 1995) ..........................................................2, 10, 11

*Chiancone v. City of Akron*,
  5 2011 WL 4436587 (N.D. Ohio Sept. 23, 2011) ..................................................14

*Elliott's Enters., Inc. v. Flying J, Inc.*,
  No. 97-1865, 1998 WL 163808 (4th Cir. Apr. 6, 1998) .......................................15

*First Nat'l City Bank v. Burton M. Saks Const. Corp.*,
  70 F.R.D. 417 (D.V.I. 1976) ................................................................................14

*Galaxy Computer Servs. v. Baker*,
  325 B.R. 544 (E.D. Va. 2005) ...............................................................................13

*Johnston Dev. Grp., Inc. v. Carpenters Local Union Number 1578*,
  130 F.R.D. 348 (D.N.J. 1990) ...............................................................................10

*Lopez v. Asmar's Mediterranean Food, Inc.*,
  No. 1:10-cv-1218, 2011 WL 98573 (E.D. Va. Jan. 10, 2011) ........................14, 15

*Sadowski v. Gudmundsson*,
  206 F.R.D. 25 (D.D.C. 2002) ...............................................................................11

*Shelton v. Am Motors Corp.*,
  805 F.2d 1323 (8th Cir. 1986) ..............................................................................10

*Srail v. Village Of Lisle*,
  No 07 C 2617, 2007 WL 4441547 (N.D. Ill. Dec. 12, 2007) ...........................10, 12

*In re Subpoena Issued to Dennis Friedman*,
  350 F.3d 65 (2d Cir. 2003) ...................................................................................10

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
  164 F.R.D. 245 (D. Kan. 1995) .............................................................................11

*United States v. Kolon Indus., Inc.*,
  No. 3:12-CR-137-01, 2013 WL 682896 (E.D. Va. Feb. 22, 2013) ........................12

*Warren v. Tri-Technology Laboratories Inc.*, No. 6:12-cv-00046, 2013 WL 2111669
    (W.D. Va. May 15, 2013)........................................................................................14

## STATE CASES

*Admiral Ins. Co. v. Columbia Casualty Ins. Co.*,
    486 N.W.2d 351 (Mich. Ct. App. 1992)................................................................13

*Holt v. Stofflet*,
    61 N.W.2d 28 (Mich. 1953) ..................................................................................15

*Mino v. Clio Sch. Dist.*,
    661 N.W.2d 586 (Mich. Ct. App. 2003)................................................................13

## FEDERAL STATUTES

Fed. R. Civ. P. 12(f) ....................................................................................................2, 14

## LOCAL RULES

Local R. 7 ........................................................................................................................16

**Preliminary Statement**

Ford's Response Brief illustrates precisely why NICO is entitled to take Mr. Oostdyk's deposition. Put simply, Ford disputes Scott Friedman's recollection of his numerous conversations with Mr. Oostdyk, where Mr. Oostdyk made clear that Ford did not want so-called "partial" payments. According to Mr. Friedman, the "partial" payments to which Mr. Oostdyk referred were the payments on only undisputed (mostly) non-batch claims, as distinguished from "full" payment on both undisputed claims and disputed batch claims. This was Resolute's understanding, and documents recently produced by Ford show that other insurers had the same understanding. ████████████████████████████████ Indeed, those same documents (which Ford refused to produce until ordered by this Court to do so) show that Mr. Oostdyk knew months before this suit was filed that other insurers had the same understanding as Resolute. Ford nonetheless asserts that Mr. Oostdyk's reference to "partial" payments was not a reference to payment on undisputed non-batch claims, but rather a reference to claims identified on an allegedly incomplete report prepared by Friedman in late 2010. *See* Ford Br. at 9-10, 21.

At trial, the jury will be asked to resolve this dispute. Mr. Friedman will testify as to his recollection of the January 2011 conversation and the many more like it that occurred in the months thereafter. Only one person on the Ford side is competent to rebut Mr. Friedman—Scott Oostdyk. ████████████████████████████████ He is the only witness on the Ford side that participated in those conversations. *Id.* NICO is entitled to discover Mr. Oostdyk's version of events. Ford cannot shield this material witness from deposition by retaining him as its trial counsel.

