**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

FORD MOTOR COMPANY          )
                                           )
            Plaintiff,        )
                                         )     Civil Action No. 3:12-cv-839
            v.              )
                                         )
NATIONAL INDEMNITY COMPANY   )
                                         )
            Defendant.     )

**DEFENDANT NATIONAL INDEMNITY COMPANY'S
OPPOSITION TO FORD'S MOTION TO COMPEL
UNREDACTED COPIES OF CERTAIN DOCUMENTS**

## INTRODUCTION

After waiting several months, and now just weeks before trial, Ford moves to compel the identification of approximately 500 non-party companies that HDI-Gerling insured (and that NICO agreed to reinsure), including Ford's direct market competitors, so that Ford can track those non-parties' loss and insurance payment histories. Ford already has data related to the performance of these policies, but Ford claims it needs the identities of HDI-Gerling's other insureds to determine if the NICO / HDI-Gerling reinsurance agreement is "valid." This argument is disingenuous. NICO has produced the full text of the reinsurance agreement to Ford. The only information that was redacted pertains to Schedule A to the agreement, and Schedule A lists only the names of the insureds and the policies that are subject to the reinsurance agreement. Those names have nothing to do with whether the Agreement is valid (which is not something Ford is able to challenge in any event).

Moreover, Ford has not presented a single cogent argument as to why the *identity* of these non-parties is relevant to this case. It is not relevant to whether Ford was entitled to payments under the terms of the insurance policy (which was a custom policy Ford negotiated, and therefore different from the policy issued to HDI-Gerling's other insureds). Ford's brief contains only a single, 3-sentence long, conclusory paragraph regarding the purported relevance of this information, stating that "NICO had a gap in its reserves it needed to make up. This provided a motive to abuse Ford." (Ford Br. 13.) Ford cites *no* support for this argument. A reserve is simply an accounting entry and has nothing to do with the amount of money NICO has on hand to pay claims (information Ford already has), or whether NICO was experiencing greater aggregated losses than it expected (also information Ford already has). There is no evidence (from the expert declarations or otherwise) that, even if there was a reserves "gap," that it would create a motive to withhold payment. Ford's argument also proves too much and leads to absurd

2

results.  Under Ford's theory, in every insurance coverage dispute where there is an allegation

that a loss was under-reserved, the insured would be entitled to discovery of the loss and

payment information of every other company holding a policy with that insurer—including

identifying information linking a particular company with its sensitive loss information.

Ford's purported prejudice argument is similarly unavailing.  Ford claims that it is

"fundamentally unfair" for "the parties to have asymmetrical access to information"  (Ford Br.

15)  But Ford has underlying financial information relating to the performance of the policies.

There is no prejudice to Ford from withholding the *identity* of the policy holders which, as noted

above, is completely irrelevant to the case.  If anything, producing the information Ford requests

would create unfair prejudice—to HDI-Gerling's other policyholders, who are nonparties to the

case and include Ford's direct competitors.

In the alternative, should the Court grant Ford's motion, NICO respectfully requests that

the protective order be amended to contain an "outside counsel attorneys eyes only" provision,

and that all documents identifying other policy holders be protected pursuant to such designation.

## BACKGROUND

Ford requests the production of unredacted versions of two  categories of documents: (a)

the schedules to the Reinsurance Agreement, which identify the other policyholders by name, (b)

documents demonstrating "financial performance of the [LPT]," along with "reports and

financial documents" that "demonstrate and explain the deal between NICO and HDI-Gerling"

("financial information documents").  The Reinsurance Agreement has already been produced

and the only information that has been redacted from the schedules is the names of the other

policyholders – the policy numbers and inception dates of the policies have already been

produced.  As to the second category of documents, Ford already has in its possession versions

of the document that omit (a) the names of the other policyholders and (b) information with the

potential to reveal the identities of other policyholders (as the brand name of particular products). Moreover, as the chronology below illustrates, Ford belatedly complains about a very narrow set of redactions.

### A.      NICO's Redaction Protocol

Since the beginning of discovery, NICO has taken the position that information concerning HDI-Gerling's other policyholder clients is wholly irrelevant and confidential business information and therefore beyond the scope of discovery in this coverage dispute.  As a result, at the start of discovery in December 2012, NICO redacted information from the documents it produced, including information identifying other policyholders, other insureds' policy numbers, the inception dates of such policies, and paid loss amounts to other insureds.

NICO employed two different methods of other policyholder redaction with regard to spreadsheet documents.  In some instances, as with spreadsheets tracking the performance of the LPT, NICO replaced the names of other policyholders and any other identifying information of those other policyholders with "REDACTED."  (Ex. 1.)  When practical, NICO employed this method to other spreadsheets.  (*Id.*)  With regard to other spreadsheets that contained thousands of cells, and were thus impractical to redact using the aforementioned method, NICO used the spreadsheet's filtering function to filter out any irrelevant and objectionable information related to other policyholders.  *Id.*

In early June, after sending a letter to Ford, NICO adjusted its redaction of non-spreadsheet documents to apply only to the names of other policyholders and other identifying information.  Because Ford has maintained an all-or-nothing approach to other policyholder information, NICO did not alter the existing other policyholder redactions on already-produced documents.

