IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FORD MOTOR COMPANY,

    Plaintiff,

v.                                  Civil Action No. 3:12cv839

NATIONAL INDEMNITY COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO COMPEL THE DEPOSITION OF SCOTT C. OOSTDYK, ESQ. (Docket No. 113). For the reasons set forth below, the motion will be denied at this time.

## BACKGROUND FACTS

In this action, Ford Motor Company ("Ford") asserts against National Indemnity Company ("NICO") claims for tortious interference with contract and conspiracy to injure another in its trade or business under Va. Code § 18.2-499. Generally speaking, Ford's claims arise out of NICO's conduct in connection with NICO's refusal to pay so-called "Non-Batch Claims" under Ford's Aggregate Stop Loss Policies ("ASLP"). Scott C. Oosdtyk, Esquire is a partner in the firm of McGuireWoods LLP and serves as counsel for Ford in this action. NICO seeks to take Mr. Oostdyk's deposition "with respect [to] his non-privileged claims-reporting and management

communications" with Ford's insureds under the ASLP.[1]

It is undisputed that, sometime after January 2011, NICO stopped
payments on Ford's Non-Batch Claims. According to NICO:

> Why those payments stopped is one of the key fact
> issues in the case. Was it the result of a
> nefairous conspiracy between HGI-Gerdling and
> NICO? Or was it because Ford, acting through Mr.
> Oostdyk, put a halt to the process then in place
> that allowed for the payment of Non-Batch Claims
> and instead opted for an 'all or nothing
> approach'—one single payment from each ASLP
> carrier reflecting payment of both disputed
> batch claims ('Batch Claims') and undisputed
> Non-Batch Claims?[2]

NICO takes the view that it stopped making those payments
because of an email sent by Mr. Oostdyk on January 17, 2011 to Mr.
Scott Friedman, a lawyer who was acting on behalf of NICO and other
insurers in sorting out which claims into the Non-Batch category and
which claims fell into the batch category. The email followed a
telephone call earlier that day. After the telephone call, Mr.
Friedman sent an email to Mr. Oostdyk, stating, inter alia:

> [last], you indicated Ford noes not want the
> insurers to issue payments at this time, even
> on claims that may not be in dispute. Instead,
> you want each insurer to issue one check when
> the audit process is complete.

To that, Mr. Oostdyk's January 17 email responded:

---

[1] Defendant National Indemnity Company's Memorandum of Law in Support
of its Motion to Compel the Deposition of Scott C. Oostdyk, Esq.
(Docket Nos. 114 and 216), p. 1 (hereinafter "NICO's Opening Brief").

[2] Id.

Yes, we want to work toward having fully verified in the next 30 days by Mitigate ALL Ford claims outstanding on Ford's Aggregate Stop Loss insurance program. We want to reach 100% verification of all non-open claims. We understand that process will involve close study by us of the reports that you will be getting us by Thursday, so that we can identify those closed Ford claims that remain unverified to this point, or for which expenses are only partially accounted on Mitigate's December interim report.

As to payments on the Ford Stop insurance program, we are directly in touch with legal or other representatives for Swiss Re, Gerling, Zurich, Chartis and Federal-Chubb. We will coordinate with them directly the payment process to Ford; we will soon make contact with the other Ford insurers. From our meetings with the carriers they have made it clear to us that a pre-requisite to that payment is a final Mitigate report on all potentially-insured Ford Agg Stop loss claims. Our goal is to work toward that finality with you, with complete focus. Thanks.

Based on this email exchange, it is NICO's position that Ford is responsible for having stopped the payment on the Non-Batch Claims. It is Ford's position that the emails exchange demonstrates merely that Ford sought to help correct an erroneous audit by Mr. Friedman and wanted to have "100 percent of its [Non-Batch] claims verified in thirty days;" and that Ford temporarily wished to delay the payments by the ASL Carriers during that period until Mr. Friedman had completed the audit report which was then under way, a date then projected to be in March 2011.

The matter was then further complicated by Mr. Friedman who says that he understood Mr. Oostdyk's letter to mean that all payments

3

were to be stopped indefinitely until Ford secured a complete resolution of its assertions of payment for both Non-Batch and Batch claims, the latter of which were in arbitration. According to Mr. Friedman, he told other insureds about this view, attributing it to Mr. Oostdyk on behalf of Ford. NICO has taken the deposition of Mr. Friedman and of numerous other people who have testified about what they understood Ford's position to have been.

