

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FORD MOTOR COMPANY,

    Plaintiff,

v.                         Civil Action No. 3:12cv839

NATIONAL INDEMNIFY COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO LIMIT TRIAL ROLE OF SCOTT OOSTDYK, ESQ. (Docket No. 245) for the purpose of disqualifying or otherwise limiting Scott Oostdyk from serving as trial counsel to the plaintiff, Ford Motor Company ("Ford"). For the reasons set forth herein, the motion to disqualify will be granted.

## BACKGROUND

In this action, Ford has asserted against National Indemnity Company ("NICO") claims for alleged tortious interference with contract and conspiracy to injure another in its trade or business under Va. Code § 18.2-499. Both claims arise out of NICO's conduct in stopping the payment of certain insurance claims referred to by the parties as "Non-Batch Claims" under Ford's Aggregate Stop Loss Policies ("ASLP").

Scott C. Oostdyk, Esquire, is a partner in the firm of McGuireWoods LLP and serves as counsel for Ford in this action.

One of the ASLP policies was issued to Ford by Gerling-Konzern Allgemeine Versicherungs-Aktiengesellschaft ("Gerling"), a German insurer which, in 2007, subsequently merged with another German insurer, HDI, to from HDI-Gerling Industrie Versicherung AG ("HDI-Gerling"). (Pl. Ford Motor Co.'s Mem. of Law in Supp. of its Mot. for Partial Summ. J. 2-3, 11, Docket No. 233) (hereinafter "Ford's Mot. for Partial Summ. J."). In 2002, Gerling and Ford's other ASLP carriers established a protocol for the submission of claims by Ford to an entity called Mitigate, Inc. ("Mitigate"). (Id. at 4). Mr. Scott Friedman ran Mitigate and made recommendations to the insurers respecting payment of the Non-Batch Claims. (Id.). The insurers, including Gerling and HDI-Gerling, before the intervention of NICO into the relationship, regularly paid most, but not all, of such claims once Mitigate reviewed and verified them. (Id. at 4-5, 9).

Contemporaneously with the HDI-Gerling merger, HDI-Gerling began searching for a reinsurer that could reinsure a large portfolio of HDI-Gerling's U.S. casualty obligations, including the ASLP. (Id. at 5-8). In late 2007, NICO and HDI-Gerling entered into a reinsurance agreement taking the form of a "Loss Transfer Portfolio," under which HDI-Gerling paid NICO a premium

of $310,600,000 and NICO agreed to provide HDI-Gerling an aggregate limit of $500,000,000 in reinsurance coverage. (Id.). That premium was treated as "float" by NICO; generally, NICO makes its money where it is able to earn income from the investment of its float prior to having to pay that float out on claims made against reinsured policies.[1] (Id. at 8).

Ford alleges that NICO soon thereafter realized that the Ford policy was not sufficiently reserved and that therefore any float would be diminished significantly or eliminated entirely. (Id. at 9). Thus, to improve its own position and to be able to have more float on which to earn income, NICO decided that the Non-Batch Claims submitted by Ford would not be paid, notwithstanding that those claims had been verified as payable by Mitigate. (See id. at 11-13). NICO's conduct in devising and effectuating this scheme is the predicate of Ford's tortious interference claim and its conspiracy claim.

To those claims, NICO has raised a defense of equitable estoppel, arguing that it did not make payment on the Non-Batch Claims because Ford, through Mr. Oostdyk, expressed to it, through Mr. Friedman, that Ford did not want payment on the Non-Batch Claims until all claims disputes, Non-Batch and otherwise, were resolved. (See, e.g., Def. Nat'l Indem. Co.'s Mem. of Law

---

[1] While this is an oversimplification of the way in which float is invested and by whom, it is a sufficient description of the process for the purpose of deciding this motion.

in Supp. of its Mot. to Limit Trial Role of Scott Oostdyk, Esq. 4-5, Docket No. 246) (hereinafter "NICO's Opening Br."). The predicate for this defense is a telephone conversation between Messrs. Oostdyk and Friedman on January 17, 2011 and the ensuing email exchange between them. In what NICO describes as the most important email, Mr. Friedman writes Mr. Oostdyk to memorialize the earlier telephone conversation between the two (the "Oostdyk-Friedman Conversation"). In it, he writes, in pertinent part:

> It is my understanding that you want us to verify 100% of the payments as soon as possible and that you want each insurer to issue one check when that process is completed . . . .
> . . . .
> [Y]ou indicated Ford does <u>not</u> want the [ASLP Carriers] to issue payments at this time, even on claims that may not be in dispute. Instead, you want each insurer to issue one check when the audit process is complete.

