IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FORD MOTOR COMPANY,

     Plaintiff,

v.                           Civil Action No. 3:12cv839

NATIONAL INDEMNITY COMPANY,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT (Docket No. 181). For the reasons set forth below, the motion will be denied as to Count I and will be granted as to Count II.

## BACKGROUND FACTS

In this action, Ford Motor Company ("Ford") asserts against National Indemnity Company ("NICO") claims for tortious inference with contract (Count I) and conspiracy to injure another in its trade or business under Va. Code § 18.2-499 (Count II). Generally speaking, Ford's claims arise out of NICO's conduct in connection with the failure to pay so-called "Non-Batch claims" under Ford's Aggregate Stop Loss Policy ("ASLP"). Having previously filed substantive motions based on the application of Virginia law, NICO now argues that Michigan's

substantive law should apply to this action. NICO now seeks summary judgment on both counts under Michigan law, asserting that as an agent of Ford's counterparty NICO cannot be held liable. NICO also seeks summary judgment on Count II on the basis that Michigan law does not encompass the Virginia statute and therefore renders Count II insufficient as a matter of law.

The facts, and the reasonable inferences therefrom, must be viewed in the light most favorable to Ford, the non-moving party. With that in mind, the facts pertinent to the motion for summary judgment on Count II are set forth below.[1]

In 1995, Ford entered into a series of ASLP agreements with Gerling-Konzern Allgemeine Versicherungs-Aktiengesellschaft ("Gerling"). Under those agreements Gerling agreed to indemnify Ford for certain potential liabilities.

In 2002, Gerling and Ford's other ASLP carriers established a protocol for the submission of claims by Ford to an entity called Mitigate, Inc. ("Mitigate"). (Id. at 4). Mr. Scott Friedman worked for Mitigate and was the auditor responsible for verifying that the claims submitted by Ford to Gerling were among the covered Non-Batch Claims that deserved payment. The protocol did not require Ford to demand payment following the

---

[1] There is no need to outline the facts relevant to the agency issue because, as explained hereafter, the issue is moot with regards to Count II and cannot be resolved as a matter of law for Count I.

issuance of a report from Mitigate.    Instead, the insurers, including Gerling and HDI-Gerling, before the intervention of NICO into the relationship, regularly paid most, but not all, of such claims once Mitigate had reviewed and verified them.

Ford's policy coverage with Gerling lapsed in 2003, but not before Ford had incurred unexpectedly large liabilities during the policy periods.    As a result of the financial strain created by the ASLP payments, Gerling merged with another insurance carrier, HDI, to form HDI-Gerling Industrie Versicherung AG ("HDI-Gerling") in 2006.

In   2007,   HDI-Gerling     entered   into   a   retroactive reinsurance agreement with NICO.    Under this agreement HDI-Gerling paid NICO a premium of $310,600,000 in exchange for NICO's assumption of the primary obligation to pay claims covered by the ASLP with Ford up to $500,000,000.  A part of the reinsurance agreement was a Loss Portfolio Transfer agreement, whereby NICO also obtained the right to directly control HDI-Gerling's claims process, including the initial decision whether to contest or pay a particular claim that Ford submitted for payment. If HDI-Gerling disagreed with NICO, or if HDI-Gerling wished to reassume responsibility for management of a particular claim, it was obligated to negotiate a commutation with NICO and forfeit that portion of its premium.    Ford was unaware of both

3

the reinsurance agreement and the Loss Portfolio Transfer at their inception.

Gerling made regular payments on claims submitted by Ford under the ASLP. By 2003, those payments were made by wire transfers to a Ford bank account in Michigan that had been established for the specific purpose of receiving ASLP payments. Although Ford would have permitted Gerling to issue checks to a different account in Chicago, Ford communicated a clear preference for wire transfers to Michigan and Gerling used those wire transfers as the vehicle for the performance of its payment obligations. It appears that HDI-Gerling continued the practice begun by Gerling and that the practice continued even after NICO became involved pursuant to the Loss Transfer Portfolio.

In February 2010, Ford's counsel in Virginia wrote to HDI-Gerling to demand payment of certain Non-Batch ASLP claims that had been pending. In May 2010, Kent Wilson, a lawyer claiming to be acting on behalf of HDI-Gerling, gave Ford instructions on how to submit Non-Batch claims to Mitigate. Ford submitted all the requested information by the end of 2010.

