IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FORD MOTOR COMPANY,

    Plaintiff,

v.                          Civil Action No. 3:12cv839

NATIONAL INDEMNIFY COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT (Docket No. 181), pursuant to Fed. R. Civ. P. 56, and DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION FOR LEAVE TO FILE AN AMENDED ANSWER AND AFFIRMATIVE DEFENSES (Docket No. 165). As part of its Motion for Summary Judgment, National Indemnity Company ("NICO") argues that the so-called "Noerr-Pennington" doctrine immunizes it from any liability it may otherwise have for causing the filing of an arbitration agreement. NICO's Motion for Leave to File an Amended Answer seeks to add a Noerr-Pennington doctrine affirmative defense to NICO's other affirmative defenses. For the reasons set forth herein, DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT (Docket No. 181) will be denied insofar as it seeks summary judgment based on Noerr-Pennington immunity, and DEFENDANT NATIONAL INDEMNITY COMPANY'S

MOTION FOR LEAE TO FILE AN AMENDED ANSWER AND AFFIRMATIVE DEFENSES (Docket No. 165) will be denied as futile.

### BACKGROUND

In this action, Ford Motor Company ("Ford") has asserted against NICO a claim for alleged tortious interference with contract.[1] Ford's claim arises out of NICO's conduct in stopping the payment of certain insurance claims referred to by the parties as "Non-Batch claims" under Ford's Aggregate Stop Loss Policy ("ASLP"). The facts below are presented in the light most favorable to Ford, the party opposing this motion, as the Court is required to consider them on a motion for summary judgment.

One of the ASLP policies was issued to Ford by Gerling-Konzern Allgemeine Versicherungs-Aktiengesellschaft ("Gerling"), a German insurer which, in 2007, merged with another German insurer, HDI, to from HDI-Gerling Industrie Versicherung AG ("HDI-Gerling"). (Pl. Ford Motor Co.'s Mem. of Law in Opp'n to Def. Nat'l Indem. Co.'s Mot. for Summ. J. 3, 7, Docket No. 242) (hereinafter "Ford's Opp'n"). In 2002, Gerling and Ford's other ASLP carriers established a protocol for the submission of claims by Ford to an entity called Mitigate, Inc. ("Mitigate"). (Id. at 4-6). Mr. Scott Friedman ran Mitigate and made

---

[1] Ford also asserted a claim under Virginia's Business Conspiracy statute. Va. Code § 18.2-499 and 500. That claim has been dismissed on NICO's motion for summary judgment.

recommendations to the insurers respecting payment of the Non-Batch Claims. (Id. at 5). The insurers, including Gerling and HDI-Gerling, before the intervention of NICO into the relationship, regularly paid most, but not all, of such claims once Mitigate reviewed and verified them. (Id. at 5-6).

Soon after the HDI-Gerling merger, HDI-Gerling began searching for a reinsurer that could reinsure a large portfolio of HDI-Gerling's U.S. casualty obligations, including the ASLP. (Id. at 7-8). In late 2007, NICO and HDI-Gerling entered into a reinsurance agreement, including a "Loss Transfer Portfolio," under which HDI-Gerling paid NICO a premium of $310,600,000 and NICO agreed to provide HDI-Gerling an aggregate limit of $500,000,000 in reinsurance coverage. (Id. at 8-9). That premium was treated as "float" by NICO. The float goes from NICO to its parent, Berkshire Hathaway, Inc. which invests the float and earns income from it. [2] (Id. at 10-11).

Ford alleges that, soon after entering the picture, NICO realized that the Ford policy was not sufficiently reserved and that, therefore, any float would be diminished significantly or eliminated entirely. (Id. at 12). Thus, to improve its own reserve position and to provide more float on which income could be earned, NICO decided that the Non-Batch claims submitted by

---

[2] While this is an oversimplification of the way in which float is invested and by whom, it is a sufficient description of the process for the purpose of deciding this motion.

Ford would not be paid, notwithstanding that those claims had been verified as payable by Mitigate.

