UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:12-cv-839 |
| | ) | |
| NATIONAL INDEMNITY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF FORD MOTOR COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SANCTIONS
REGARDING THE PRODUCTION OF OUTSIDE COUNSEL CASE FILES

Ford Motor Company ("Ford"), by counsel, states as follows in support of its Motion for Sanctions Regarding the Production of Outside Counsel Case Files:

**Introduction**

Ford files this motion at the Court's invitation to redress the wrongful and persistent request by NICO that Ford produce millions of pages of documents from Ford's outside counsel case files related to Ford's underlying product liability litigation.

At the beginning of this litigation, NICO's counsel took the position that NICO had caused Ford's non-batch claims to be non-paid because the claims had not been submitted. Despite undisputed evidence that the non-batch claims at issue had been submitted to HDI/Gerling's appointed auditor, Mitigate, and had been audited and verified by Mitigate pursuant to HDI/Gerling's specified protocol, NICO nevertheless sought wide-ranging discovery of the litigation files underlying the claims, including outside counsel files housed with Ford's outside law firms. Those documents were voluminous, existed only in hard copy, and were scattered at law firms throughout the country. Ford effected its discovery obligations and began

- 1 -

collecting the documents, scanning them, and reviewing them for privilege—at great expense. Ford incurred over $3.6 million in fees and costs directly attributable to these improper discovery requests.  At the same time, Ford repeatedly wrote to counsel for NICO and requested that the applicable requests be withdrawn, but NICO would not relent.  Finally, at a telephone conference on May 6, 2013, the Court ordered an end to the production of the outside counsel files.

As set forth below, NICO never needed the outside counsel files.  Despite repeatedly claims that it was still" investigating" Ford's claims, NICO's counsel conceded at oral argument on September 5, 2013 that the claims at issue are "covered" but not payable.  Moreover, NICO has now unilaterally paid Ford in excess of $11.5 million on a portion of Ford's non-batch claims, conceding that the claims were not only covered, but payable, and NICO has paid interest on those claims dating back to 2011.  Ford disagrees that this is the full amount owed, but the key point is that NICO has conceded that the claims are covered.

Because NICO never had a good faith basis for production of the outside litigation files, Ford is entitled under Rule 26(g)(3) to recover the costs and fees it incurred in responding to NICO's  requests, and respectfully requests the Court enter an order granting it that relief.

### **Statement of Facts**

On December 21, 2012, NICO served its First Requests for Production on Ford.  Exhibit 1, Defendant National Indemnity Company's First Requests for Production to Plaintiff Ford Motor Company, Dec. 21. 2012.  The First Requests for Production included the following:

> RFP No. 22:  All documents that refer to, relate to, or embody communications between or among any of Ford, Resolute, HDI-Gerling, Gerling, or any other Person regarding the Gerling Aggregate Stop Loss Policies or any Insurance Claims asserted by Ford.

RFP No. 25:  All documents that refer or relate to any claims made by Ford under the Gerling Aggregate Stop Loss Policies that are at issue in the Arbitration.

RFP No. 27:  Documents that demonstrate the history of Ford's claims under the Gerling Aggregate Stop Loss Policies that are at issue in the Arbitration.

RFP No. 32:  All documents referencing, explaining, or evidencing Ford's investigation or knowledge of any claims made under the Gerling Aggregate Stop Loss Policies.

RFP No. 34:  All documents that refer to, relate to, or embody statements made by Ford or any of its officers directors, agents or employees, or anyone speaking either apparently or in fact on its behalf, as to the merit, value, potential defects, liability, or potential liability associated with any or all Insurance Claims and/or claims under the Aggregate Stop Loss Program.

Exhibit 1.  Ford duly served its objections to NICO's requests.  *See* Exhibit 2, Plaintiff Ford Motor Company's Objections to Defendant National Indemnity Company's First Requests for Production, Jan. 4, 2013.  Ford advised NICO that its requests were extremely broad and called for the production of a vast number of documents related to the underlying case files.

On January 14, 2013, NICO served its Second Requests for Production, which included the following:

RFP No. 41:  All documents that refer or relate to each Insurance Claim identified by Ford in its response to NICO's Interrogatory No. 22.

RFP No. 42:  All documents that refer or relate to any payment or indemnification received by Ford for each Insurance Claim identified by Ford in its response to NICO's Interrogatory No. 22.

RFP No. 43:   All documents that refer or relate to any communication between Ford and any person related to each Insurance Claim identified by Ford in its response to NICO's Interrogatory No. 22.