Ford's *ad hominem*-laden response brief attempts to distract the Court from these key facts. First, Ford argues that NICO has not asserted estoppel as a defense, because it did not do

1

so with sufficient specificity.  Ford is wrong, and the time to raise that argument has long since

passed.  *See* FED. R. CIV. P. 12(f).  Ford has been on notice for months of the core factual

contentions that support NICO's estoppel defense, and the conversations involving Mr. Oostdyk

have been specifically raised in several hearings already.  *See, e.g.,* Ex. 33, Hr'g Tr. May 6,

201,3 at 7-8; Ex. 34, Hr'g Tr. May 29, 2013 at 30-33.

Second, Ford argues that the undisputed facts will show that it should prevail on any

estoppel defense as a matter of law.  That is a summary judgment argument, not a ground for

opposing discovery.  And even if Ford could prevail on such a motion, the evidence of Mr.

Oostdyk's repeated and consistent instructions to Mr. Friedman and others regarding payment of

undisputed non-batch claims is relevant to the "intent" element of Ford's tortious interference

and conspiracy claims.  It shows that NICO's conduct was, at most, the product of a

miscommunication by Mr. Oostdyk about the timing of payments, not a malicious attempt to

harm Ford as Ford contends.

Third, Ford suggests that this discovery is not necessary, because NICO can learn about

these conversations from Mr. Friedman.  That misses the point.  NICO already knows what Mr.

Friedman will say about these conversations at trial.  If Ford was not planning to dispute the

issue, that might end the matter.  But, Ford *is* planning to dispute the issue, and NICO does not

know how the one witness on the Ford side with percipient knowledge of these conversations

intends to respond.  As one court observed (in applying the *Shelton* test that Ford favors), "[i]f

this will be a swearing match between [one party's fact witness] and [the other party's trial

counsel], then sooner or later [trial counsel] will have to be deposed."  *Cascone v. Niles Home

for Children*, 897 F. Supp. 1263, 1266 (W.D. Mo. 1995).

2

Finally, Ford argues that, if NICO gets to take Mr. Oostdyk's deposition, then Ford gets to depose NICO's entire team of trial lawyers because their participation in this action and/or the related arbitration makes them part of the alleged conspiracy against Ford.  Setting aside the *ad hominem* attack, Ford only sought to take these depositions after NICO asked to depose Mr. Oostdyk, thus undermining any contention that these depositions are necessary and proper.  To the extent Ford thinks these depositions are justified, it can seek to compel them exactly as NICO has sought to compel Mr. Oostdyk's deposition.

**Facts**

## I.    Ford Does Not Dispute the Facts Critical to This Motion.

Ford expends considerable energy articulating its competing case for how and why it wanted immediate payment from HDI-Gerling on undisputed non-batch claims.  Resolving which version of these facts is correct will be one of the jury's tasks at trial.  The key question at this point, however, is whether NICO has established the factual predicate for taking Mr. Oostdyk's deposition.  And on this question, the key facts are not in dispute.



## II.     Ford's Communications Through Mr. Oostdyk to Other Carriers After January 2011

But that is not all.  Evidence adduced in discovery in the weeks since NICO filed its motion shows that Mr. Oostdyk's involvement was even greater than NICO originally believed. Specifically, the communications between Ford and other carriers—which Ford resisted disclosing on the ground that they were irrelevant, but which the Court ordered Ford to produce, Ex. 36 (ECF No. 91)—as well as the 30(b)(6) testimony from Ford's Dan Ames, show that Mr. Oostdyk was consistently giving the same "no partial payment" instruction directly to the other insurers, thus bolstering Mr. Friedman's version of events and demonstrating that Mr. Friedman is the more credible fact witness.







Critically, when asked about this particular exchange at deposition, Ford's Rule 30(b)(6) designee testified that

---

[1]

[2] The fact that the documents relating to Mr. Oostdyk's communications with Ford's other insurers concerning the timing of payments fully corroborate NICO's position, explains why Ford refused to produce them, forcing NICO to move this Court to compel their production.