4

**B.      NICO's Objections to Producing Other Policyholder Information**

Since discovery began, NICO has been timely objecting to each of Ford's discovery

requests that sought the production of other policyholder information.  For example, in

December 2012, NICO interposed a general objection to each request seeking irrelevant

information or disclosure of NICO's confidential business information.  (*See, e.g.*, ECF No. 151-

5 at General Objection Nos. 2 & 3.)  NICO incorporated these general objections by reference

into each of its specific objections to Ford's requests, which could be read as seeking information

concerning the other policyholders.[1]  Additionally, NICO objected to a number of Ford's

discovery requests on the ground that they improperly sought information concerning other

policyholders.  For example, in Ford's first set of document requests, Ford sought "[a]ll

documents referencing, explaining, or evidencing NICO's investigation or knowledge of the

Gerling Aggregate Stop Loss Policies and/or any claims made under them," (ECF No. 151-5 at

No. 11.) and NICO specifically objected to producing documents referencing other

policyholders:

> NICO further objects to this Document Request on the ground that the Request is
> not limited to claims tendered by Ford and, therefore, improperly seeks
> information concerning NICO's investigation or knowledge concerning claims
> tendered by other policyholders.

(*See id.*.)

Consistent with these objections, NICO has redacted information concerning other

policyholders since NICO's initial document production on January 10, 2013.  NICO redacted as

---

[1]   NICO's general objections were thus incorporated into its objections to the production
of Requests for Production No. 2 and 8, which are the subject of Ford's motion.  (ECF No. 151-
5.)  NICO's general objections to Ford's Third RFPs, containing requests 53 through 60,
contained similar objections to the production of irrelevant or confidential information.  (ECF
No. 151-6.)

little content as practical to ensure that the context of otherwise discoverable information was discernible from NICO's documents.

Moreover, NICO specifically identified all such redactions on its privilege log and supplemental privilege logs, which NICO provided to Ford on February 13, 2013, March 22, 2013, May 17, 2013, and June 27, 2013. (*See, e.g.*, Ex. 3 at Ref. 1 (identifying redactions for information relating to other policyholders as "Nonresponsive/Confidential" as defined next to the asterisk on p. 12).) These privilege log entries allowed Ford, if it wished, to identify the precise locations in NICO's production where NICO redacted information relating to other policyholders on the basis of irrelevance and confidentiality. NICO was upfront and clear about these redactions from the beginning.

### C.     The Parties' Communications Concerning NICO's Redactions

Ford first questioned these redactions on March 1, 2013, two months after NICO's first production. Ford argued broadly that it was entitled to discovery concerning the other insureds, and that NICO's redactions were improper. (*See* Ex. 4.) NICO responded less than a week later, on March 7, 2013, reiterating the bases for its redactions and providing a detailed explanation of the reasons for the redactions. *First*, NICO explained that information about other policyholders has no bearing on any claim or defense asserted by Ford in the litigation and was thus beyond the scope of discovery under Rule 26. *Second*, NICO asserted:

> [T]he information requested by Ford concerning other companies whose claims are reinsured by NICO is confidential information entrusted to NICO, through its agency relationship with HDI-Gerling. That information includes, in addition to the identity of other companies, some of which are in direct competition with Ford, confidential and sensitive information about persons who have made claims against these other policyholders. HDI-Gerling, and its claims agents, NICO and Resolute Management, are entrusted to maintain that personal and confidential information and are no more at liberty to disclose it to Ford than they are at liberty to disclose Ford's confidential information to others.

(*See* Ex. 5 at 8.)

When Ford responded on March 21, 2013, Ford did not address NICO's substantive justification for its redactions, but simply reiterated its argument that NICO was not entitled to redact information concerning other policyholders—an argument buried within a letter addressing NICO's responses to various other requests for production.  (*See* Ex. 6 at 4.)  The next day there was a meet-and-confer and Ford did not raise any issue concerning these redactions. Nor did it raise the redactions  in its March 22 letter following up on the meet-and-confer.  (*See* Ex. 7.)

On March 28, 2013, Ford addressed the issue of other policyholder information in response to NICO's first amended privilege log.  However, Ford once again merely stood on its general position that NICO's redactions of information concerning other policyholders were improper.[2]  (*See* Ex. 8 at 2.)

On April 7, 2013, NICO again restated its position, this time in connection with Ford's proposed deposition topics:

> Similarly proposed topic 1(f), which seeks deposition testimony concerning "Other insureds covered by the reinsurance agreement," also is improper.  As you know from NICO's objections and responses to Ford's written discovery, information concerning policyholders other than Ford is neither relevant to any party's claim or defense, nor is it reasonably calculated to lead to the discovery of admissible evidence. Information about NICO's and/or HDI-Gerling's other policyholders also is confidential and NICO and HDI-Gerling are under a fiduciary duty to maintain that confidentiality. This is particularly the case with regard to any other policyholders who might be in competition with Ford.

---

[2]  If Ford truly believed that information concerning NICO's other policyholders was relevant in this litigation, it is unclear why Ford failed to seek to have this topic included in the Court Ordered briefing on the issue of NICO's withholding of reserve and reinsurance information.  *See* D.I. 51 (March 27, 2013 Order).

(*See* Ex. 9.)  This position was further reiterated two weeks later, on April 22, 2013, when NICO

objected to Ford's third requests for production.  (Ex. 10, ECF No. 151-6 at 2 (General Objection

No. 3).)

It was not until May 30, 2013, approximately six months after NICO's first production,

that Ford raised this topic again and sought a meet –and–confer on May31.  (*See* Ex. 11 [May 30,

2013 Letter from Ford to NICO].)  NICO agreed to meet and confer on this issue, but pointed out

that Ford could have asked the Court to modify its March 27, 2013 Order to include other

policyholder information as a topic to be briefed.  (*See* Ex. 12.)