NICO argues that "[u]nder the doctrine of equitable estoppel, Mr. Oostdyk gave [the instruction to suspend all payments until resolution of all claims [Non-Batch and Batch] could be achieved] on behalf of Ford, and HDI-Gerling relied on that instruction in determining to suspend payments that it otherwise would have made, NICO cannot be held liable for HDI-Gerling's failure to make those payments under any of theories alleged in the Complaint."[3] In other words, according to NICO, its deposition of Mr. Oostdyk is important to the defense of equitable estoppel. On that score, Ford contends that NICO cannot succeed on an equitable estoppel defense so Mr. Oostdyk's deposition is not needed.[4] And, in any event, says Ford, NICO has not satisfied the prevailing test for taking the deposition of an opposing counsel

It is against this background that NICO's motion to depose Mr. Oostdyk must be decided.

---

[3] NICO's Opening Brief, p. 9.

[4] Whether NICO can succeed on such a defense is not a matter to be decided in this motion.

## DISCUSSION

The test for determining whether it is appropriate to allow the deposition of an opposing party's counsel is set forth in Shelton v. Am. Motors Corp., 805 F.2d 1323 (8th Cir. 1986). The Shelton standard has been adopted by the First, Fifth, Sixth and Tenth Circuits. Our Court of Appeals has not decided the issue; however, district court decisions within the circuit rather uniformly have followed the Shelton standard. Ashbury v. Litton Loan Servicing LP, 2009 WL 973095 *3 n.4 (S.D. W. Va. Apr. 9, 2009); Buyer's Direct, Inc. v. Belk, Inc., 2012 WL 3278928 *3 (E.D.N.C. Aug. 10, 2012); Hughes v. Sears, Roebuck & Co., 2011 WL 2671230, *4-5 (July 7, 2011); N.F.A. Corp. v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83 (M.D.N.C. 1987); Maxtena, Inc. v. Marks, 2012 WL 6190298 *11 (D. Md. Dec. 11, 2012).[5]

The Court concludes that Shelton supplies the proper rule for assessing whether NICO may take Mr. Oostdyk's deposition. Under Shelton, the party seeking to depose an opposing party's counsel must establish that: "(1) no other means exist to obtain the information than to impose opposing counsel; (2) the information sought is

---

[5] NICO takes the view that the controlling test is set forth in In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 72 (2nd Cir. 2003). In Friedman, the Second Circuit held that a flexible standard was to be taken into account in assessing whether trial counsel's deposition could be taken focusing on the lawyer's role in connection with the matter on which discovery was sought, the risk of encountering privilege and work-product issues and the extent of discovery already conducted. That test is not as well-reasoned or as properly focused as Shelton, and the Court declines to follow it.

relevant and non-privileged; and (3) the information is crucial to the preparation of the case." Shelton, 805 F.2d at 1327 (citations omitted). NICO has not satisfied the first facet of the Shelton test for it has actually demonstrated that there are other means to obtain the information that it seeks, rather than to depose Mr. Oostdyk. In fact, it appears that the information sought by NICO has been obtained from Mr. Friedman and other deponents. Therefore, even assuming that the information is relevant and is non-privileged and that it is crucial to the preparation of the case,[6] NICO has not satisfied the Shelton test.

NICO takes the view that the only person who can refute Mr. Friedman is Mr. Oostdyk, and thus he must be deposed. Ford represented at oral argument that, at this time, there is no plan to have Mr. Oostdyk[7] testify. However, the parties are nearing the end of discovery, and it is time for Ford to make that election. It appears that, in part, Ford intends to meet NICO's position on the effect of Mr. Oostdyk's email by offering Mr. Oostdyk's response email. It is not immediately obvious how that email can be admitted into evidence without Mr. Oostdyk's testimony or how Ford can explain

---

[6] NICO contends that the communication between Mr. Oostdyk and Mr. Friedman is important to the case. And, there is merit to that point because the reason why NICO says that it stopped the payments to Ford was instructions that it got from Mr. Friedman, who claims to have been instructed to that end by Mr. Oostdyk.

[7] Mr. Oostdyk was listed on Ford's Rule 26 disclosures as a person with knowledge.

how Mr. Friedman's version of the January 17 telephone call8 without Mr. Oostdyk's testimony, but Ford apparently believes that it has means of addressing Mr. Friedman's testimony other than calling Mr. Oostdyk as a witness. Quite clearly, if Mr. Oostdyk is to be called as a witness, he must be deposed, but that is not the case at this time.

## CONCLUSION

For the foregoing reasons, DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO COMPEL THE DEPOSITION OF SCOTT C. OOSTDYK, ESQ. (Docket No. 113) is denied. However, Ford is instructed to state definitely by 5:00 PM, EST, July 26, 2013, whether it will offer Mr. Oostdyk's testimony. If Ford states that Mr. Oostdyk is to testify, then he must be deposed immediately.

It is so ORDERED.

                                        /s/     _____

                              Robert E. Payne
                              Senior United States District Judge


Richmond, Virginia
Date: July 22, 2013

---

8 NICO, at one time, argued that Mr. Oostdyk was the "claims handler" for Ford's ASLP claims, but that contention appears to have gone by the wayside.