Email from Scott Friedman to Scott Oostdyk (Jan. 17, 2011, 5:02 PM) (Docket No. 246-4) (hereinafter "Mr. Friedman's Email").

According to NICO, Mr. Friedman informed it of the Oostdyk-Friedman Conversation and thus was under the impression that Ford did not want to be paid on the Non-Batch Claims until all of its claims were resolved. NICO thus bases its equitable estoppel defense on the email exchange and the Oostdyk-Friedman Conversation. NICO also argues that Ford's course of performance with the other ASLP Carriers, including

4

conversations that Mr. Oostdyk had with representatives from several of those carriers, demonstrates Ford's intent to collect on all claims in a single payment. NICO also contends that those conversations support Mr. Friedman's understanding of what he was told by Mr. Oostdyk. (See, e.g., NICO's Opening Br. 4-5). NICO contends that its knowledge of this course of performance is supportive of its equitable estoppel defense. Further, according to NICO, the information from Mr. Friedman and NICO's knowledge of Ford's conduct also negates the intent element necessary for it to be liable under Ford's tortious interference[2] and Virginia Business Conspiracy[3] claims. (Def. Nat'l Indem. Co.'s Reply Mem. of Law in Supp. of its Mot. to Limit Trial Role of Scott Oostdyk 9, Docket No. 263) (hereinafter "NICO's Reply").

In response, Ford contends that an email sent by Mr. Oostdyk to Mr. Friedman in response to Mr. Friedman's Email shows clearly that Mr. Friedman's interpretation of the Oostdyk-Friedman Conversation was flawed, and that, instead, Mr. Oostdyk was simply communicating that Ford wanted only a temporary cessation of payments on the Non-Batch Claims while some errors

---

[2] Autopartsource, LLC v. Bruton, No. 3:13-cv-054, 2013 WL 3766524, at *5 (E.D. Va. July 16, 2013) (citing Preferred Sys. Solutions, Inc. v. GP Consulting, LLC, 732 S.E.2d 676, 687-88. (Va. 2012).

[3] Schlegel v. Bank of Am., N.A., 505 F. Supp. 2d 321, 326 (W.D. Va. 2007).

that Ford identified in an audit prepared by Mr. Friedman were
being corrected.   In that email, Mr. Oostdyk wrote:

> [W]e want to work toward having fully
> verified in the next 30 days by Mitigate ALL
> Ford claims outstanding on Ford's [ASLP].
> We want to reach 100% verification of all
> non-open claims . . . .
> . . . .
> As to payments on the [ASLP], we are
> directly in touch with legal or other
> representatives for [several of the ASLP
> Carriers, including Gerling].   We will
> coordinate with them directly the payment
> process to Ford . . . .

Email from Scott Oostdyk to Scott Friedman (Jan. 17, 2011, 9:50
PM) (Docket No. 233-32) (hereinafter "Mr. Oostdyk's Reply
Email").

NICO also has shown that Ford has identified as trial
exhibits fifty-seven email or written communications to or from
Mr. Oostdyk, or emails or written communications authored by
others referencing communications with Mr. Oostdyk, bearing on
the nature and extent of Ford's desire to postpone payments of
the Non-Batch claims.   NICO has identified thirty-eight other
such communications that it intends to offer into evidence.[4]
Thus, by virtue of Mr. Oostdyk's Reply Email and many other
documents, Mr. Oostdyk's statements on the topic of payment

---

[4] After oral argument, counsel submitted for review all the
documents of this sort identified by each side.   The number of
documents identified by each side is based on a count of the
documents submitted (with duplicates eliminated) and not on the
numbers stated at oral argument.

delay will be presented to the jury.  In sum, Mr. Oostdyk will be testifying through those documents.  On the basis of Mr. Oostdyk's email and other evidence, Ford contends that NICO's position that Ford did not want payment is clearly erroneous, and that any evidence based on this possibility should not serve as grounds for disqualification.  (See, e.g., Pl. Ford Motor Co.'s Mem. of Law in Opp'n to Def. Nat'l Indem. Co.'s Mot. to Compel the Dep. of Ford's Trial Att'y 21, Docket. No. 256) (hereinafter "Ford's Opp'n to Mot. to Compel").