In November 2010, NICO directed HDI-Gerling to file for arbitration against Ford for certain so-called "Batch" claims. NICO did not use the arbitration demand as an opportunity to stop payment on Non-Batch claims. In fact, in December 2010, another insurance payment was made by wire transfer to Ford's

Michigan account in HDI-Gerling's name.  Ford filed an answer in the arbitration and also filed a counterclaim in January 2011, seeking payment of all Non-Batch claims under the ASLP.

Mitigate issued a revised report verifying Ford's Non-Batch claims on March 17, 2011.  On March 21, 2011, HDI-Gerling, at NICO's direction, sent a letter from its arbitration counsel in New York to Ford's counsel in Virginia.  In that letter, NICO characterized Ford's counterclaim as a "demand that Gerling pay an unspecified amount of money for . . . 'under-paid claims' that Ford has never substantiated with documentation despite several requests from Gerling to do so." (Opposition, at 19). Ford filed this action in November 2012.  Ford's claims have not been paid since then.

The $360 million premium that HDI-Gerling paid to NICO was treated as "float" by NICO and its parent Berkshire Hathaway, Inc. which earns income from the investment of the float before having to pay any of that float out on claims made against reinsured policies.[2]  Ford alleges that, soon after NICO entered the Loss Transfer Portfolio, NICO realized that the Ford policy was not sufficiently reserved and that, therefore, the anticipated float would be diminished significantly or

---

[2] While this is an oversimplification of the way in which float is invested and by whom, it is a sufficient description of the process for the purpose of deciding this motion.

eliminated entirely. (Id. at 9). Thus, to have more float
which Berkshire Hathaway, Inc. could invest to earn more income,
NICO decided that the Non-Batch claims submitted by Ford would
not be paid, notwithstanding that those claims had been verified
as payable by Mitigate. (See id. at 11-13). NICO's conduct in
devising and effectuating this scheme is the predicate of Ford's
tortious interference claim and its business conspiracy claim.

NICO argues that Michigan, as the location of the Ford bank
accounts where NICO was supposed to submit payment and perform
under the terms of the ASLP, is the proper choice under lex loci
delicti. Ford's position is that the wrongful act giving rise
to Ford's claims for conspiracy and tortious interference was
the March 21 letter, and that, before that point in time Ford
had not suffered any legal injury. Ford concludes that, because
"NICO . . . reached into Virginia" and "caused Ford to react in
Virginia, [triggering] the first casually related injury,"
(Opposition at 19-20), Virginia is the proper choice under lex
loci delicti and Virginia law should be applied in this action.
NICO contends that the March 21, 2011 letter sent to Ford's
counsel in Virginia and refusing payment of ASLP non-batch
claims cannot provide an adequate basis to apply Virginia's
substantive law in this action.

Both parties agree that Virginia's choice of law rules
should be applied and that the proper test in Virginia for

choice of law in this action is lex loci delicti, "the place of the wrong." The parties diverge in their application of that test, however. NICO initially argued in its opening and reply briefs that Michigan law should apply because Michigan was "intimately connected with this dispute" in a number of ways. (Reply at 5). At oral argument on the motion, NICO abandoned that intimate connection theory in favor of a new focus on the Michigan bank accounts as the place of performance. Ford was given leave to brief the bank account theory and to argue against it during a subsequent hearing before the Court.

## DISCUSSION

### 1.  Summary Judgment Standard

Rule 56 sets forth the familiar standard for summary judgment, providing that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that

party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The Court explained that, "[i]n such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Id. at 323, 106 S. Ct. 2548; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. See Anderson, 477 U.S. at 250, 106 S. Ct. 2505. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## 2. Choice of Law Analysis

"It is axiomatic that, when sitting in diversity jurisdiction, federal courts must apply state substantive law as announced by the state's highest court." Insteel Indus., Inc. v. Costanza Contracting Co., 276 F. Supp. 2d 479, 483 (E.D. Va. 2003) (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Thus, "a federal court sitting in Virginia and exercising diversity jurisdiction applies Virginia's choice of law rules." Id. (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941)). See also Resource Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005). "[G]iven that the parties and facts in this action are associated with multiple jurisdictions, it is first necessary to apply the Virginia choice of law rules to determine the substantive law against which the Court will measure the allegations that give rise to" Counts I and II. Insteel Industries, 276 F. Supp. 2d at 483.