In furtherance of this objective, on November 19, 2010, NICO caused HDI-Gerling to initiate arbitration against Ford. (Ford's Opp'n 14). Pursuant to the contract between Ford and HDI-Gerling, arbitration was initiated through the American Arbitration Association ("AAA"), a private arbitral organization. (Id. at 4). Statement of Ethical Principle for the American Arbitration Association, an ADR Provider Organization, Am. Arbitration Ass'n, http://www.adr.org/aaa/ faces/s/about/misssion/ethicalprinciples (last visited Aug. 22, 2013). According to Ford, it considered this arbitration demand an effective denial of the Non-Batch claims.[3] (Ford's Opp'n at 14). Ford contends that NICO did not initiate arbitration because of a legitimate dispute over the validity of the Non-Batch claims, but, rather, to "pressur[e] or frustrat[e] Ford into accepting less than full value for its legitimate Aggregate Stop Loss claims." (Complaint ¶ 39, Docket No. 1). Ford thus contends that "NICO'[s] manipulation and orchestration of the on-going insurance coverage arbitration with HDI Gerling was

---

[3] The Court will accept the statement as true for purposes of this motion, notwithstanding that Ford also claims that, as of the time the arbitration demand was filed "there were yet not verified non-batch claims for NICO to deny." (See Ford's Opp'n 18). This apparent inconsistency is ultimately immaterial to the resolution of the present motion,

tortious."   (Pl. Ford Motor Co.'s Mem. of Law in Opp'n To Nat'l Indem. Co.'s Mot. for Leave to File an Am. Answer 2, Docket No. 179).

NICO argues that its decision to initiate arbitration against Ford is protected under the Noerr-Pennington doctrine, which generally provides protection under the First Amendment for certain activities that constitute petitions to the Government.   (Def. Nat'l Indem. Co.'s Mem. of Law in Supp. of its Mot. for Summ. J. 24, Docket No. 182).   Ford, however, argues that the Noerr-Pennington doctrine provides no protection where private parties initiate arbitration through a wholly private entity such as the AAA.   (Ford's Opp'n 2).

## DISCUSSION

I.   **Motion for Summary Judgment**

A.   **Standard of Review**

Pursuant to Fed. R. Civ. P. 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The Court explained that, "[i]n such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> at 322-23 (internal quotation marks omitted).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)); <u>Seabulk Offshore, Ltd. v. Am. Home Assurance Co.</u>, 377 F.3d 408, 418 (4th Cir. 2004) (citing <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 183 (4th Cir. 2001)). The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial. See <u>Matsushita</u>, 475 U.S. at 586-87. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," disposition by summary judgment is appropriate. <u>Id.</u> at 587 (citing <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

**B.  Development of the <u>Noerr-Pennington</u> Doctrine**

"The <u>Noerr-Pennington</u> doctrine guarantees citizens their First Amendment right to petition the government for redress

6

without fear of antitrust liability." Balt. Scrap Corp. v. David J. Joseph Co., 237 F.3d 394, 398 (4th Cir. 2001) (citing United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669 (1965); E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136-39 (1961)). The doctrine thus has its genesis as a judicially-created exception to antitrust liability, allowing the association of individuals or organizations for the purpose of petitioning the government, even when the underlying purpose of the petitioning activity is to restrain trade. See Pennington, 381 U.S. at 670; Noerr, 365 U.S. at 137-38.

In Noerr, a group of truck operators and their trade association brought suit against a group of railroad operators, alleging that the railroad operators, by conspiring to engage, and actually engaging, in a publicity campaign meant to "foster the adoption and retention of law and law enforcement practices destructive of the trucking business," should by liable under the Sherman Act for illegally conspiring to monopolize the long-freight industry. Noerr, 365 U.S. at 129. The Supreme Court found that liability could not be imposed "at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." Id. at 138. In reaching this conclusion, the Supreme Court expressed its concern that a construction of the Sherman Act

that resulted in the truckers' liability "would raise important constitutional questions.   The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot . . . lightly impute to Congress an intent to invade these freedoms." Id. at 137-38.

In Pennington, the Supreme Court made clear that the antitrust liability immunity created in Noerr applied equally to situations where associations were formed for the purpose of petitioning executive branch officials.   In that case, a group of small coal mine operators brought suit against a coal miners' union alleging that the union was colluding with larger mine operators to force the smaller mine operators out of business. See Pennington, 381 U.S. at 659-60.   Part of this alleged conspiracy included the filing of petitions by the larger mine operators with the Secretary of Labor for the purpose of establishing a minimum wage for coal mine workers that would price the smaller operators out of the market.   Id. at 660. Just as in Noerr, the Supreme Court found that this petitioning activity was protected because "Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." Pennington, 381 U.S. at 670.