RFP No. 44:  All documents demonstrating, listing, discussing, or in any way related to Ford's exhaustion of the self-insured

retentions applicable to the Insurance Claims identified by Ford in
its response to NICO's Interrogatory No. 22.

Exhibit 3, Defendant National Indemnity Company's Second Requests for Production to
Defendant Ford Motor Company, Jan. 14, 2013.  Ford again timely served objections.  Exhibit 4,
Plaintiff Ford Motor Company's Objections to Defendant National Indemnity Company's
Second Requests for Production, Jan 29, 2013.

The claims Ford submitted to HDI/Gerling for payment arise from product liability
actions against Ford, but only those cases in which Ford's total payments for defense costs,
settlement and/or the satisfaction of any judgment exceed $2,000,000.  Thus most of the cases at
issue involved hard-fought lawsuits between Ford and the product liability plaintiffs who sued it,
resulting in the creation of voluminous litigation files.  Most of those litigation files were in the
custody of Ford's outside law firms throughout the country, and they were largely preserved in a
hard copy, paper format.

Ford recognized that the collection, privilege review and production of its outside counsel
case files would require a massive effort, and it so advised NICO  both  orally and in writing.
Exhibit 5, February 4, 2013 Letter from S. Oostdyk to M. Levine, Feb. 4, 2013 at p.4.  NICO,
however, insisted that it needed the outside counsel files to defend this action.   In a February 6,
2013 letter, Michael Levine, writing on behalf of NICO, asserted that the non-batch outside
counsel case files constituted material that, "bears directly on the claims that are undeniably at
issue in this litigation."  Exhibit 6, Letter from M. Levine to S. Oostdyk, Feb. 6, 2013 at p.1.  In
the same letter, Mr. Levine acknowledged that the non-batch files alone constituted over 2.5
million pages of documents.

On February 7, 2013, the Court held the initial pretrial conference for this matter.  The parties raised the question of the voluminous discovery requested by NICO at that time, and the Court provided NICO with unequivocal guidance that the merits of the underlying claims would not be re-litigated in this action.  Tr. of Initial Pretrial Conf., Feb. 7, 2013 at 48:8-13.  Despite the Court's clear guidance, however, NICO insisted to Ford that it needed access to the outside counsel files.  On February 15, 2013, Mr. Levine wrote another letter in which he offered to relent on his request for the 2.5 million pages of documents, but only if Ford would agree to waive attorney/client privilege and produce Ford's internal litigation database  maintained by Ford's Office of the General Counsel.  Exhibit 7, Letter from M. Levine to S. Oostdyk Feb. 15, 2013 at p. 3.  NICO's demand that Ford waive its privilege was patently unreasonable, and thus in an effort to satisfy NICO's discovery requests, Ford continued to collect, scan, review for privilege, and produce the outside counsel case files.

As the expense  of collecting and processing the outside counsel files continued to mount, Ford sent a letter to Mr. Levine on March 29, 2013 in which it advised NICO of the high cost of production and asked NICO to confirm that it still wanted the documents produced.  Exhibit 8, Letter from S. Oostdyk to M. Levine March 29, 2013 at p.1.  Ford told NICO that there were more documents than originally anticipated and that as of that time more than 4,300 boxes of documents had been collected.  *Id*.  Ford also advises NICO that it would seek cost shifting.  *Id*.  NICO responded in another letter in which it continued to insist that the outside counsel case files were highly material and even threatened to seek a continuance of the trial date and to delay depositions based on the time it was taking to review and produce the documents.  Exhibit 9, Letter from M. Levine to S. Oostdyk, April 5, 2013 at pp. 1-2.

Ford responded on April 9, 2013 and explained to NICO in no uncertain terms that the outside counsel case files are not material.  Ford further explained that the only case files that are potentially relevant in this action are the materials that were provided to Mitigate by Ford and used in the Mitigate audits.  Those documents were made available in Dearborn, Michigan on March 7, 2013, and as of April 9, NICO had still not reviewed them.[1]  NICO still refused to relent.

Finally, in a telephone conference on May 6, 2013, the parties argued this issue and the Court ordered the production of the outside counsel case files stopped.  Exhibit 10, Tr. of Telephone Conference May 6, 2013 at 42:2-43:7.  The Court also gave Ford leave to file a motion for sanctions.  *Id*. at 35:20-23.

Despite being cautioned by the Court at the February 7, 2013 pretrial conference, and despite being advised repeatedly by Ford of the massive volume of documents and the great expense involved in collecting and producing the outside documents, NICO persisted in seeking their production.  Subsequent developments have made it even more clear that NICO never had a good faith basis for requesting the outside counsel case files.