Given Ford's consistent position—articulated repeatedly by Mr. Oostdyk—that Ford did not want partial payments, it is unsurprising that, ███████████████████████ ████████████████████████████████████████████████ And as of January 2013—more than two months after Ford filed this suit—███████████████ ████████████████████████████████████████ ████████████████████ To this day, Ford has not commenced arbitration or litigation against any other ASLP insurer—its animus is directly solely at NICO, the agent of HDI-Gerling, which is the one party engaged in an arbitration with Ford.

## III.  Timeline and Content of Pleadings in the Arbitration

Ford also explains at length that the pleadings in the arbitration constitute both Ford's requests for payment on undisputed non-batch claims and NICO's denial of those claims.  But Ford glosses over key statements in those pleadings and mischaracterizes important facts.

HDI-Gerling served its arbitration demand in November 2010, two months before Mr. Oostdyk's "no partial payments" instruction and four months before the March 2011 Mitigate

report that, according to Ford, identifies the amounts HDI-Gerling owes on non-batch claims.[3]



So

Ford's contention that HDI-Gerling's arbitration demand constituted a refusal by NICO to

continue to pay undisputed non-batch claims (Ford Br. at 23) is simply false. The undisputed

fact is that NICO continued to pay such claims. And because Ford received this payment *after*

HDI-Gerling demanded arbitration on the batch claims, Ford must know that its contention

cannot be proven.

Ford also wrongly suggests that its arbitration counterdemand constituted a request for

immediate payment on the undisputed batch claims that now populate Ford's Exhibit B. In

Ford's counterdemand, Ford actually states:

> While Gerling has paid some amounts on numerous product
> liability claims, in some cases it has not paid all of the amounts
> Ford paid in judgment or settlement and/or all of the defense
> expenses Ford incurred. Ford seeks the unpaid amounts *in this
> arbitration*.

Ex. 44 at 7 (emphasis added). Those two sentences constitute everything that Ford says in its

counterdemand about its non-batch claims—there is no dollar amount associated with this

---



demand, there was no schedule of amounts due attached, nor any other specification of the amounts sought.[4]

Moreover, Ford served its non-specific counterdemand on January 14, 2011,[5] more than two months before the March 2011 Mitigate verification report.  As of that date, NICO had paid HDI-Gerling's share of all amounts requested by Ford on non-batch claims.  Puzzled by Ford's assertions, HDI-Gerling stated in its response to the counterdemand on March 21, 2011:

> Ford seeks reimbursement for "under-paid" claims, but has not specified the claims for which it was not fully reimbursed, nor has it quantified an amount it was purportedly under-paid. … Ford's failure to make a specific demand reveals the dubious nature of its claim.  Gerling has properly paid claims where Ford has provided sufficient documentation to show the amount of loss covered under the policies.

(Ex. 45, HDI-Gerling Response to Ford Counterdemand).

Ford never responded.  So HDI-Gerling again demanded clarification.  Ex. 50, October 13, 2011 Letter from C. Worcester to S. Oostdyk.  Ford in response promised to substantiate its claim with a detailed list, Ex. 51, Nov. 9, 2011, Letter from S. Oostdyk to C. Worcester, but it never did.   HDI-Gerling noted Ford's persistent silence on this question in its January 2012 position statement in the arbitration.  Ex. 46, HDI-Gerling January 2012 Position Statement at 2 n.2.  Ford remained silent, notwithstanding HDI-Gerling's repeated demands for substantiation.  *See* Ex. 52, December 5, 2012 Email from T. Calabro to S. Oostdyk.

---

[4] ████████████████████████████████████████████████

[5] Ford's Counterdemand is misdated "January 14, 2010," approximately ten months prior to the beginning of the arbitration.  The Counterdemand's correct date is January 14, 2011.

Critically, there is no dispute that HDI-Gerling actually attempted to attempted to pay certain undisputed claims—i.e., pre-1999 "Bronco II" claims[6]—but, consistent with the testimony of Scott Friedman ██████████████████████████████████████ ████████ "Ford has declined to accept any money payment unless all of its claims are resolved." *Id.* at 3 n.4. ████████████████████████████████████████ ████████████████████████████████████████████ If HDI-Gerling's understanding was mistaken, and Ford did want payment on undisputed claims before "all of its claims were resolved," Ford never provided any indication. ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████

---

[6] Bronco II claims are actually batch claims that have been declared to Ford's batch carriers. Unlike the other batch claims, however, the policy limits for Ford's batch coverage for Bronco II claims has been exhausted in the pre-1999 years, thus triggering the excess coverage for batch claims provided by Exclusion L in the ASLP.