At the parties' June 1 meet-and-confer, Ford once again did not offer any explanation as

to why the information concerning other insureds was relevant to the present dispute:

> As we discussed, NICO considers the identities of other policyholders and their
> loss information to be highly confidential and of zero relevance to this case. I
> asked you to explain the relevance, but you did not do so, other than to note that
> other policyholders are named on the Reinsurance Agreement (the "LPT")
> between HDI-Gerling and NICO.

(*See* Ex. 13 (memorializing meet and confer).)  Even though NICO maintained its objections to

the production of other policyholder information at the parties' June 1st meet and confer, it

offered to compromise while still protecting over 500 of its policyholders from having their

confidential information revealed in a lawsuit they are neither involved in, nor likely even aware

of.  As memorialized in NICO's June 3rd letter:

> In an effort to reach mutual agreement on this topic, [NICO] offered (a) to
> produce Schedule A to the LPT with only the names of the other policyholders
> redacted—i.e., to unredact the policy numbers and their inception dates; and (b) to
> produce documents sufficient to show the aggregate performance of the LPT
> generally, without specifically identifying other policyholders. You said you
> would need to consult with your client as to whether this would be acceptable.
> Please let us know.

(*See id.*)  Ford did not accept this offer however, and, two days later, simply claimed:

> The Court has ruled against NICO on the issue of claim reserves, and as we established in our letter last week and the ensuing meet and confer, NICO has waived any objection as to relevance regarding other policyholder information.

(*See* Ex. 14.)  But Ford was wrong.  The Court had not "ruled against NICO on this issue."  The

Court had ruled on Ford's motion for reserve information (ECF No. ___), which is a wholly

separate issue.

On June 6, 2013, counsel for NICO responded, clarifying that it sought the proper

balance between its obligations to other policyholders and its discovery obligations in its

production of documents containing other policyholder information. (Ex. 1.)  NICO explained

that, on certain spreadsheets (like those showing aggregate performance of the LPT), it would

redact only "the names of the policyholders and the descriptions of specific claims "which in

many instances effectively reveal [the] identity of the other policyholder," but leave all other

information unredacted.  NICO also informed Ford that when impractical to redact only the

information identifying  other policyholders, NICO used the spreadsheet's filtering function to

remove irrelevant and objectionable data related to other insureds such that "only information

pertinent to Ford claims in the LPT appears on the spreadsheet…", .   NICO further invited Ford

to make any requests regarding its preference that NICO perform the redactions differently.

Now, Ford again risks the continuance of trial as the Court confronts another motion by

Ford to compel wholly irrelevant documents, just weeks before the close of discovery.  (*See* Ex.

17, May 9, 2013 Hr'g Tr. 27:7-16 (noting that trial may be put off by continued discovery)).)

## ARGUMENT

Ford complains in this litigation that it has been harmed because NICO, not some third-

party, allegedly interfered with Ford's right to insurance recovery under certain of Ford's

insurance policies with HDI-Gerling.  Despite the relatively straightforward nature of Ford's

liability claim, Ford seeks extensive discovery concerning irrelevant and confidential information relating to other policyholders, all of whom are unrelated to Ford or any policy issued to Ford.  As described above, this includes information whose sole purpose can only be to identify other policyholders, and thus cannot bear on the instant case.

Despite the fact that Ford has been aware of the issue since December 2012, Ford's motion comes only weeks before discovery closes and trial is scheduled to begin.  For the reasons set forth below, NICO should not be compelled to produce the information sought by Ford relating to the identify of other policyholders.

## I.      LIMITED REDACTIONS ARE APPROPRIATE FOR WHEN THE INFORMATION REDACTED IS IRRELEVANT

Courts "frequently restrict discovery based on relevance." *See Abbott v. Lockheed Martin Corp.*, 2009 WL 511866, at *2 (S.D. Ill. Feb. 27, 2009) (collecting cases); *see also WLR Foods v. Tyson Foods*, 65 F.3d 1172, 1184–85 (4th Cir. 1995) (affirming district court's decision to limit discovery based on relevance).  A court's ability to restrict discovery based on relevance stems from its broad discretion over discovery matters.  *See Money Point Diamond Corp. v. Union Corp.,* 998 F.2d 1009 (4th Cir. 1993) ("In determining whether evidence qualifies as relevant for discovery or admissibility purposes, the district court has broad discretion.").

Consistent with this power, courts have permitted redactions where the redacted information is irrelevant, and limited to a narrow, discrete subject matter.  For example, in *Schiller v. City of New York*, No. 04-7922, 2006 WL 3592547, at *1 (S.D.N.Y. Dec. 7, 2006), the court denied a motion to compel unredacted versions of meeting minutes produced by plaintiffs. In particular, the court found that redacted information discussed in the discoverable minutes was wholly irrelevant to any claim or defense in the litigation and the minutes were therefore properly redacted.  *Id.* at *7.  Similarly, in *Abbott v. Lockheed Martin Corp.*, No. 06-0701, 2009

WL 511866  (S.D. Ill. Feb. 27, 2009), the court found that redaction of specific information regarding benefits plans "is acceptable because that information is not relevant to the issues in this case and not reasonably calculated to lead to the discovery of admissible evidence." *Id.* at *3.