As NICO puts it, absent some intervention from the Court, "Mr. Oostdyk, as trial counsel, would be free to argue the meaning of his own correspondence and refute the trial and deposition testimony of those with whom he interacted." (NICO's Opening Br. 3).  NICO is further concerned that, "[l]eft unchecked, Mr. Oostdyk will have the ability, through cross-examination and argument, to explain away his communications with Mr. Friedman [and representatives of the other ASLP Carriers] just as if he were testifying as a witness," and argues that this scenario creates a "substantial risk of prejudice to NICO." (NICO's Reply 1-2).  NICO argues that this "is precisely the type of unseemly situation that the witness-advocate rule was designed to avoid." (Id.)

Ford takes the view that this issue is moot now that it has unequivocally declared that it will not call Mr. Oostdyk as a

7

trial witness,[5] (Ford's Opp'n 13), notwithstanding that NICO counters that NICO may be required to call Mr. Oostdyk as its own witness to refute Ford's contention that it desired to be paid immediately on the Non-Batch Claims.  (NICO's Opening Br. 2).  NICO argues that it will be forced to call Mr. Oostdyk as a witness if Ford succeeds in introducing at trial the emails respecting the delay of payment authored by Mr. Oostdyk or sent to him, or if Ford succeeds in excluding Mr. Wilson's testimony as it relates to his conversations with Mr. Oostdyk.  (Id.). Ford has said that all of those documents are admissible over NICO's hearsay objections for the non-hearsay purpose of showing that NICO knew about, and was on notice of, Ford's position that it had requested only a short term deferral of payments until the Mitigate report was revised.  That position seems to be well-taken.  Thus, NICO will be calling Mr. Oostdyk in its case.

---

[5] The Court, in a previous order denying NICO's motion to compel the deposition of Mr. Oostdyk, required Ford to make a final declaration concerning whether it would call Mr. Oostdyk as a witness in its case by July 26, 2013.  (Mem. Op. 6-7, July 22, 2013, Docket No. 217).  Ford declared that it would not call Mr. Oostdyk at trial, but included a caveat reserving the right to change its mind based on the deposition testimony of Kent Wilson.  (Ford's Mem. of Law in Opp'n to Def. Nat'l Indem. Co.'s Mot. to Disqualify Ford's Lead Trial Counsel 1, Docket No. 256) (hereinafter "Ford's Opp'n").  Part of NICO's initial argument in favor of this motion focused on Ford's equivocation.  (NICO's Opening Br. 2).  Since that time, the deposition of Mr. Wilson has been taken, and Ford, in its opposition to this motion, now "unequivocally" declares it will not call Mr. Oostdyk at trial. (Ford's Opp'n 1-2).

NICO's motion will be decided against this factual background.

## DISCUSSION

The Virginia Rules of Professional Conduct ("Virginia Rules") govern the conduct of attorneys appearing in this Court. See, e.g., Sanderson v. Boddie-Noell Enters., Inc., 227 F.R.D. 448 (E.D. Va. 2005). Applicable here is Virginia Rule 3.7(a) (the "witness-advocate rule"), which provides that:

> A lawyer shall not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness except where:
>
> > (1) the testimony relates to an uncontested issue;
> >
> > (2) the testimony relates to the nature and value of legal services rendered in the case; or
> >
> > (3) disqualification of the lawyer would work substantial hardship on the client.

Va. Rules of Prof'l Conduct 3.7(a). The witness-advocate rule:

> [D]erives from the fundamental fact that the roles of advocate and witness are inconsistent, it being the function of the advocate to argue the cause of another and the role of a witness to state facts objectively. In recognition of this fundamental difference in the roles of witness and advocate, the rule serves as a prophylactic rule designed to protect the interests of the client, the adverse party, and the institutional integrity of the legal system as a whole.