### A. Lex Loci Delicti

Claims for tortious interference with contract and for violation of the Virginia Business Conspiracy Statute, Va. Code § 18.2-499, et. seq., are properly characterized as intentional torts. Virginia "applies the lex loci delicti, the law of the place of the wrong, to tort actions." Milton v. IIT Research

Inst., 138 F.3d 519, 521 (4th Cir. 1998); see also Jones v. R.S. Jones & Assocs., Inc., 246 Va. 3, 431 S.E.2d 33, 34 (Va. 1993).

"Under Virginia law, the 'place of the wrong' is the place 'the last event necessary to make an [actor] liable for an alleged tort takes place.'" General Assur. Of America, Inc. v. Overby-Seawell, No.12-2244, 2013 WL 3722347, at *5 (4th Cir. July 17, 2013)[3] (quoting Quillen v. Int'l Playtex, Inc., 789 F.2d 1041, 1044 (4th Cir. 1986)). See also Restatement (First) of Conflict of Laws § 377 (1934); McMillan v. McMillan, 253 S.E.2d 662 (Va. 1979) (declining to adopt the "most significant relationship" approach suggested in the Restatement (Second) of Conflict of Laws). "[W]hen Virginia residents are victims of out-of-state torts, the Virginia courts routinely apply the law of other states, even though the physical pain or economic impact caused by the tort injury may be experienced by the Virginia plaintiffs within the boundaries of the Commonwealth." Milton, 138 F.3d at 522.

## 3. Count I: Tortious Interference With Contract

To press a successful claim in Virginia for tortious interference with a contract, a plaintiff must show: (1) the existence of a valid contract; (2) knowledge of the contract on the part of the interferor; (3) intentional interference

---

[3] Unpublished opinions are not precedent in this Circuit, but they are useful tools for analysis.

10

inducing or causing a breach or termination of the contract; and (4) resultant damage to the party whose contract has been disrupted. Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97, 102 (Va. 1985). "For claims of tortious interference with contract . . . the occurrence of the plaintiff's injury marks the last event necessary to establish liability." Gen. Assurance Of America, Inc. v. Overby-Seawell, No.12-2244, 2013 WL 3722347, at *5 (4th Cir. July 17, 2013) (citing Collelo v. Geographic Servs., Inc., 727 S.E.2d 55 (Va. 2012)).

Taking the facts in the light most favorable to the plaintiff as the non-moving party, the injury suffered by Ford in Count I was HDI-Gerling's willful breach of its insurance contract (the ASLP) at the inducement of NICO. HDI-Gerling breached the ASLP by failing to perform under the term of the insurance contract. Specifically, HDI-Gerling failed to pay out on claims that fell under the umbrella of ASLP coverage and had been properly verified by the March 2011 Mitigate report. This breach of the payment obligation under the insurance policy provided the damage to Ford that satisfies the fourth necessary element of a claim for tortious inference. Simultaneously, the breach provided the injury that marked the last event necessary to make NICO liable for the alleged tort.

At this point in the analysis, there is an unfortunate lacuna in the jurisprudence on Virginia's choice of law. The

11

location where "the last event necessary to make an act liable for an alleged tort takes place" will vary amongst different claims, depending on what elements comprise the particular claim and which element is deemed to provide the "last event necessary" to make the actor liable for the particular tort at issue. The Insteel case is illustrative of this point. The last event necessary for the fraud claim in Insteel was the "reasonable reliance on the false representation." Insteel Industries v. Costanza Contracting Co., 276 F. Supp. 2d 479, 486-87 (E.D. Va. 2003). Accordingly, the location of the reasonable reliance was held to govern the choice of law under Virginia's rule of lex loci delicti. Id. at 487. But despite the efforts of both parties in this action to bolster their position by reference to Insteel, the lex loci delicti analysis in that case turned on the element of reliance and the "last event necessary" that was specific to the intentional tort of fraud. Insteel did not address the choice of law for a claim of tortious interference with a contract.