Since these seminal cases, application of the Noerr-Pennington doctrine has been expanded in several ways.   First, the Supreme Court has held that the Noerr-Pennington doctrine

shields parties from Sherman Act liability where the alleged concerted action in restraint of trade is the "institut[ion of] state and federal proceedings [including] rehearings and . . . reviews or appeals from agency or court decisions." Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 509 (1972); see also id. at 510 ("Certainly the right to petition extends to all departments of the Government.   The right of access to the courts is indeed but one aspect of the right of petition.").[4] The doctrine has also been extended beyond the antitrust arena to immunize petitions to the government in the context of

---

[4] In the most recent Supreme Court decision to have discussed the Noerr-Pennington doctrine, Justices Thomas and Scalia opined that they would be inclined to find that the Noerr-Pennington doctrine does not apply to the filing of a suit in federal court.   Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488, 2501 (2011) (Thomas, J., concurring) ("I seriously doubt that lawsuits are 'petitions' within the original meaning of the Petition Clause of the First Amendment.   Unreasoned statements to the contrary in this Court's prior decisions do not convince me otherwise." (citation omitted)); id. at 2503 (Scalia, J., concurring in the judgment in part and dissenting in part) ("The assertion [in California Motor Transport v. Trucking Unlimited that the filing of a lawsuit is protected under the Noerr-Pennington doctrine] was pure dictum.   The holding of California Motor Transport was that the Noerr-Pennington doctrine . . . did not apply to sham litigation . . . .   The Court has never actually held that a lawsuit is a constitutionally protected 'Petition,'" . . . .   I find the proposition that a lawsuit is a constitutionally protected 'Petition' quite doubtful." (citations omitted)).   Because the parties in Guarnieri assumed the doctrine was applicable, however, the Court did not reach a decision on the matter.   Id. at 2501 (Thomas, J., concurring); id. at 2504 (Scalia, J., concurring in the judgment in part and dissenting in part).   Because the parties here have litigated this issue under a similar assumption, this Court will likewise abstain from further assessing the point.

tortious interference claims, <u>IGEN Int'l v. Roche Diagnostics GmbH</u>, 335 F.3d 303, 310 (4th Cir. 2003).

Second, at least one court has found that the <u>Noerr-Pennington</u> doctrine shields from liability parties who initiate arbitration proceedings against other private parties. <u>See Oneida Tribe of Indians of Wis. v. Harms</u>, No. 05-C-0177, 2005 WL 2758038, at *3 (E.D. Wis. Oct. 24, 2005). The Court finds, however, that the better-reasoned view is that the <u>Noerr-Pennington</u> doctrine does not provide such immunity to private parties initiating private arbitration proceedings.

C.   **<u>Noerr-Pennington</u> Doctrine in the Context of Arbitration**

In <u>Harms</u>, a dispute arose over registration by the defendant of an Internet domain name the plaintiff claimed infringed on its trademarks. <u>Harms</u>, 2005 WL 2758038, at *2. In response to the registration, the plaintiff took three actions: it sent a letter demanding that the defendant transfer the domain name to the plaintiff, it filed an arbitration demand with the National Arbitration Forum,[5] and, after being denied relief in the arbitration hearing, it filed a complaint in federal court. <u>Id.</u> In response to the filing of the lawsuit, the defendant counterclaimed for malicious prosecution. <u>Id.</u>

---

[5] The National Arbitration Forum is a private provider of arbitration services. <u>See</u> <u>About Us</u>, Nat'l Arbitration Forum, http://www.adrforum.com/aboutus (last visited Aug. 23, 2012).

The court determined that all of the plaintiff's actions were protected under the Noerr-Pennington doctrine.  In reaching its conclusion that filing an arbitration demand was protected, the court cited Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft for the proposition that "[Noerr-Pennington] immunity has . . . been extended to arbitration for domain name disputes."  Harms, 2005 WL 2758038, at *3 (citing Eurotech, 189 F. Supp. 2d 385, 393 (E.D. Va. 2002)).  The Eurotech holding, however, was not as broad as the Harms court suggested.