At the motion hearing held on September 4, 2013, Jane Byrne, speaking on behalf of NICO, conceded that there was no dispute about whether Ford's non-batch claims are covered. "We agree that the non-batch claims are covered. There's no dispute about that. What we dispute is whether they're payable." Tr. of Motion Hearing, Sep. 4, 2013 at 38:18-20.  The importance of this admission cannot be overstated.  Ms. Byrne went on to discuss whether and to what extent Ford has satisfied the self-insured retentions under the ASL Policies, but she never qualified her clear admission of coverage.  After having repeatedly taken the position that Ford's claims had not been properly submitted and that NICO did not have enough information to determine

---

[1] NICO did eventually send a team to Dearborn and ultimately paid to have the files scanned.

whether the non-batch claims were covered, NICO admitted on the record that the claims were in fact covered.

On September 30, NICO unilaterally paid Ford $11,579,708.56 by wire transfer.  In a letter to Ford advising it of the payment, Mr. Lewis stated that the payment was for non-batch claims "that exceed the applicable each-and-every occurrence retention without using batch claims to exhaust Ford's aggregate retentions."  Exhibit 11, Letter from K. Lewis to D. Ames, Sep. 20, 2013.  Access to the underlying case files was unnecessary to make this calculation. Mr. Lewis's colleague, Mr. Whitley, admitted at deposition on May 9, 2013 that he could calculate this amount based on the Mitigate reports.  Exhibit 12, Tr. of Dep. of S. Whitley, May 9, 2013 at 184-6-8.

Through the course of this litigation, NICO has given various reasons why it could not pay Ford's non-batch claims.  It has now finally paid a portion of the non-batch claims at issue in this litigation, and taken together, Ms. Byrne's admission, Mr. Lewis' letter, and the $11.5 million payment to Ford all attest to the fact that NICO's repeated requests that Ford collect, scan, privilege review, and produce the outside counsel non-batch case files were never intended to help NICO determine whether Ford's non-batch claims were covered, but rather they were made for an improper purpose as contemplated by Fed. R. Civ. P. 26(g).

<u>Argument</u>

A.   **The Law is Clear that if a Party Propounds a Discovery Request for an Improper Purpose, the Other Party is Entitled to Sanctions.**

The Federal Rules of Civil Procedure permit a party to obtain documents and materials from the opposing party, as long as the document request is within the scope of discovery.  *See* Fed. R. Civ. P. 26(b); 34(a).  The courts have multiple sources of authority for regulating this discovery process.

Rule 26(g) requires that discovery requests not be "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" and that the request is proportional.  *See* Fed. R. Civ. P. 26(g)(1)(B)(ii)-(iii).  If a certification violates this rule without substantial justification, sanctions are mandatory on the attorney, the party, or both.  Fed. R. Civ. P. 26(g)(3).  "Rule 26(g) was designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." *Malautea v. Suzuki Motor Co. Inc.*, 987 F.2d 1536, 1545 (11th Cir. 1993) (citing to advisory committee notes); *Mancia v. Mayflower Textile Servs. Co.*, 253 F.R.D. 354, 358 (D.Md. 2008) ("[T]he rule aspires to eliminate one of the most prevalent of all discovery abuses: kneejerk discovery requests served without consideration of cost or burden to the responding party.").

More importantly, federal courts possess inherent powers to "levy sanctions in response to abusive litigation practices."  *Roadway Express Inc. v. Piper*, 447 U.S. 752, 765 (1980); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993).  Under the court's inherent powers, sanctions are generally imposed when a party acted in bad faith or with deliberate misconduct, when there is prejudice to the moving party, and a need for deterrence.  *See, e.g., Zaczek v. Fauquier Co.*, 764 F.Supp. 1071, 1078-79 (E.D.Va. 1991) (Payne, J.) (sanctioning party for excessive motion practice and other discovery abuses).

**B.    NICO's Conduct is Sanctionable.**

As set forth above, Ford repeatedly and very clearly warned NICO that its requests encompassed a vast number of documents that would be very expensive to produce.  Ford questioned NICO's need for the documents and asked NICO to withdraw or limit its requests. The Court similarly cautioned NICO, and ultimately halted the production.  NICO's putative need for the documents was the need to get more information about Ford's claims so it could

determine if they were covered.  The record now make clear that was not the real reason for the requests.  NICO has admitted that Ford's claims are covered and has in fact voluntarily paid a substantial portion of them.  The only conclusion Ford can reach is that NICO propounded its requests for the outside counsel non-batch case files, then later refused to withdraw or limit them, not because it had a real need for the documents, but rather to put Ford to needless costs and to tie its lawyers up in discovery.