[7] That Ford does not like its prospects for success in the arbitration is betrayed by the report of its expert witness, Stephen Prater. In Mr. Prater's report, he refers to the arbitration as an "insurer friendly arbitration proceeding." Ex. 48, Expert Report of Stephen Prater at 13. There is no explanation for Mr. Prater's characterization of the arbitration as "insurer friendly." That characterization, however, is belied by the fact that the umpire presiding over the arbitration is a well-respected, retired federal district court judge from the Southern District of New York who was actually nominated by Ford and HDI-Gerling. There has been no suggestion by Ford in that proceeding that the arbitration tribunal is biased or in any way unfit for service. Moreover, because Mr. Prater's list of reliance documents do not include any rulings of the arbitration tribunal, the source of Mr. Prater's characterization that the arbitration proceeding is "insurer friendly" must be presumed to be Ford or Mr. Oostdyk himself.

## Argument

I.   **NICO Knows Friedman's Version of Events—It Needs to Learn Whether and How Mr. Oostdyk Will Dispute It.**

Under either the "flexible approach" adopted by the Second Circuit[8] or the *Shelton* test[9] that Ford says should apply, Mr. Oostdyk's deposition is fully justified.  Mr. Oostdyk was a key player in the events giving rise to this lawsuit.  He communicated directly with Scott Friedman and others in the insurer group regarding how ***and when*** Ford wanted payment on undisputed non-batch claims, and he did so orally without a Ford corporate representative present.  And the facts already developed show that Mr. Oostdyk, starting in January 2011 and continuing into late 2012, was instructing carriers not to pay non-batch claims.  Mr. Oostdyk's own conduct on behalf of Ford substantially undermines Ford's contention that HDI-Gerling's non-payment of non-batch claims was part of some grand conspiracy to harm Ford.

The law on this point is clear.  "In cases where the attorney's conduct itself is the basis of a claim or defense, there is little doubt that the attorney may be examined as any other witness[.]" *Johnston Dev. Grp., Inc. v. Carpenters Local Union No. 1578*, 130 F.R.D. 348, 352 (D.N.J. 1990).  "A party cannot insulate an attorney who has otherwise relevant knowledge from the processes of discovery by having that attorney file an appearance in the pending case." *Srail v. Vill. Off Lisle*, No 07 C 2617, 2007 WL 4441547, at *2 (N.D. Ill. Dec. 12, 2007).  Indeed, an attorney that is a key participant in the facts giving rise to a suit "has the duty to avoid situations where he is likely to be deposed." *Cascone v. Niles Home for Children*, 897 F. Supp. 1263, 1265 (W.D. Mo. 1995) (citing Missouri analog to Virginia Rule of Professional Conduct 3.7).  Thus, by employing counsel "'to represent it in a case where an attorney has played a role in the

---

[8] *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d Cir. 2003) (Sotomayor, J.).

[9] *See Shelton v. Am Motors Corp.*, 805 F.2d 1323, 1324 (8th Cir. 1986).

underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested.'" *Sadowski v. Gudmundsson*, 206 F.R.D. 25, 26 (D.D.C. 2002) (quoting *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 164 F.R.D. 245, 249 (D. Kan. 1995)).

Ford argues in response that NICO can get the information it would obtain from a deposition of Mr. Oostdyk from other sources, such as Mr. Friedman, Mr. Drennan or Mr. Wilson, or the various documents where Mr. Oostdyk gave his "no partial payment" instruction. *See* Ford Br. at 12-20.  Not so.  NICO cannot learn from these witnesses Mr. Oostdyk's recollection of his conversations with these witnesses.  If Ford intends to dispute these witnesses' recollections—and Ford's Response Brief makes clear that it does—Mr. Oostdyk's recollection is critical, because he is the only witness who can offer rebuttal testimony.  Again, if Ford is willing to concede that it will not dispute the memory of those witnesses, then NICO will reconsider whether it needs Mr. Oostdyk's deposition.  But, so far, Ford has not been willing to do that because it knows that would be the end of its case.