The case law is replete with other examples where courts have deemed narrowly drawn relevancy redactions to be acceptable.  *See, e.g.*, *RBS Citizens, N.A. v. Husain*, No. 09-4956, 2013 WL 2457982, at *11 (N.D. Ill. June 4, 2013) (denying motion to compel unredacted documents  "about other RBS customers' loans," which were "not relevant to any of the claims at issue here"); *Rep. Asset Mgmt., LLC v. Royal Surplus Lines Ins. Co.*, No. 600476, 2007 WL 478749 (N.Y. Sup. Ct. June 19, 2006) (defendant permitted to redact irrelevant reserve and reinsurance information); *Beauchem v. Rockford Products Corp.*, No. 01-50134, 2002 WL 1870050, at *2 (N.D. Ill. Aug. 13, 2002) (finding good cause existed to support redaction where the redacted information concerning the company's operation and administration as reflected in board minutes was wholly irrelevant); *Stahl v. Rhee*, 136 A.D.2d 539, 540 (2d Dep't 1988) (identities of persons involved in medical trials irrelevant to action and permissibly redacted from drug experience reports).

In the instant case, Ford seeks unredacted copies of the following categories of documents: (a) the schedules to the Reinsurance Agreement between HDI-Gerling and NICO and (b) documents containing financial information related to other policyholders.  To be clear, the data related to the performance of the LPT as whole has already been produced, but Ford wants the specific identifying information linking loss and insurance payment history information to each specific non-party policyholder.  Because all of the redacted data represents

confidential information likely to compromise the business interests of third parties to the instant

litigation, the motion should be denied.

### A. The Names Redacted From Schedule A Are Not Relevant

Pursuant to Federal Rule of Civil Procedure 26, parties may obtain discovery only on

matters that are relevant to a claim or defense of a party in the litigation or that is reasonably

calculated to lead to the discovery of admissible evidence.  *See* Fed. R. Civ. P. 26(b)(1);

*Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) ("Even assuming that this

information is relevant (in the broadest sense), the simple fact that requested information is

discoverable under Rule 26(a) does not mean that discovery must be had."); *see also Halim v.*

*Balt. City Bd. Of Sch. Comm'rs*, No. WMN-11-2265, 2012 U.S. Dist. LEXIS 85210, at *4–5 (D.

Md. June 20, 2012) (denying a request for personnel files "contain[ing] very sensitive private

information about non-parties to this litigation" where party seeking discovery failed to articulate

a "legitimate need" beyond bare belief that filed would "contain information related to his

allegations").

Ford asks the Court to compel NICO to produce an unredacted copy of Schedule A to the

Reinsurance Agreement.  Ford claims this information is necessary to determine if the HDI-

Gerling / NICO Reinsurance Agreement is "valid."  (Ford Br. 14.)  Ford also claims that it has

been prejudiced because "NICO has produced the contract only with heavy redactions that make

it impossible for Ford and its expert to understand the scope of the agreement."  (*Id.* at 2.)  This

is disingenuous.  NICO has not redacted *any* portion of Reinsurance Agreement's text.  The only

redactions were to Schedule A, which is simply a list of policies that are subject to the

Reinsurance Agreement, stating the names of policyholders, their policy numbers, and the dates

those policies incepted.  NICO has produced all of this information to Ford except the names of

the policyholders.[3]  (*See* ECF No. 151-9, 151-10.)  The names of the policyholders does not

reveal anything more about the "scope" of the Reinsurance Agreement.  Moreover, the validity

of the NICO-HDI-Gerling Reinsurance Agreement has never been an issue in this case, Ford has

no standing to claim that the Reinsurance Agreement is invalid,[4] and in fact, Ford leveraged the

Reinsurance Agreement to argue (successfully) to this Court that certain of HDI-Gerling's

documents are within NICO's control pursuant to that agreement.  (ECF No. 21 at 3.).

Moreover, Ford negotiated a custom (or "manuscript" as opposed to a form) policy with HDI-

Gerling that is different from the policies HDI-Gerling issued to its other insureds.  The names of

other policyholders, therefore, have nothing to do with whether Ford is entitled to payment under

the terms of its policy with HDI-Gerling, which issue is being arbitrated .[5]

---

[3] NICO initially produced Schedule A with the insurance policy numbers and inception dates of each insured redacted, along with the names of the insureds.  In an effort to compromise pursuant to the only meet and confer on this issue (held on May 31, 2013), NICO has produced Schedule A with only the insureds' names redacted.

[4] The Reinsurance Agreement expressly states, in a clause entitled "No Third Party Rights" that "[t]his Agreement is solely between the Reinsured and the Reinsurer.  Nothing in this Agreement shall in any manner create any obligations or establish any rights of action against the Reinsurer in favor of any third parties . . . including . . . insureds and reinsureds of the Reinsured . . . ." (ECF No. 151-15 at 10.).  Thus, under either the law of Virginia or Michigan, Ford cannot pursue suit, given that it is neither a party to nor a beneficiary to the agreement. *Envtl. Staffing Acquisition Co. v. B & R Constr. Mgmt.*, 725 S.E. 2d 550, 554 (Va. 2012)(finding no "intention to benefit third parties" given "an express stipulation in the instrument to the effect that it is for the sole benefit of the obligee named therein."); *Radisson Hotel Corp. v. Pontchartrain Hotel Group, L.L.C.*, 983 F. Supp. 692 (E.D. Mich. 1997)  (requiring "an express promise to act to the benefit of the third-party" to find beneficiary status).

[5] While Ford at one point contended that NICO's entry into the Reinsurance Agreement itself constituted a conspiracy with HDI-Gerling and tortious interference with the policies, Ford has since disavowed that contention.  (*See* ECF No. 183-34 (No. 15).)  Even if that theory were still live in the case, the names of HDI-Gerling's other policyholders is irrelevant to that question, as discussed herein.