*Personalized Mass Media Corp. v. Weather Channel, Inc.*, 899 F. Supp. 239, 242 (E.D. Va. 1995) (citations omitted) (internal quotation marks omitted).

The parties agree that the test to determine whether disqualification is appropriate under Virginia Rule 3.7(a) is enunciated in *Personalized Mass Media*, which held that disqualification is appropriate only where the moving party can show "the testimony of the lawyer is: (1) relevant; (2) necessary; and (3) is or may be prejudicial to the client whose lawyer is to be called as a witness by the adverse party."[6] *Id.* at 243 (citations omitted). Also, as noted in *Personalized Mass Media*, disqualification must be balanced against "the fundamental principle that a party ought to be represented by its counsel of choice if that is at all possible." *Id.* at 242. Thus, "a party seeking to invoke the witness-advocate rule for disqualification purposes must prove that the proposed witness-advocate's testimony is 'strictly necessary,' not merely relevant and useful," and the moving party must "overcome a 'substantial burden' to prove the necessary elements of the witness-advocate rule." *Sutherland v. Jagdmann*, No. 3:05-cv-

---

[6] This test was initially formulated under the predecessor to the Virginia Rules of Professional Conduct, the Virginia Code of Professional Responsibility. *See Personalized Mass Media*, 899 F. Supp. at 242. The parties nevertheless agree that this test remains valid. (*See* NICO's Opening Br. 11 n.4; Ford's Opp'n 13).

042, 2005 WL 5654314, at *2 (E.D. Va. Oct. 31, 2005) (citing Personalized Mass Media, 899 F. Supp. at 243).

For the following reasons, NICO has met the substantial burden imposed by Personalized Mass Media and no exception to Virginia Rule 3.7(a) applies.   Hence, NICO's motion seeking disqualification of Mr. Oostdyk will be granted.

### A.   Mr. Oostdyk's Testimony Is Relevant

There is little doubt that the testimony NICO seeks to solicit from Mr. Oostdyk is relevant to this case.   The Oostdyk-Friedman Conversation, and the email exchange that followed, is central both to NICO's equitable estoppel defense and to NICO's rebuttal of Ford's accusation that it acted intentionally to interfere with the Ford/HDI-Gerling relationship.   In like fashion, the numerous communications offered by Ford and NICO on the topic of delay constitutes, for all practical purposes, relevant testimony by Mr. Oostdyk.   Testimony related to the Oostdyk-Friedman Conversation is clearly of sufficient relevance to satisfy the first element of the Personalized Mass Media test.   So too is the testimony by way of the other documentary communications.[7]

---

[7] It may be that some documents may not be admitted as a result of rulings at the final pretrial conference, but it appears that many of the documents to be offered by both sides will qualify for admission.

While Ford does not seriously dispute the relevance of the Oostdyk-Friedman Conversation, it does argue that any testimony concerning Mr. Oostdyk's communications with other ASLP Carriers "ha[s] nothing to do with whether NICO – post its initiation of arbitration against Ford – relied on Mr. Oostdyk's statement to not pay Ford's claims and whether that reliance was reasonable." (Ford's Opp'n 14). That argument might have more force if the communications at issue were relevant only to NICO's equitable estoppel defense. However, the argument ignores the fact that these communications are relevant to Ford's assertion that NICO acted intentionally and without legal justification. That is so because NICO contends that its knowledge of these communications, coupled with its knowledge of Ford's course of performance with the other ASLP Carriers, gave it reason to believe that Mr. Friedman's characterization of his conversation with Mr. Oostdyk was accurate. Moreover, it appears preliminarily that the communications with other carriers will be relevant to parts of the equitable estoppel issue.

**B.   Mr. Oostdyk's Testimony Is Necessary**

The Court also finds that Mr. Oostdyk's testimony is necessary. His written communications which, as explained above, are testimonial in nature, are a key part of Ford's case-in-chief. NICO intends to present substantial evidence that Mr. Oostdyk, acting on behalf of Ford, instructed both Messrs.