However, even within the universe of tortious interference claims, there are significant factual variations that can affect the lex loci delicti analysis. That is because the nature of the injury induced by the interfering defendant is important in determining the "last event necessary" to create the injury to the plaintiff caused by the tortious interference. For example,

in General Assurance, the induced injury was the termination of a contract between the plaintiff and its business counterparty. See Gen. Assurance Of America, Inc. v. Overby-Seawell, No.12-2244, 2013 WL 3722347, at *5 (4th Cir. July 17, 2013). The contract at issue was for services to be provided to a North Carolina bank and was terminated by the North Carolina bank in North Carolina. General Assurance held that the alleged injury had occurred when the counterparty bank terminated the contract with which the defendant interfered. That was, therefore, the last event necessary to render the defendant liable for the alleged tort. Id. That event, which occurred in North Carolina, then triggered North Carolina substantive law under Virginia's lex loci delicti analysis. Id.

Likewise, in Heflin, on which both parties rely, the induced injury was the termination of a contract between a counterclaiming defendant and its business counterparty for the installation of certain devices in several Florida locations. See Heflin v. Coleman Music and Entertainment, L.L.C., No. 2:10-cv-566, 2011 WL 6130802, at *7 (E.D. Va. Dec. 5, 2011). The court in Heflin chose to apply Florida's substantive law to the tortious interference claim.[4] Id.

---

[4] Ford has argued that Heflin's reference to a letter sent to Florida as "the alleged wrongful act" requires this Court to apply Virginia's substantive law on the sole basis of a letter sent to Virginia. But, that argument ignores Heflin's

The alleged injury induced through tortious interference in this action, however, is not termination of a contract, but a breach of a contract through non-performance of one of its terms.  Only one case, Hilb Rogal, applies Virginia's version of lex loci delicti to a tortious interference claim where the alleged injury was the breach of a contract between the plaintiff and its business counterparty.  See Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc., No. 3:05-cv-355, 2006 WL 5908727 (E.D. Va. Feb. 10, 2006), aff'd 230 Fed. Appx. 328 (4th Cir. 2007).  In Hilb Rogal, the Court decided that the first causally-created injury was the tortious interference with employment retention agreements between the plaintiff and two of its executives.  Id. at *3-4, *7.  Hilb Rogal went on to hold that lex loci delicti mandated the application of Georgia law because the executives worked in Georgia, were solicited by an agent of the defendant in Georgia, and breached their contracts through disloyal conduct in Georgia.  Id. at *7.

Even Hilb Rogal, however, is of limited utility when applied to the facts of this action because the injury there was caused by conduct, not a failure to perform.  And the opinion

---

simultaneous concern with the performance of the contract in Florida and finds little support in General Assurance.  See General Assurance, 2013 WL 3722347 at *5 (characterizing the district court's focus on the location of "the alleged harmful contact" between the defendant and the plaintiff's business counterparties as "misplaced").

does not clarify whether the "place of the injury" for purposes of lex loci delicti was the place of solicitation, the place where the executives would have been expected to perform under their contracts with the plaintiff, or the place where the executives committed acts that constituted a breach of their contracts. General Assurance indicates that the place where solicitation occurred should not be the focus of the analysis. See Gen. Assurance Of America, Inc. v. Overby-Seawell, No.12-2244, 2013 WL 3722347, at *5 (4th Cir. July 17, 2013) (characterizing the district court's focus on the location of "the alleged harmful contact" between the defendant and the plaintiff's business counterparties as "misplaced"). But that still leaves a choice between the place where performance by a counterparty was expected and the place where the counterparty took action contrary to the expected performance, thereby breaching the contract. It is also necessary to account for the difference between a situation in which a breach of contract is effected through disloyal conduct, as in Hilb Rogal, and a situation in which a breached is effected through a failure to render payment, as here.

To determine which state's law applies under Virginia's rule of lex loci delicti, it is necessary to look to the location of the last event necessary to make NICO liable for the claim asserted. For a claim of tortious interference, the last

15

event necessary is a legal injury or damage to the plaintiff caused by the wrongful interference. Where that legal injury or damage was a breach of contract between the plaintiff and its business counterparty, a court must identify the state in which the breach occurred and apply the law of that state. In the absence of any precedent that can provide a cognizable rule for applying lex loci delicti to the particular form of tortious interference inducing a failure to abide by a payment obligation, the Court has found it helpful to look to other applications of Virginia's choice of law rules to determine if they can be analogized in a manner consistent with the cases discussed above.