In Eurotech, as in Harms, a dispute arose between the parties over the registration of an Internet domain name. Eurotech, 189 F. Supp. 2d at 387.  In that case, the defendant previously had filed a complaint with the World Intellectual Property Organization ("WIPO") alleging that the plaintiffs had infringed on its trademarks by registering the domain name.  Id. at 388.  After the defendant obtained a positive outcome in the arbitration, the plaintiffs filed a complaint in federal court asserting various claims against the defendant, including tortious interference and abuse of process claims.  Id. at 389. The defendant argued that the Noerr-Pennington doctrine immunized it from tort claims based on its filing and maintaining the arbitration proceeding.  Id.  The court agreed with the defendant.  Id. at 391.

In contending that the court, in Eurotech, should not apply the Noerr-Pennington doctrine to immunize the filing of an arbitration demand, the plaintiffs argued that, "because WIPO is a private entity, arbitration under WIPO auspices is a wholly private matter undeserving of Noerr-Pennington immunity," id. at 392, essentially the same argument Ford that advances in this case.   In rejecting this argument, the court focused on the quasi-public nature of WIPO:

> This argument is unpersuasive because WIPO is not simply and solely a private body; rather, it is a quasi-public organization that is an integral part of the United Nations system of organizations, with a mandate to administer intellectual property matters.   With its headquarters in Geneva, Switzerland, WIPO administers 23 treaties and has 178 member states, including the United States.   In this regard, it is important to note that the United States Department of Commerce participated in establishing WIPO's . . . procedures to provide "a streamlined, inexpensive administrative dispute-resolution procedure" for Internet domain names. . . . Thus, given WIPO's quasi-public nature, it is reasonable and appropriate that the Noerr-Pennington doctrine, already applicable to cover resort to the judicial process, should also apply to the initiation and maintenance of WIPO arbitration proceedings.

Id. at 392-93 (footnote omitted) (citation omitted).

In dicta, the court intimated that it might have come to the same conclusion even if WIPO was a wholly private entity. Specifically, the court stated, "It is also clear that WIPO

12

proceedings, a form of arbitration, are part of the adjudicatory process and thus warrant Noerr-Pennington immunity." Id. at 393. The court supported this proposition by noting that the Fourth Circuit has stated that "the Federal Arbitration Act, 9 U.S.C. §[§] 1-16[,] embraced 'arbitration as a less formal and more efficient means of resolving disputes than litigation' and thus was an important, indeed favored, component of the adjudicatory process." Id. at 393 n.15 (quoting Hightower v. GMRI, Inc., 272 F.3d 239, 241 (4th Cir. 2001)). Hightower, importantly, did not involve application of the Noerr-Pennington doctrine, but instead involved a motion to compel arbitration, and is thus not determinative on the issue of the applicability of the Noerr-Pennington doctrine to private arbitrations. See Hightower, 272 F.3d at 240.

The Court declines NICO's urging to convert the dicta in Eurotech into a firm legal precept. The analysis begins with the remembrance that the Noerr-Pennington doctrine is constitutional in nature, having been developed to avoid a possible conflict between the First Amendment and the Sherman Act. Noerr, 365 U.S. at 137-38. The constitutional section at issue provides that "Congress shall make no law . . . abridging the right of the people . . . to petition the Government for a redress of grievances." U.S. Constitution, Amendment I. That text is clear, and it concerns petitioning the Government for

redress of grievances.  That plain text provides the answer to the issue presented here.

The institution of private arbitration before a private organization does not implicate the First Amendment's prohibition against establishing laws that abridge "the right of the people . . . to petition the Government for a redress of grievances" for the threshold reason that the arbitration here does not petition the Government at all.  The decision in Oneida Tribe offers no support for the notion that the filing of a private arbitration petition somehow constitutes petitioning the Government.  In fact, Oneida Tribe simply assumes that to be the case.  But, that assumption runs counter to the clear language used by the Founders to establish protection for petitioning the Government, an entirely different kind of activity than instituting proceedings in a non-governmental forum.