Significantly, NICO was aware at the time it made the requests that Ford had submitted documentation to Mitigate, HDI/Gerling's appointed auditor, documentation of the underlying non-batch claims, and it had done so pursuant to the "Mitigate protocol" specified by HDI/Gerling.  NICO was also aware that Ford had supplied voluminous information to Mitigate. In a November 2008 e-mail to Kevin Lewis, Steve Whitley described the sufficiency of Ford's claims documentation:

> D) Ford Documentation
>
> In support of the overall monitoring process above, we also receive comprehensive updates and reports on a regular basis.  Typically we receive the following:
>
> -updates from Ford on individual claims where they advise developments or seek authority on individual cases above their retention or insurers involved.
> -updates and copy reports on cases coming up for discussion in conference call every two weeks.
> -quarterly detailed claims reports.
> -early assessment reports.
> -product liability reports.
> -product liability notice reports.
> -product liability trial calendar
> -status of Ford products trials
>
> I understand that some years ago there was some criticism of Ford for lack of communication and their response has been to copy almost everything to insurers despite the fact that it results in a huge volume and inevitable duplications of the same information.  The result is that anything of

> significance is reported to us at several layers and it is difficult
> evisage[sic] a situation where there is a significant claim which does not
> get noticed, referred and updates several times before payment is required.

Exhibit 13, E-mail from S. Whitley to K. Lewis, Nov. 19, 2008 (NICO464705).  NICO knew

that Mitigate had verified the claims, and it also knew that the claims were "payable."  NICO

simply had no legitimate need of the outside counsel files.

Ford is thus entitled to sanctions, and the most appropriate sanction is to require NICO to

bear the financial costs of its conduct.

**C.**     **Ford has incurred  substantial costs in complying with NICO's Frivolous Requests for Production.**

As set forth in the attached Affidavit of Anne Bentley McCray, Ford has incurred

$1,613,940.00 in fees incurred via McGuireWoods and another $2,069,381.54 in outside vendor

costs in connection with collecting and processing the outside counsel files for the non-batch

claims.  Exhibit 14, Affidavit of Anne Bentley McCray.  These amounts represent a substantial

portion of the amounts at issue in this litigation, and are grossly disproportionate to the costs

otherwise incurred in discovery.  Ford was forced to incur these expenses needlessly due to

NICO's improper conduct.

## Conclusion

Wherefore, Plaintiff Ford Motor Company respectfully requests that the Court grant it an

award of $ 3,683,321.54 in fees and costs as a sanction under Fed. R. Civ. P. 26(g)(3).

Dated: September 27, 2013

Respectfully Submitted,

_____/s/_____ _____

Scott C. Oostdyk (VSB#28512)
soostdyk@mcguirewoods.com

J. Tracy Walker (VSB#31355)
twalker@mcguirewoods.com

H. Carter Redd (VSB#34392)
hredd@mcguirewoods.com

Matthew D. Fender (VSB# 76717)
mfender@mcguirewoods.com

McGuireWoods LLP
One James Center
901 E. Cary Street
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061

*Counsel for Ford Motor Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of September, 2013, I served the foregoing via the Court's CM/ECF system which will cause a Notice of Electronic Filing (NEF) to be sent to the following counsel of record for National Indemnity Company:

<table>
<tr>
<td>
Michael S. Levine, Esq.<br>
Hunton & Williams LLP<br>
1751 Pinnacle Drive, Suite 1700<br>
McLean, Virginia  22102<br>
Tel: (703) 714-7602<br>
Fax: (703) 918-4050<br>
E-mail: mlevine@hunton.com
</td>
<td>
George P. Sibley, III<br>
Hunton & Williams LLP<br>
Riverfront Plaza, East Tower<br>
951 East Byrd Street<br>
Richmond, Virginia 23219-4074<br>
Tel: (804) 788-8262<br>
Fax: (804) 788-8218<br>
E-mail: gsibley@hunton.com
</td>
</tr>
</table>

     /s/                      
Counsel

Scott C. Oostdyk (VSB#28512)
soostdyk@mcguirewoods.com

J. Tracy Walker (VSB#31355)
twalker@mcguirewoods.com

H. Carter Redd (VSB#34392)
hredd@mcguirewoods.com

Matthew D. Fender (VSB# 76717)
mfender@mcguirewoods.com

McGuireWoods LLP
One James Center
901 E. Cary Street
Richmond, VA 23219
Tel: (804) 775-1000
Fax: (804) 775-1061

*Counsel for Ford Motor Company*

510834498v4