For this reason, the court in *Cascone*—a case applying the *Shelton* test that NICO discussed at length in its brief (*see* NICO Br. at 14-15) but that Ford completely ignores in its response—rejected the same argument Ford makes here.  *See* 897 F. Supp. at 1265-66.  There, the plaintiff sought to depose defense counsel (Ms. Moody) concerning a conversation the plaintiff had with defense counsel about the scope of plaintiff's job responsibilities.  *Id.* at 1265. Like Ford here, the defendant argued that information about Plaintiffs' job responsibilities were available from other sources.  *Id.*  The Court rejected that argument:  "Ms. Moody is the best source for information regarding what she told Ms. Cascone regarding her responsibilities for

12

handling garnishments … .  If this will be a swearing match between Ms. Moody and Ms. Cascone, then sooner or later Ms. Moody will have to be deposed." *Id.*

This case will be, at least in part, a swearing match between Mr. Oostdyk and the various individuals to whom he gave the critical "no partial payment" instruction.[10]  At trial, NICO will present testimony from Mr. Friedman, Mr. Wilson, and potentially others about the consistent written *and oral* instructions that Mr. Oostdyk gave the insurer group concerning the payment of non-batch claims.  If Ford intends to dispute that testimony, then Mr. Oostdyk is the only witness Ford can call to do so.  NICO is entitled to learn what Mr. Oostdyk will say if called to testify. Ford's tactical decision to retain a key witness as trial counsel cannot shield that witness from discovery.  *Srail*, 2007 WL 4441547 at *2.

## II.    Mr. Oostdyk's Testimony Is Relevant to the Intent Element of Ford's Affirmative Claims as Well as NICO's Properly-Pleaded Estoppel Defense.

The significance of Mr. Oostdyk's testimony regarding his recollection of his conversations with Mr. Friedman and others regarding Ford's expectations as to the timing of payment on undisputed non-batch claims is plain.  It is at the heart of the case.  Ford says HDI-Gerling's failure to make these payments was the product of NICO's malice.  Mr. Oostdyk's consistent "no partial payment" instructions provide strong evidence that both undermines Ford's contention that NICO acted intentionally—a required element under both of Ford's claims—and provides a basis for NICO's estoppel defense.

---

[10] Ford's witnesses may know whether or not Mr. Oostdyk was ***authorized*** to issue the "no partial payments" directive, but they cannot (and have admitted that they do not) have personal knowledge of whether he ***said*** it.  Mr. Oostdyk's authorization from Ford is irrelevant. *See United States v. Kolon Indus., Inc.*, No. 3:12-CR-137-01, 2013 WL 682896, at *13 (E.D. Va. Feb. 22, 2013) (Payne, J.) (citations omitted) ("An agency relationship can be actual or apparent. ... Apparent authority arises where a third party reasonably believes that the putative agent has the authority to bind the principal. The mark of an agent is the ability, whether actual or apparent, to contract in the name of the principal and thereby bind him.").

In its response, Ford argues that NICO's estoppel defense is not a part of the case or will be dismissed as a matter of law at some point down the line. Even if these allegations were valid—and as explained below they are not— Mr. Oostdyk's oral and written statements to Mitigate and representatives of other insurers provide strong rebuttal evidence to Ford's contention that NICO acted with malice toward Ford.

To prevail on either of its claims, Ford must show that NICO intended to harm Ford. *See Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992) (a cause of action for tortious interference with a contractual relationship requires a showing of the following elements: "(1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant."); *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003) ("Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference"); *see also 17th St. Assocs., LLP v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 600 (E.D. Va. 2005) (intent is an element of tortious interference); *Galaxy Computer Servs. v. Baker*, 325 B.R. 544, 555 (E.D. Va. 2005) (business conspiracy under Virginia statute requires intent to harm another's business without justification). In an attempt to satisfy these requirements, Ford thus alleges that NICO acted with a "self-dealing motive," Compl. ¶53, employing "sharp and vexatious actions," *id.* ¶55, "without lawful justification," *id.* ¶58. Ford has further suggested that there was no explanation for the non-payment of non-batch claims—i.e., the end of partial payments. *See* Compl. ¶¶41-42; *id.* ¶44.