### B.   The Identifying Information Redacted from Other Documents is Also Not Relevant

Ford additionally seeks the production of documents demonstrating "financial performance of the [LPT]," along with "reports and financial documents" that "demonstrate and explain the deal between NICO and HDI-Gerling." (Ford Br. 4.)  The redaction of many of these documents concerned only two types of information.  **First**, NICO redacted the names of any other policyholders.  (Ex. 1) **Second**, NICO redacted information concerning other policyholders' claims, where that information would reveal the identity of another policyholder and it was impractical to redact otherwise.[6]

### 1.   Ford Cannot Explain How the Identity of Other Insureds Is Relevant to this Case

Ford's brief contains only a single, 3-sentence long, conclusory paragraph regarding the purported relevance of this information, stating that "NICO had a gap in its reserves it needed to make up.  This provided a motive to abuse Ford." (Ford Br. 13.)  Ford cites *no* support for this argument.  Rather, Ford cites only to declarations from two of its purported experts, Mr. Prater and Mr. Terrell.  Mr. Prater submits a two-page declaration which provides a single sentence regarding the purported relevance of this information, wherein he asserts, "NICO's withholding of those insured's identities has prevented me from investigating the extent of NICO's pattern and practice with regard to the loss portfolio transfer at issue in this matter." (ECF No. 151-13 at ¶6.)  Mr. Prater does not explain what "pattern and practice" he is trying to discern or how such a pattern or practice would tend to prove or disprove whether NICO's entry into the Reinsurance

---

[6]   For example, where the description of a claim revealed the name of a pharmaceutical produced by a given insured, that information was redacted to protect the identity of the insured. Or when confronted with spreadsheets that contained thousands of cells of data, data related to other policyholders' claims was irrelevant and redacted, but the information related to Ford's claims was produced. (Ex. 1.)

Agreement constitutes tortious interference with the Gerling policies issued to Ford.  Similarly, Mr. Terrell simply declares, without providing any support, that access to the unredacted information will help him "more fully" analyze the economics of the HDI-Gerling / NICO reinsurance transaction, "including forming a determination if NICO had additional reserve shortfalls from other policies." (ECF No. 151-14 at ¶ 5.)   Mr. Terrell claims that "[i]f that is the case," it would give NICO "additional incentive for its bad conduct with respect to Ford's claims."  (ECF No. 151-14 at ¶ 5.)  Again, whether NICO actually had additional reserve shortfalls from other policies does not tend to prove or disprove whether NICO's entry into the Reinsurance Agreement constitutes tortious interference with the Gerling policies issued to Ford. These conclusory declarations reveal that Ford is simply on a fishing expedition, and embarking on it just weeks before discovery closes and trial is scheduled to begin.

More importantly, neither of Ford's purported experts provides any explanation as to why the *identity* of the other policyholder clients of Gerling  is necessary for their analysis when they already have the underlying aggregate financial information.  Moreover, neither "expert" explains why a reserve gap—even if one existed—would create an incentive for "bad conduct."

2.      Ford Seeks the Identify of Other Insureds for Impermissible Purposes

Moreover, the reason that Ford has suggested for seeking the identity of the other policyholders—its hope to establish a "pattern and practice" of past bad acts—is not permissible. Even if the redacted information could establish a "pattern and practice" of withholding payment, it is well-established that evidence of the actor's previous (or subsequent) performance

of similar acts on other occasions is not admissible to prove liability.  *See* Fed. R. Evid. 404(b)(1); *Sea Marsh Grp., Inc. v. SC Ventures, Inc.*, 111 F.3d 129 (4th Cir. 1997) (sustaining refusal to admit evidence under 404(b) despite claims that such evidence went to the intent of the parties, where claims of tortious interference with contract were alleged); *see also Laura Campbell Trust v. John Hancock Life Ins. Co.*, 411 F. Supp. 2d 606, 609 (D. Md. 2006) (finding that plaintiff trust lacked any probative evidence to support its position that a genuine dispute of fact existed with respect to the signature of a document where plaintiff relied solely on propensity evidence to establish signature).[7]

In the insurance context in particular, courts have found that information relating to other policyholders' claims is not relevant and need not be produced pursuant to Rule 26(b) where the parties are engaged in a coverage dispute, which must be determined based on the facts of the tendered claim and the relevant policy language.  *See, e.g.*, *N. River Ins. Co. v. Greater N.Y. Mut. Ins. Co.*, 872 F. Supp. 1411 (E.D. Pa. 1995) (finding that information from other policyholders "will necessarily involve totally different facts and circumstances" and that "[s]uch information not only is highly unlikely to have any relevance to [the present claim] but does not even 'appear reasonably calculated to lead to the discovery of admissible evidence'"); *see also Penford Corporation v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 265 F.R.D. 430 (N.D. Iowa 2009) (finding that "evidence of claims by other policyholders is not relevant to the resolution" of the issue of insurance coverage"); *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*

---

[7]  Ford may argue on reply that the evidentiary rules regarding propensity evidence are inapplicable to whether information should be produced during discovery.  However, propensity evidence is patently unlikely to lead to the discovery of admissible evidence.  *See Martel v. Cal. Dep't of Corr.*, No. CIV S-04-0014, 2006 U.S. Dist. LEXIS 55651, at *3-4 (E.D. Cal. July 27, 2006) (request for evidence in order to "establish a pattern of [d]efendant's conduct" was not "reasonably calculated to lead to discovery of admissible evidence because, even if such evidence exists, evidence of prior wrong or acts is inadmissible to show action in conformity therewith." (citing Fed. R. Evid. 404(b))).