12

Friedman and Wilson that Ford did not want partial payments on Non-Batch Claims. NICO intends to support this interpretation of that evidence with evidence that representatives of other ASLP Carriers had the same interpretation. (See NICO's Opening Br. 3). Ford will certainly attempt to discredit that testimony through both cross-examination and the introduction of Mr. Oostdyk's Reply Email.[8] It is thus Mr. Oostdyk's statements and emails that are at the heart of this controversy, and, for that reason, Mr. Oostdyk's testimony is necessary to NICO's defense, as well as to Ford's case.

Ford attacks this conclusion on two separate fronts, but both arguments fail. First, Ford argues that NICO has no need to examine Mr. Oostdyk on the subjective reasoning for his statements because an "equitable estoppel defense rests on an objective standard, only requiring that the relied-upon statements were intentionally made." (Ford's Opp'n 14) (citing Lissman v. Hartford Fire Ins. Co., 848 F.2d 50, 53 (4th Cir. 1988); T. v. T., 224 S.E.2d 148, 152 (Va. 1976)). But, as Ford has itself previously noted, NICO must show that its reliance was reasonable, and Ford claims that Mr. Oostdyk's Reply Email forecloses any possibility of reasonable reliance. (Ford's Opp'n to Mot. to Compel 21). And, while Ford contends that

---

[8] For example, Ford has used Mr. Oostdyk's Reply Email for this exact purpose in its partial motion for summary judgment. (See Ford's Mot. for Partial Summ. J. 10).

other documents also refute a reasonable reliance argument, (id.), most, if not all, of those documents cited by Ford in support of this contention were also authored by, or sent to, Mr. Oostdyk. See, e.g., Letter from Scott Oostdyk to Thomas Brusstar et. al. (Feb. 12, 2010) (Docket No. 233-11); Letter from Kent Wilson to Scott Oostdyk (Sep. 1, 2010) (Docket No. 233-12). If Ford is successful in introducing any of those documents into evidence to rebut NICO's defenses (either of equitable estoppel or that Ford has failed to meet its burden to prove intent), NICO's need to examine Mr. Oostdyk concerning them is clear. And, it appears that many, if not all, of those documents listed as exhibits by Ford will be admissible.

But, even if Ford intends to rebut NICO's defenses solely through the live testimony of other recipients of Mr. Oostdyk's communications, NICO should not be limited to cross-examination of those witnesses either to attack their credibility or to indirectly attack Mr. Oostdyk's credibility. Indeed, if NICO can directly attack Mr. Oostdyk's credibility by examining Mr. Oostdyk himself, its theory of defense will be more effectively presented.

Ford also contends that Mr. Oostdyk's testimony is not necessary because NICO can obtain information about Mr. Oostdyk's communications from documents and from third parties, but this argument, too, misses the mark. Personalized Mass

14

*Media* is instructive on this point.   In that case, an attorney argued he should not be disqualified as trial counsel because someone else could testify to the same topics he was being asked to testify to.   899 F. Supp. at 243.   The Court rejected that argument, noting that the attorney's "testimony [was] essential to many of the inequitable conduct issues."   Id.   As demonstrated both above and through numerous other documents, Mr. Oostdyk, beginning years before the initiation of this litigation, has been heavily involved in working on behalf of Ford to collect from the ASLP Carriers on the Non-Batch Claims. His statements and his actions have now become a key part of Ford's case and the focus of NICO's defense.   Without serious question, Mr. Oostdyk's credibility matters, and, as NICO argues, the presence of Mr. Oostdyk as both a witness (directly or through his documents), and a trial advocate, is not a fair way to permit that issue to be decided.   Indeed, to allow Mr. Oostdyk to appear in both capacities would give Ford an unfair advantage and restrict NICO's ability to test Mr. Oostdyk's credibility.   The Court therefore finds that Mr. Oostdyk's testimony is necessary.

## C.   Mr. Oostdyk's Testimony Will Be, Or May Be, Prejudicial To Ford

The Court is satisfied that Mr. Oostdyk's testimony will be, or may be, prejudicial to Ford.   "Whether testimony may be

prejudicial is to be determined against an objective standard and, of course, may not be satisfied by mere speculation as to its effect." Id. (citing Shaffer v. Farm Fresh, Inc., 966 F.2d 142 (4th Cir. 1992)).   Personalized Mass Media is again instructive.   In Personalized Mass Media, the Court held that disqualification was proper where the plaintiff's attorney's testimony "could be prejudicial . . . on the critical question of inequitable conduct."   Id. at 244.   There, as here, the plaintiff's attorney was intimately involved in the factual background that supported the defendant's affirmative defense. Id.