In this action, the tortious interference claim can be likened to breach of contract with additional elements that make the wrong an intentional tort. The "place of the wrong" becomes the place of the contract breach, and it would stand to reason that Virginia would apply the same choice of law for a simple breach of contract action as it would for a tortious interference action where the first causally-created injury was a breach of contract.

In Equitable Trust Co. v. Bratwursthaus Mgmt. Corp., 514 F.2d 565 (4th Cir. 1975), the Fourth Circuit applied Virginia's choice of law rules to an action for breach of contract. There, as here, the defendants were alleged to have breached the

16

contract by not making a previously promised payment and therefore failing to tender performance of the payment obligation. The Fourth Circuit first observed that, "Virginia adheres to the principle that the law of the place of performance governs questions arising in connection with the performance of a contract." Id. at 567 (citing Arkla Lumber and Mfg. Co. v. West Virginia Timber Co., 132 S.E. 840 (Va. 1926)). The Fourth Circuit then held that, because "[t]he only place where [the defendants] could have tendered performance of their obligation [by making payment] would have been at Equitable's offices in Baltimore," Virginia's choice of law rules required the application of Maryland law. Id.

When the essence of a contract is the making a specified payment contingent upon the occurrence of certain independent events, as in an insurance contract, it is logical that the place of intended payment and performance should be held to be the location of the event giving rise to liability for tortious interference with the contract requiring that payment. It is true, of course, that Virginia's choice of law for questions relating to a breach of contract is not based on a theory of lex loci delicti. But, where a breach of contract provides the predicate act for a tort claim, it seems reasonable and logical to focus the lex loci delicti analysis on a location that is readily defined and consistent with lex loci delicti decisions

17

that bear the closest resemblance to the facts at hand. Hilb
Rogal selected the law of the state where the performance had
been expected when the contract was breached, so a focus on the
place of performance is entirely consistent with the most
relevant case addressing this issue.[5]

Because the course of performance in the contract between
HDI-Gerling and Ford ran through the Michigan bank accounts that
Ford established specifically for the purpose of receiving ASLP
payments, and Ford expressed a preference for performance in
that manner, the place of performance for the ASLP payment
obligation was in Michigan. Therefore, the last event necessary
to make NICO liable for interference with the Ford-HDI-Gerling
contract was the failure of HDI-Gerling, at the inducement of
NICO, to make the insurance payment to Ford, thereby providing
the first causally-created injury to Ford. Michigan therefore
was the "place of the wrong" for purposes of lex loci delicti,
and Michigan law will be applied to the tortious inference claim
in Count I.

Ford has argued that the relevant injury for purposes of
lex loci delicti in Count I is the March 21 letter from NICO's
New York counsel, addressed to Ford's Virginia counsel,

---

[5] A focus on the place of performance is also consistent with the
holdings in General Assurance and Heflin, although as discussed
supra the injury in those cases was the termination of a
contract, rendering those decisions somewhat less relevant to
this action.

informing Ford that it would not make payment on the Non-Batch claims verified by Mitigate. By Ford's reasoning, the fact that the letter was sent to Ford's counsel in Virginia, thereby causing Ford to react in Virginia, leads to the conclusion that Virginia would apply its own substantive law under lex loci delecti. But, that argument misapprehends the nature of the action creating the first damage and causally related injury. The March 21 letter itself was not the initial legal injury to Ford; rather, it was the mechanism by which Ford learned that it had suffered a legal injury. The action that harmed Ford was the non-delivery of the contractually owed insurance payment to Ford's designated account in Michigan. The March 21 letter communicating that the payment would not be made does not drive the choice of law analysis because it simply affirms the existence of a pre-existing and ongoing injury to Ford. See Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc., No. 3:05-cv-355, 2006 WL 5908727, at *6 (E.D. Va. Feb. 10, 2006), aff'd 230 Fed. Appx. 328 (4th Cir. 2007). ("The fact that [the plaintiff] learned of the [injury] in Virginia is irrelevant to the choice of law analysis"). And to the extent that the assertions in the March 21 letter were fraudulent, as Ford contends them to be, those assertions were not a first causally-created injury that provides the basis for application of lex loci delicti, but rather a false pretext for the first injury.

19

The Michigan bank accounts, as the site of the first causally-created injury, are the proper focus of the choice of law analysis and the legal foundation for the application of Michigan law to Count I.