Recognizing that rather obvious barrier to its theory, NICO takes the view that the Noerr-Pennington doctrine applies because the award made by a private arbitral form is enforceable in Federal court under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and because arbitration is a favored process.  That argument fails at the first step because the mere fact that an award is enforceable in federal court does not convert an act invoking the powers of a private arbitration forum into a petition to the Government for the redress of grievances.  And,

although private arbitration may be a "favored" part of the adjudicatory process, Congress, in passing the Federal Arbitration Act, merely enacted federal law upholding the validity of arbitration agreements, not purporting to transform private arbitration organizations into governmental entities. Application of the Noerr-Pennington doctrine to private arbitration proceedings, then, is far-removed from the constitutional foundation for the doctrine.

Morrison v. Amway Corp. (In re Morrison), No. 08-03269, 2009 WL 1856064 (Bankr. S.D. Tex. June 26, 2009), is instructive. In Morrison, the plaintiffs brought suit for, among other things, "defraud[ing] them of various contract and tort claims and obtain[ing] a fraudulent judgment against them by [the defendants' creation of] a fraudulent arbitration scheme." Id. at *3. The defendants moved to dismiss the complaint, arguing that the Noerr-Pennington doctrine immunized them from liability. Id. The court rejected this argument. Id.

While the court noted that the damages at issue arose "from the creation and implementation of the alleged fraudulent arbitration scheme, not from a petition to the arbitrator or the District Court," it ultimately rejected the defendants' argument because "Noerr-Pennington immunizes petitions to a public adjudicative body; it protects neither fraudulent conduct that

15

ultimately leads to the filing of a petition nor does it protect <u>private adjudications carried out before a privately selected arbitrator</u> rather than carried out before a governmental entity." <u>Id.</u> (emphasis added). The court further explained that:

> Indeed, a private arbitration arrangement is the antithesis of the very public rights that <u>Noerr-Pennington</u> seeks to protect. The very purpose of private arbitration is to allow parties to resolve their disputes by an agreed method rather than through the public forum of the government-operated courts. Congress has approved this private mechanism and persons entering into contracts are free to agree to arbitrate. But, the fact that Congress allows private contracts does not convert those private contracts into public fora. Parties have chosen to leave the public avenues for redress and compensation and rely on private mechanisms. It would be presumptuous of this Court to now endow such a private mechanism with the cloak of the government.

<u>Id.</u> at *6. <u>See also</u> <u>Gen. Steel Domestic Sales, LLC v. Bacheller</u>, 291 P.3d 1, 9-10 (Colo. 2012) (finding <u>Noerr-Pennington</u> doctrine inapplicable where defendants "initiated a private arbitration action [and] [a]s such, they did not petition any branch of government for a redress of grievances"). The reasoning in <u>Morrison</u> and <u>Bacheller</u> is persuasive because it is faithful both to the plain text of the First Amendment and to sound logic.

For the reasons explained above, application of the Noerr-Pennington doctrine to private arbitrations is not permissible and therefore NICO's motion for summary judgment insofar as it seeks summary judgment through the Noerr-Pennington doctrine will be denied.

## II. Motion to Amend Answer

Courts should generally allow parties to amend pleadings "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). Nevertheless, courts should deny as futile such motions when the amended pleading could not withstand a motion to dismiss. Perkins v. United States, 55 F.3d 910, 917 (4th Cir. 1995) (citing Glick v. Koenig, 766 F.2d 265, 268-69 (7th Cir. 1985)). Because the Court has found that the Noerr-Pennington doctrine is inapplicable to the claims presented here, NICO's request to add a Noerr-Pennington affirmative defense to their answer would be futile, and that motion will therefore be denied.

## CONCLUSION

For the foregoing reasons, DEFENDANT NATIONAL INDEMNITY COMPANY'S MOTION FOR SUMMARY JUDGMENT (Docket No. 181) is denied insofar as it requests summary judgment be granted through application of the Noerr-Pennington doctrine, and DEFENDANT

NATIONAL INDEMNITY COMPANY'S MOTION FOR LEAVE TO FILE AN AMENDED ANSWER AND AFFIRMATIVE DEFENSES (Docket No. 165) is denied.

It is so ORDERED.

                              /s/          REP
                         _____
                         Robert E. Payne
                         Senior United States District Judge

Richmond, Virginia
Date:  September 6, 2013