Mr. Oostdyk's multiple conversations with Scott Friedman and others regarding the timing and method of payment undermine these contentions. Mr. Oostdyk's consistent "no partial payment" instructions show that Resolute was well-justified in its belief that Ford wanted

to wait until its dispute over batch claims with HDI-Gerling was resolved before accepting

payment on undisputed non-batch claims. ████████████████████████████████████

████████████████████████████████████████████ At a minimum, this

evidence shows that NICO did not act with any intent to harm Ford.

        In all events, NICO's estoppel defense is very much part of the case.  Ford's argument

that NICO did not plead estoppel with sufficient particularity is—at best—an untimely motion to

strike.[11]  Under Rule 12(f), a plaintiff has 21 days to move to strike an affirmative defenses.

FED. R. CIV. P. 12(f); *see also First Nat'l City Bank v. Burton M. Saks Const. Corp.*, 70 F.R.D.

417, 419 (D.V.I. 1976) ("The plaintiff's motion to strike the defendants' affirmative defenses is

untimely, having been filed nearly six months after the receipt of the defendants' answer, and

shall be denied."); *Chiancone v. City of Akron*, No. 5:11CV337, 2011 WL 4436587, at *3 (N.D.

Ohio Sept. 23, 2011).  Ford's deadline to file such a motion came and went months ago.

        And even when timely, motions to strike are highly disfavored.  *Lopez v. Asmar's*

*Mediterranean Food, Inc.*, No. 1:10-cv-1218, 2011 WL 98573, at *1 (E.D. Va. Jan. 10, 2011)

(Cacheris, J.).  For this reason—and contrary to Ford's contention—District Judges in the

Eastern and Western Districts of Virginia have refused to apply the *Twombly/Iqbal* standard to

affirmative defenses.  *Warren v. Tri-Tech Labs. Inc.*,  No. 6:12–cv–00046, 2013 WL 2111669, at

*7 n.7 (W.D. Va. May 15, 2013) (Moon, J.) (declining to apply *Twombly* and *Iqbal* standard to

affirmative defenses); *see also Lopez*, 2011 WL 98573, at *1 (same).  As Judge Cacheris has

---

        [11]  NICO notes that Ford is using its responsive brief to continue its pattern of seeking
affirmative relief in a format that limits NICO's ability to respond.  Ford should, as it knows, file
a motion.  *See* Ex. 34, Hr'g Tr., May 29, 2013, 79:15-19 (addressing Ford's arguments about
other policyholders' information: "They may have done all kinds of things wrong, but you have
to get them on the table in a way that I can understand what they are. Then they have a chance to
respond to them, and then I have to rule on them."); *id.* at 89:21-25 (discussing redactions Ford
objected to at the hearing, and admonishing Ford: "Then make a motion with respect to those ….
I'm not going to deal in—they have to have a chance to respond to it.").

explained, "[t]raditionally, [a motion to strike] imposes a sizable burden on the movant, and courts typically strike defenses only when they have no possible relation to the controversy. Moreover, whenever granted, the defendant should generally be given leave to amend." *Lopez*, 2011 WL 98573 at *1. The *Lopez* court further explained that heightened pleading standards, while written into the rule governing complaints, are "not present in Rule 8(b)(1)." *Id.* And, weighing against policy concerns cited by district courts that impose such heightened standards, are "countervailing considerations of whether it is fair to apply the same pleading standard to plaintiffs, who have far more time to develop factual support for their claims, as to defendants, who have 21 days to respond to a complaint, who did not initiate the lawsuit, and who risk waiving any defenses not raised (though waiver is only enforced where prejudice or unfair surprise would result)." *Id.* at *2 n.5.