2007 WL 3376831, at *5 (S.D. Ohio Nov. 8, 2007) (given the lack of relevancy to the plaintiff insured's own claims, and privacy concerns of other policyholders, other policyholders' information was "not reasonably calculated to lead to the discovery of admissible evidence"); *Moses v. State Farm Mut. Auto. Ins. Co.*, 104 FR.D. 55, 57 (N.D. Ga. 1983) (an insurer's conduct regarding the insurance claims of other insureds is "of no consequence" to the adequacy of its conduct toward the plaintiff).[8]

The potential for discovery into other policyholders "spawning unbearable side litigation . . . defeats the purpose and spirit of the discovery rules themselves" and warrants non-disclosure. *Leksi Fed. Ins. Co. v. Fed. Ins. Co.*, 129 F.R.D. 99, 105-106 (D.N.J. 1989) (denying motion to compel information concerning other insureds); *Clark Equip. Co. v. Liberty Mut. Ins. Co.*, 1995 WL 867344, at *3 (Del. Super. Apr. 21, 1995) (finding that discovery of other policyholders would exceed "rational limits . . . on the extent of discovery in complex litigation of this nature").

Given the plainly impermissible purpose for which Ford seeks to use the redacted material, in concert with the tenuous claims of relevance for the information, NICO's redactions are permissible.

---

[8]   Of course, this litigation cannot itself be a coverage dispute because disputes over coverage under the policies are contractually required to be arbitrated, and are in fact being arbitrated.  Moreover, because Ford's assertions against NICO concern the allegation that NICO tortiously induced a breach of the policies, Ford's claims simply *assume* the existence of a breach.  However, because the existence of a breach can only be determined by the arbitration panel, and because the arbitration hearing will not be held until after the trial, the only argument that could even potentially be ripe for trial is whether entry into the Reinsurance Agreement itself constitutes tortious interference with the Gerling policies issued to Ford—which, as noted *supra* note 5, is a theory Ford has affirmatively disavowed..

## C.      The Cases Ford Cites Are Inapposite

Ford cites inapposite case law for the proposition that relevancy redactions are impermissible.  (*See* Ford Br. 10-11.)  In *In re MI Windows & Doors Prods. Liab. Litig.*, 2013 U.S. Dist. LEXIS 9468, at *1 (D.S.C. Jan. 24, 2013), the court found that the defendant "clearly had over-redacted" and wrongfully redacted relevant information that either "form[ed] the basis of the homeowner plaintiff's complaints" or that was "at issue in several of the homeowner plaintiffs' complaints." *Id.* at *5-6.  In contrast, here, NICO's purported "pattern and practice" with respect to other insureds have not been implicated in Ford's Complaint.  Nor could they, as the issue for the Court to consider is NICO's actions with respect to Ford, ***and only Ford***.[9] *In re State Street Bank and Trust Co. Fixed Income Funds Invs. Litig.*, 2009 WL 1026013, at *1 (S.D.N.Y. Apr. 8, 2009) is also inapposite.  In *State Street*, the court expressed concerns that relevancy redactions "breed suspicions" due to nature of the information behind the blacked out portions of documents as being unknown.  2009 WL 1026013, at *1. The concerns at issue in *State Street* are not present here because NICO has implemented narrowly drawn redactions relating to a specific category of wholly irrelevant information, as described herein, and has identified such redactions on its privilege logs such that Ford is fully aware of the redacted subject matter and the location of these redactions in NICO's documents.  Ford's other cases are also distinguishable.[10] *See Howell v. City of New York*, 2007 WL 2815738, at *2 (E.D.N.Y. Sept.

---

[9]   Ford also relies on *MI Windows* for the proposition that "redaction of irrelevant information, even when sparingly done, deprives plaintiffs of context for the relevant information."  (Ford Br. 10.)  However, Ford fails to provide any reasoning as to why it believes information concerning other insureds—including granular claims-related data—deprives Ford of context for the information in NICO's produced documents that actually concern Ford.

[10]   *David v. Alphin*, 2010 U.S. Dist. LEXIS 144275 (W.D.N.C. Mar. 30, 2010) is also inapposite.  *Alphin* involved claims that the defendant favored its own mutual funds in the administration of a 401(k) plan.  At issue was the discovery of the bank's administration of pension funds (for which the defendant bank bore the risk and the costs) versus the bank's

25, 2007) (leaving for "another day" the question of whether "the redacted information should not be produced because it is irrelevant"); *Evon v. Law Offices of Sidney Mickell*, 2010 U.S. Dist. LEXIS 20666, at *5 (permitting redactions of sections of documents that are "clearly and convincingly irrelevant").[11]

Given that the information sought by Ford is entirely irrelevant to the present dispute, it would be unfair to require NICO to go back and unwind its redactions. This is further compounded by the fact that Ford waited to bring its motion until shortly before the close of fact discovery even though it was aware of Ford's redaction protocol for nearly five months—since at least as early as February 13, 2013.