Ford argues that Mr. Oostdyk's testimony would, if anything, support Ford's contentions, but Ford's arguments are colored by its view of the case and are unconvincing.   Ford argues, for example, that:

> [P]resumably Mr. Oostdyk would testify
> consistently with the other witnesses cited
> by NICO in its Memorandum, such as Kent
> Wilson   or   [other   ASLP   Carrier
> representatives].   Mr. Wilson testified that
> he did not represent HDI-Gerling in January
> 2011, when Mr. Oostdyk relayed these
> purported non-payment statements to Mr.
> Friedman, and that Mr. Oostdyk simply
> confirmed the prior statements to Mr.
> Friedman which are documented in the email
> exchange.   This is not prejudicial to Ford.
> The email exchange favors Ford.

(Ford's Opp'n 16) (internal citations omitted).   This argument, however, is flawed.   It assumes, for example, that a jury would

find that the Oostdyk-Friedman Conversation favors Ford, but that is not necessarily so.   NICO intends to present evidence that Mr. Oostdyk made to Mr. Wilson the same kind of statement that Mr. Friedman says Mr. Oostdyk made to him.   And, NICO will offer evidence that representatives of other ALSP Carriers too understood, through communications with Mr. Oostdyk and Mr. Friedman, that Ford wanted to delay payments, at least for some period of time.   If the jury accepts NICO's view of that evidence then the prejudice to Ford is clear.   Just as was true in Personalized Mass Media, "[e]vidence offered to date permits the conclusion that [this] issue will be litigated at trial and that [Mr. Oostdyk] possesses potentially prejudicial information pertinent to [its] resolution."   Personalized Mass Media, 899 F. Supp. at 243.

Moreover, NICO can be expected to cross-examine Mr. Oostdyk aggressively when it calls him in NICO's case.   And, there are documents that Mr. Oostdyk will have to address that can be interpreted in more than one way.   If NICO is successful in impeaching Mr. Oostdyk, then the prejudice of his testimony to Ford is obvious.

For these reasons, the Court finds that Mr. Oostdyk's testimony will be, or may be, prejudicial to Ford.

### D.   None Of The Virginia Rule 3.7(a) Exceptions Apply

Because all three elements of the <u>Personalized Mass Media</u> test are satisfied, Mr. Oostdyk must be disqualified unless one of the Virginia Rule 3.7(a) exceptions apply.   The only exception that is even arguably relevant is found at Virginia Rule 3.7(a)(3), which precludes disqualification where it "would work substantial hardship on the client."   Ford has made no showing that any such substantial hardship would be worked.

Although Ford made no explicit mention in its Opposition Brief of any prejudice that it would suffer if Mr. Oostdyk is disqualified, at oral arguments on this motion Ford made clear that it believes it would be prejudiced because it would be denied its choice of lead counsel.   (Hr'g Tr. 39:16-40:10, Aug. 16, 2013, Docket No. 303).   But Ford has an entire, and capable, trial team from the same law firm that can step in and try the case, and Mr. Oostdyk will only be disqualified from acting as a trial advocate, not from assisting in the preparation of the case or even from assisting at trial in a non-advocacy role. While this circumstance may be inconvenient to Ford, it cannot be said that this imposes a "substantial burden" on Ford such as to preclude Mr. Oostdyk's disqualification.   Accordingly, the Court finds that no exception to Virginia Rule 3.7(a) applies, and that Mr. Oostdyk must therefore be disqualified as trial counsel for Ford.

**CONCLUSION**

For the foregoing reasons, DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION TO LIMIT TRIAL ROLE OF SCOTT OOSTDYK, ESQ. (Docket No. 245) will be granted.

It is so ORDERED.

                                    /s/          *REP*
                          _____
                          Robert E. Payne
                          Senior United States District Judge


Richmond, Virginia
Date: August 21, 2013