**4.  Count II: Statutory Business Conspiracy**

Under Va.Code §§ 18.2-499 and -500, to prove a claim for statutory business conspiracy, a claimant must show that two or more persons combined, associated, agreed, mutually undertook or concerted together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act. VA Code Ann. § 18.2-499. The statute does not require proof of actual malice, only legal malice. Commercial Bus. Systems, Inc. v. Bell South Services, Inc., 249 Va. 39, 453 S.E.2d 261, 266-267 (Va. 1995).

"When determining what state's law is dictated by lex loci delicti with respect to conspiracy, the place of the wrong is the place of the first causally-related injury because the first legal injury produced by an alleged business conspiracy is the last act necessary for liability." Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc., No. 3:05-cv-355, 2006 WL 5908727, at *6 (E.D. Va. Feb. 10, 2006), aff'd 230 Fed. Appx. 328 (4th

Cir. 2007).  "The headquarters of a corporate victim, where the effects of an alleged conspiracy are ultimately felt on the bottom line, is not necessarily where the legal injury occurred."  Id.

It is not unusual for a tortious interference claim to be paired with a claim under the Virginia Business Conspiracy Statute.  See General Assur. Of America, Inc. v. Overby-Seawell, No.12-2244, 2013 WL 3722347 (4th Cir. July 17, 2013); Alliance Technology Group, LLC v. Achieve 1, LLC, No. 3:12-cv-701, 2013 WL 143500 (E.D. Va. Jan. 11, 2013); Hilb Rogal, 2006 WL 5908727; Government Employees Ins. Co. v. Google, Inc., 330 F. Supp. 2d 700 (E.D. Va. 2004).  The same injury can provide a predicate element for both types of claims, as it does here.  And, because the "place of the wrong" and the "last event necessary" is the same for a business conspiracy claim as for a tortious interference claim – the first causally-created injury – the lex loci delicti analysis again hinges on the location of the first injury to the plaintiff.

The breach of HDI-Gerling's contract with Ford provides the first causally-created injury for both the tortious interference claim and the Virginia Business Conspiracy claim. Therefore, the structure of the analysis is the same as in Count I as in Count II.  In the absence of any cases that purport to apply lex loci delicti to a Virginia Business Conspiracy claim with a breach of

21

contract predicate, the Court will apply the same reasoning it employed in Count I and take guidance from the Virginia choice of law rule for breach of contract actions for the limited purpose of establishing the choice of law for a Business Conspiracy Statute claim with a predicate breach of contract. Therefore, the law of Michigan applies to Count II; and, because Michigan law does not encompass the Virginia Business Conspiracy Statute, the motion for summary judgment on Count II will be granted.

## 5.    The Agency Issue

NICO has sought summary judgment on Count I under Michigan law on the theory that, as HDI-Gerling's agent, it is legally incapable of committing tortious interference with HDI-Gerling's contract with Ford.[6]  (See Motion, at 18-19). See also Lawsuit Fin. L.L.C. v. Curry, 683 N.W.2d 233, 241 (Mich. App. 2004) ("To maintain a cause of action for tortious interference, the plaintiff must establish that the defendant was a 'third party' to the contract rather than an agent of one of parties acting within the scope of its authority as an agent.'). However, "It has long been the policy of [Michigan] that 'when there is a disputed question of agency, if there is any testimony, either direct or inferential, tending to establish it, it becomes a

_____

[6] NICO advanced the same theory in seeking summary judgment on Count II.  There is no need to discuss that issue given the dismissal of Count II for the reasons set forth in Section 4.

22

question of fact for the jury to determine." Jackson v. Goodman, 244 N.W.2d 423, 425 (Mich. App. 1976) (quoting Miskiewicz v. Smolenski, 227 N.W. 789, 792 (Mich. 1929)).

"The test of principal and agent is the right to control." Birou v. Thompson-Brown Co., 241 N.W.2d 265, 268 (Mich. App. 1976). Because the central question of control has been vigorously disputed by the parties through alternative interpretations of the retroactive reinsurance agreement and Loss Portfolio Transfer, the Court finds that the issue of agency in this action is a question of fact that must be submitted to a jury. NICO's motion for summary judgment on Count I therefore will denied.

## CONCLUSION

For the forgoing reasons, the DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT (Docket No. 181) is granted in part and denied in part. Count I will proceed under Michigan substantive law. Count II is dismissed.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 4, 2013

23