Ford also is incorrect that NICO's estoppel defense will fail as a matter of law. To begin, if Ford believes the defense is factually unsupported, it can move for summary judgment. *See supra* n.11. And in all events, Ford's characterization of the estoppel defense and how it would apply in this case (Ford Br. at 20-21) is flawed. For example, Ford's contention that NICO must show a "material <u>mis</u>representation" is not correct. Under both Michigan and Virginia law, the defendant need not show actual fraud to prevail on an estoppel defense. *See Holt v. Stofflet*, 61 N.W.2d 28, 30 (Mi. 1953); *Elliott's Enters., Inc. v. Flying J, Inc.*, No. 97-1865, 1998 WL 163808, *3 (4th Cir. Apr. 6, 1998). Rather, it is sufficient to show "that the person to be estopped has misled another to his prejudice, or that the innocent party acted in reliance upon the conduct or misstatement by the person to be estopped." *Elliott's Enters.*, 1998 WL 163808 at *3.

16

Nor is Ford correct that the evidence is insufficient to support a finding that NICO reasonably relied on Mr. Oostdyk's "no partial payment" instructions. ██████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████████████████████████

████████

## III.   Ford's Demand for Depositions of NICO's Lawyers Is a Red Herring.

If Ford has a good faith basis to seek the depositions of counsel for NICO in this matter, then Ford should file its own motion rather than making frantic ad hominem attacks in its response brief.  *See* LOCAL CIV. R. 7.  *Cf.* Ex. 34, Hr'g Tr., May 29, 2013, 79:15-19; *id.* at 89:21-25.  Whether such depositions are appropriate is irrelevant to whether Mr. Oostdyk should be deposed.  And tellingly, Ford did not even suggest that it was interested in or needed such depositions until NICO requested Mr. Oostdyk's deposition.  The Court should disregard Ford's transparent attempt to create false leverage through *ad hominem* attacks on counsel and assertions that they are part of a conspiracy merely because they participate as counsel in an arbitration or a lawsuit.

## <u>Conclusion</u>

Mr. Oostdyk is a material witness.  Scott Friedman and others will testify that Mr. Oostdyk told representatives of ASLP carriers throughout 2011 and 2012 that Ford did not want

partial payments—i.e., payments only on undisputed non-batch claims.  The insurers followed Mr. Oostdyk's instructions.  Throughout 2011, the only insurers to pay Ford were those willing to make "full" payments on both batch and non-batch claims combined.  █████████

██████████████████████████████████████████████████████████

██████  This evidence eviscerates Ford's allegation that NICO acted with malice by not paying undisputed non-batch claims.  If Ford intends to dispute any of this testimony, the only person who is competent to do so is Mr. Oostdyk.  NICO is entitled to take his deposition.

Respectfully submitted,

Dated:  July 5, 2013

/s/ George P. Sibley, III

Walter J. Andrews (VSB No. 46031)
wandrews@hunton.com
Michael S. Levine (VSB No. 48013)
mlevine@hunton.com
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, VA 22102
(703) 714-7400

George P. Sibley, III (VSB No. 48773)
gsibley@hunton.com
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200

Jane M. Byrne (*pro hac vice*)
janebyrne@quinnemanuel.com
Andrew M. Berdon (*pro hac vice*)
andrewberdon@quinnemanuel.com
Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Toji Calabro (*pro hac vice*)
tojicalabro@quinnemanuel.com
Brad Rosen (*pro hac vice*)
bradrosen@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Defendant*
*National Indemnity Company*

## CERTIFICATE OF SERVICE

I certify that on July 5, 2013, I caused a true and correct copy of the foregoing to be filed

on the Court's CM/ECF system, which will cause of a notice of electronic filing to be served on

the following counsel for Ford Motor Company:

> Scott C. Oostdyk, Esq.
> J. Tracy Walker, Esq.
> H. Carter Redd, Esq.
> Matthew D. Fender, Esq.
> McGuireWoods LLP
> One James Center
> 901 E. Cary Street
> Richmond, Virginia 23219

> /s/ George P. Sibley, III
> George P. Sibley, III (VSB No. 48773)
> gsibley@hunton.com
> Hunton & Williams LLP
> Riverfront Plaza, East Tower
> 951 East Byrd Street
> Richmond, Virginia 23219-4074
> (804) 788-8200