Moreover, because information concerning the other insureds is clearly irrelevant, Ford cannot be prejudiced by NICO's redactions. Ford claims that it is owed "a level playing field in this litigation," and has gone so far as to invoke the spoliation doctrine. (Ford Br. 15.) However, the spoliation doctrine clearly does not apply here. First, no evidence has been destroyed; there is a clear distinction between *destruction* of evidence and *redaction*. *McAdam v. Grzelczyk*, 911 A.2d 255, 261 (R.I. 2006)(observing a party's redaction of text was "no evidence whatsoever" that document destruction occurred); *see also Manley v. Invesco*, No. CIV.A. H-11-2408, 2012 WL 2994402, at *2 (S.D. Tex. July 20, 2012)(finding document redactions unpersuasive

---

administration of a 401(k) plan, where it bore no such risk. The Court found that a comparison of the administration of the two plans was relevant to whether the bank breached its duty of loyalty, given that prudent administration of the pension funds would have benefited the defendant. That scenario is *not* analogous to that which the Court confronts here – where there are no allegations that NICO stands to benefit by treating other policyholders better than it treats Ford.

[11]   The large reports and Excel documents produced by NICO containing claims-related information for both Ford and NICO's other policyholders can be viewed as the type of large document at issue in *Evon*. Under the court's reasoning in *Evon*, separate sections of these reports, including Excel cells, reflecting information relating to NICO's other, unrelated insureds, which is "clearly and convincingly irrelevant," are properly redacted.

evidence of spoliation); *Pure Power Boot Camp v. Warrior Fitness Boot Cam*p, 587 F. Supp.

548 (S.D.N.Y. 2008) (holding that the redaction of date information from emails did not amount

to spoliation of evidence justifying sanctions).  Moreover, even if NICO destroyed information

concerning the other policyholders rather than merely redacted it, the case law is clear that a

party cannot commit spoliation with respect to clearly irrelevant information.  *E.I. Du Pont De*

*Nemours & Co. v. Kolon Indus., Inc.,* No. 09-58, 2011 WL 1597528, at *13 (E.D. Va. Apr. 27,

2011) (requiring a showing of relevance "somewhat more stringent than the standard provided

by Federal Rule of Evidence 401" to demonstrate spoliation).

## II.    THE CONFIDENTIALITY OF OTHER POLICYHOLDERS' INFORMATION ALSO JUSTIFIES REDACTION

Redacting the identity of HDI-Gerling's other policyholders is also justified because such

information is confidential.  Courts recognize "an interest in the confidentiality of customer

information and lists based on fears of predatory or harassing practices."  *Ikon Office Solutions,*

*Inc. v. Konica Minolta Bus. Solutions*, No. 08-539, 2009 U.S. Dist. Lexis 116372, at *14

(W.D.N.C. Nov. 25, 2009); *Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc.* 200 F.R.D.

255, 262 (M.D.N.C. 2001)(recognizing the confidentiality of supplier lists).  Like the customer

lists in *Ikon*, the names of HDI-Gerling's policyholder clients are confidential information

subject to protection, and NICO as HDI-Gerling's agent is duty bound to protect them.

These concerns are especially relevant in the context of competitive relationships, given

that "[a]mple precedent exists for limiting disclosure of highly sensitive, confidential or

proprietary information, especially where a party might use the information to gain a competitive

advantage. *Ikon*, 2009 U.S. Dist. Lexis 116372, at *15 (W.D.N.C. Nov. 25, 2009).  In the instant

case, Ford has itself identified that several of the other policyholders whose information is

sought are in direct competitive relationships with Ford.  For example, Ford's own motion lists

███████████████████████████████ as other insureds.  (Ford Br. at

12.)  Given the direct competitive relationship between Ford and the other policyholders,

redaction of information identifying other policyholders is warranted.

Indeed, courts have permitted litigants to redact such information under similar

circumstances.  *See, e.g.*, *Rayfield Aviation, LLC v. Lyon Aviation, Inc.*, 2012 U.S. Dist. LEXIS

105393, at *12-13 (M.D.N.C. July 30, 2012) ("Lyon's full, unredacted bank records, which

would include business beyond the Agreement and beyond Rayfield, would not be relevant, and

would include confidential business information that would put Lyon at a competitive

disadvantage if it is required to be turned over to Rayfield."); *see also RBS Citizens,* 2013 WL

2457982, at *12 (denying motion to compel "redacted confidential information that relate[d] to

other borrowers and [was] not responsive to Defendants' discovery requests or relevant to their

claims").

Ford's asserted reasons as to why NICO's redactions due to confidentiality are improper

are each meritless.  First, Ford asserts that NICO's redactions are unnecessary given that a

stipulated protective order has been entered in this case.  (*See* Ford Br. 10 (relying on *In re State

Street*).)  But the protective order still permits Ford to review the documents, and Ford should not

be permitted to track sensitive loss information and connect such losses to specific companies,

including Ford's direct market competitors.  Second, Ford contends that NICO's "confidentiality

concerns are futile and disingenuous in light of what NICO has already disclosed."  (Ford Br. 12-

13.)  But even if the identity of some of the other policyholders has been inadvertently disclosed,

that does not mean that the identity of all policyholders should be disclosed, and it does not mean

that Ford is entitled to information that will permit Ford to connect specific insureds with their

sensitive loss information.

Ford further contends that, even if NICO's information is confidential, NICO is not entitled to any protection of this information because NICO took the position during the parties' Rule 26(f) conference that "no protective order was necessary because none of the information that would be forthcoming in discovery was confidential in nature."  (Ford Br. 6.)  Ford's argument is nonsensical given that, at the time of the pre-trial conference, NICO could not have anticipated that Ford would seek wholly irrelevant and business-sensitive information concerning HDI-Gerling's other policyholder clients to support its claim that NICO tortiously interfered with Gerling's policies issued to Ford.  Had Ford indicated early in this litigation that it intended to seeks such sweeping discovery, NICO would have sought additional protections when it negotiated the terms of the protective order.

Given the substantial confidentiality concerns implicated by the production of this sensitive information, Ford's motion should be denied.

## III.   NICO HAS NOT WAIVED ITS OBJECTIONS

Ford also argues, incorrectly, that NICO waived confidentiality with respect to information relating to the other policyholders because it failed to object to Ford's applicable document requests (contained within Ford's first and third set of requests) on the basis of confidentiality.  (Ford Br. 11-12.)  Ford's position is untenable as NICO *did* object to Ford's document requests on the basis of confidentiality.[12]  (*See* ECF Nos. 151-5, 151-6 at General Objection No. 3 ("NICO objects to Ford's Document Requests to the extent they . . . seek disclosure of proprietary and/or confidential business information . . . .").)  These objections were incorporated by reference into each of NICO's objections to Ford's discovery requests. Moreover, as of February 13, 2013, Ford has been aware that NICO's documents (first produced

---

[12]  Ford's position is also internally inconsistent with its position that the protective order (which governs the use only of confidential information) adequately addresses NICO's concerns.

on January 10, 2013) included information concerning the identities of other policyholders that

NICO redacted on the basis of relevancy and confidentiality.  (*See, e.g.,* Ex. 3 at Nos. 1, 31, 32.)

In addition, the equities do not favor a finding of waiver here.  A "court has broad

discretion to decide on a case by case basis whether waiver is appropriate."  *Hall v. Sullivan*, 231

F.R.D. 468, 474 (D. Md. 2005).  Where a party demonstrates that "good cause" exists to avoid

waiver, a court may find that no waiver has occurred.  *Id*. The factors relevant to a showing of

good cause are (1) the length of the delay or failure to particularize, (2) the reason for the delay

or the failure to particularize, (3) whether there was any dilatory or bad faith action on the part of

the party that failed to properly object, (4) whether the party seeking discovery has suffered any

prejudice, (5) whether the document production request was properly framed and not excessively

burdensome; and (6) whether waiver would impose an excessively harsh result on the defaulting

party.  *Id*.  Here, Ford has waited until just weeks before discovery closes, it has no good faith

basis for waiting this long to raise the issue with the Court, NICO made the redactions in good

faith, it would take substantial time and effort to unredact all the documents that NICO has

already produced, and this burden would be unfair to NICO this close to trial, particularly when

Ford has made no showing that the information is at all relevant to the case.

## IV.   IF NICO'S REQUESTED RELIEF IS NOT GRANTED, AN AMENDED PROTECTIVE ORDER SHOULD ISSUE

While Ford is not entitled to discovery of other policyholder information, in the event

that Ford's requested relief is granted, any information concerning other policyholders should be

produced subject to an "Attorneys' Eyes Only" designation.  NICO has demonstrated "good

cause" to issue a protective order "to protect a party from annoyance, embarrassment,

oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  Courts recognize "an interest in

the confidentiality of customer information and lists based on fears of predatory or harassing

practices." *Ikon*, 2009 U.S. Dist. Lexis 116372 at *__.  The disclosure of the sensitive business information of the other policyholders stands to harm both HDI-Gerling and its policyholders clients, some of which are in direct competition with Ford.  *Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc.* 200 F.R.D. 255, 262 (M.D.N.C. 2001) (weighing evidence of confidentiality and prospect of harm in determining whether a protective order should issue).  Given the substantial risk to the other policyholders, any information that is produced should be subject to an "Attorney's Eyes Only" designation, providing that only outside counsel for Ford may review any produced information regarding other policyholders.

## CONCLUSION

For the foregoing reasons, NICO respectfully requests that Ford's motion to compel be denied.  If the Court determines that Ford's motion should be granted, NICO respectfully requests that the information be produced pursuant to an amended protective order, by which this information will be designated as Attorneys' Eyes Only.

Respectfully submitted,


Dated:  July 11, 2013                                    /s/ George P. Sibley, III
                                                        _____
                                                        Walter J. Andrews (VSB No. 46031)
                                                        wandrews@hunton.com
                                                        Michael S. Levine (VSB No. 48013)
                                                        mlevine@hunton.com
                                                        HUNTON & WILLIAMS LLP
                                                        1751 Pinnacle Drive
                                                        Suite 1700
                                                        McLean, VA 22102
                                                        (703) 714-7400

George P. Sibley, III (VSB No. 48773)
gsibley@hunton.com
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200

Jane M. Byrne (*pro hac vice*)
janebyrne@quinnemanuel.com
Andrew M. Berdon (*pro hac vice*)
andrewberdon@quinnemanuel.com
Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Toji Calabro (*pro hac vice*)
tojicalabro@quinnemanuel.com
Brad Rosen (*pro hac vice*)
bradrosen@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100

*Attorneys for Defendant*
*National Indemnity Company*

## CERTIFICATE OF SERVICE

I certify that on July 11, 2013, I caused a true and correct copy of the foregoing to be

filed on the Court's CM/ECF system, which will cause of a notice of electronic filing to be

served on the following counsel for Ford Motor Company:

> Scott C. Oostdyk, Esq.
> J. Tracy Walker, Esq.
> H. Carter Redd, Esq.
> Matthew D. Fender, Esq.
> MCGUIREWOODS LLP
> One James Center
> 901 E. Cary Street
> Richmond, Virginia 23219

> /s/ George P. Sibley, III
> _____
> George P. Sibley, III (VSB No. 48773)
> gsibley@hunton.com
> HUNTON & WILLIAMS LLP
> Riverfront Plaza, East Tower
> 951 East Byrd Street
> Richmond, Virginia 23219-4074
> (804) 788-8200

04113 61795/5411486 6